# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4   "AMY," "ERIKA," JANE SMITH as      )

5   next of friend for "TORI" minor, )  NO.

6   "JENNY," "JESSICA," "LILY,"        )  19CV2184 PJH

7   "SARAH," JANE DOE as court         )

8   appointed conservator for          )  Pages 1 - 267

9   "SKYLAR" and "SAVANNAH" minors,  )

10  JOHN DOE as court appointed        )  Confidential Pages:

11  conservator for "SALLY" and        )  Pages 176 - 222

12  "SIERRA" minors, "MAUREEN,"        )

13  WILLIAM L.F. DUSSAULT as           )

14  Guardian ad Litem for "VIOLET"     )

15  minor, and JANE ROE as next        )

16  friend for "PIA," AND "MYA,"       )

17             Plaintiffs,             )

               vs.                     )

18  RANDALL STEVEN CURTIS,             )

19             Defendant.              )

    _____)

20

21    REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

22                 KEVIN J. LAWS

23           Tuesday, January 26, 2021

24

25  Job No. 4417506

                                      Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     OAKLAND DIVISION

 4   "AMY," "ERIKA," JANE SMITH as      )

 5   next of friend for "TORI" minor, )  NO.

 6   "JENNY," "JESSICA," "LILY,"       )  19CV2184 PJH

 7   "SARAH," JANE DOE as court         )

 8   appointed conservator for          )

 9   "SKYLAR" and "SAVANNAH" minors,   )

10   JOHN DOE as court appointed        )

11   conservator for "SALLY" and        )

12   "SIERRA" minors, "MAUREEN,"        )

13   WILLIAM L.F. DUSSAULT as           )

14   Guardian ad Litem for "VIOLET"     )

15   minor, and JANE ROE as next        )

16   friend for "PIA," AND "MYA,"       )

17                 Plaintiffs,          )

18          vs.                         )

19   RANDALL STEVEN CURTIS,             )

20                 Defendant.           )

21   _____)

22

23   Reported by:

24   Ashala Tylor, CSR #2436, CLR, CRR, RPR

25   JOB NO. 4417506

                                          Page  2
```

1

2

3

4

5

6        Videotaped deposition of KEVIN JAY LAWS, taken via

7   virtual Zoom, commencing at 1:00 p.m. (EST) and ending

8   at 8:31 p.m., on Tuesday, January 26, 2021, before

9   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  3

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR PLAINTIFFS MAUREEN, PIA AND MYA:

 4             BY:   DEBORAH A. BIANCO, PRO HAC VICE

 5             14535 Bel-Red Road, #201

 6             Bellevue, Washington   98007

 7             (425) 747-4500

 8             deb@debbiancolaw.com

 9

10     FOR PLAINTIFFS LILY, SARAH, SKYLAR, SAVANNAH, SALLY,

11     SIERRA, AND VIOLET:

12             BY:   CAROL L. HEPBURN, PRO HAC VICE

13             200 First Avenue West, #550

14             Seattle, Washington   98119

15             (206) 957-7272

16             carol@hepburnlaw.net

17

18     FOR THE PLAINTIFFS AMY, ERIKA, TORI, JENNY, AND

19     JESSICA:

20             MARSH LAW FIRM PLLC

21             BY:   MARGARET E. MABIE, ESQ.

22             31 Hudson Yards, 11th Floor

23             New York, New York   10001

24             (315) 296-9046

25             margaretmabie@marsh.law
```

                                                    Page  4

```
 1    APPEARANCES OF COUNSEL: (continued)

 2

 3   FOR CERTAIN PLAINTIFFS:

 4         SAVAGE LAW FIRM

 5         BY:  J. WILLIAM SAVAGE, ESQ.

 6         620 SW 5th Avenue, Suite 1125

 7         Portland, Oregon  97204

 8         503.549.4691

 9         jwsavage@earthlink.net

10

11   FOR THE DEFENDANT:

12         COLEMAN & BALOGH LLP

13         BY:  ETHAN BALOGH, ESQ.

14         235 Montgomery Street, Suite 1070

15         San Francisco, California  94104

16         (415) 999-7462

17         eab@colemanbalogh.com

18

19   Also Present:

20         Alexus Ortiz, Videographer

21

22

23

24

25
```

Page 5

```
1                        I N D E X

2    WITNESS            EXAMINATION BY              PAGE

3    Kevin Laws

4                     Mr. Balogh              12, 101

5                     Ms. Hepburn                 261

6

7

8

9                      E X H I B I T S

10   NO.             DESCRIPTION                  PAGE

11   Exhibit 1   (Not marked)

12   Exhibit 2   (Not marked)

13   Exhibit 3   School Series re Violet Report by    125

14               Kevin Laws

15   Exhibit 4   Jan_Socks1 Series re Sierra by Kevin   124

16               Laws

17   Exhibit 5   Jan_Socks2 Series re Savannah report   122

18               by Kevin Laws

19   Exhibit 6   Jan_Socks3 Series re Skylar report by   123

20               Kevin Laws

21   Exhibit 7   Jan_Socks4 Series re Sally report by   124

22               Kevin Laws

23   Exhibit 8   Jenny Series re Jenny report by

24               Kevin Laws (Not marked)

25   Exhibit 9   Affidavit of Kevin J. Laws - Amy    126
```

Page 6

```
 1   E X H I B I T S (continued)

 2   NO.             DESCRIPTION                    PAGE

 3   Exhibit 10  Affidavit of Kevin J. Laws - Erika     126

 4   Exhibit 11  Affidavit of Kevin J. Laws - Jenny

 5               (Not marked)

 6   Exhibit 12  Affidavit of Kevin J. Laws - Jessica   127

 7   Exhibit 13  Affidavit of Kevin J. Laws - Tori      128

 8   Exhibit 14  Declaration of Kevin J. Laws - Lily    124

 9   Exhibit 15  Declaration of Kevin J. Laws - Mya     113

10   Exhibit 16  Declaration of Kevin J. Laws - Pia     118

11   Exhibit 17  Redacted images report with attached   236

12               images

13   Exhibit 18  Declaration of Kevin J. Laws - Sarah   128

14   Exhibit 19  Declaration of Kevin J. Laws - Savannah 122

15   Exhibit 20  Declaration of Kevin J. Laws - Sierra  123

16   Exhibit 21  Sweet Pink Sugar series re Mya Report  115

17               by Kevin Laws

18   Exhibit 22  Sweet White Sugar series re Pia Report 118

19               by Kevin Laws

20   Exhibit 23  Vicky Series re Lily Report by Kevin

21               Laws (Not marked)

22   Exhibit 24 Declaration of Kevin J. Laws - Violet   125

23   Exhibit 25 Curtis PNY attache 16GB thumb drive     233

24   Exhibit 26 Curtis San Disk2 16GB                   228

25   Exhibit 27 Curtis San Francisco Written Notes      214
```

Veritext Legal Solutions
866 299-5127

```
 1   E X H I B I T S (continued)

 2   NO.              DESCRIPTION                  PAGE

 3   Exhibit 28 Curtis Transcend 16GB Thumb Drive   234

 4   Exhibit 29 San Disk Cruzer 128 GB thumb drive  235

 5   Exhibit 30 Invoice from K&S Teaching and       136

 6              Consulting LLC, Invoice 1022

 7   Exhibit 31 Invoice from K&S Teaching and       141

 8              Consulting LLC, Invoice 1023

 9   Exhibit 32 Invoice from K&S Teaching and       143

10              Consulting LLC, Invoice 1024

11   Exhibit 33 Invoice from K&S Teaching and       144

12              Consulting LLC, Invoice 1025

13   Exhibit 34 Invoice from K&S Teaching and       145

14              Consulting LLC, Invoice 1026

15   Exhibit 35 Invoice from K&S Teaching and       146

16              Consulting LLC, Invoice 1030

17   Exhibit 36 Invoice from K&S Teaching and       146

18              Consulting LLC, Invoice 1031

19   Exhibit 37 Invoice from K&S Teaching and       147

20              Consulting LLC, Invoice 1032

21   Exhibit 38 Invoice from K&S Teaching and       147

22              Consulting LLC, Invoice 1033

23   Exhibit 39 Invoice from K&S Teaching and       147

24              Consulting LLC, Invoice 1034

25   ///
```

Veritext Legal Solutions
866 299-5127

```
1   E X H I B I T S (continued)

2   NO.              DESCRIPTION                    PAGE

3   Exhibit 40 Invoice from K&S Teaching and         148

4             Consulting LLC, Invoice 1035

5   Exhibit 41 Invoice from K&S Teaching and          98

6             Consulting LLC, Invoice 1036

7   Exhibit 42 (Not marked)

8   Exhibit 43 (Not marked)

9   Exhibit 44 (Not marked)

10  Exhibit 45 Declaration of Kevin J. Laws           14

11      (Confidential - Under separate cover)

12  Exhibit 46 Declaration of Violet's Mother

13            (Not marked)

14  Exhibit 47 Photographs                           213

15  Exhibit 48 Photographs redacted                  171

16      (Confidential - Under separate cover)

17  Exhibit 49 Photographs combined                  176

18      (Confidential - Under separate cover)

19  Exhibit 50 Handwritten notes by Kevin Laws       198

20      (Confidential - Under separate cover)

21

22

23

24

25

                                          Page  9
```

```
 1                    Tuesday, January 26, 2021

 2                       1:00 p.m. (EST)

 3                     Fairfax, Virginia

 4

 5            THE VIDEOGRAPHER:  Good afternoon.  We are        01:01

 6     going on the record at 1:00 p.m. on January 26,          01:01

 7     2021.                                                    01:01

 8            Please note that the microphones are              01:01

 9     sensitive and may pick up whispering, private            01:01

10     conversations, and cellular interference.  Please        01:01

11     turn off all cell phones or place them away from the     01:01

12     microphones, as they can interfere with the             01:01

13     deposition audio.  Audio and video recording will       01:01

14     continue to take place unless all parties agree to      01:01

15     go off the record.                                       01:01

16            This is Media Unit 1 of the video-recorded       01:01

17     deposition of Kevin J. Laws, taken by counsel for       01:01

18     defendant in the matter of, quote, "Amy" et. al.,       01:01

19     versus Randall Steven Curtis, filed in the              01:01

20     United States District Court, Northern District of      01:01

21     California, Oakland Division, Case Number               01:02

22     19 CV 2184 PJH.                                          01:02

23            This deposition is being recorded remotely       01:02

24     via Virtual Veritext Technologies with the witness      01:02

25     located in Fairfax, Virginia.                            01:02
```

                                              Page 10

| | | |
|---|---|---|
| 1 | My name is Alexus Ortiz from the firm | 01:02 |
| 2 | Veritext Legal Solutions, and I'm the videographer. | 01:02 |
| 3 | The court reporter is Ashala Tylor from the firm | 01:02 |
| 4 | Veritext Legal Solutions. | 01:02 |
| 5 | I am not related to any party in this | 01:02 |
| 6 | action nor am I financially interested in the | 01:02 |
| 7 | outcome. | 01:02 |
| 8 | Counsel and all present in the room and | 01:02 |
| 9 | everyone attending remotely will now state their | 01:02 |
| 10 | appearances and affiliations for the record.  If | 01:02 |
| 11 | there are any objections to proceeding, please state | 01:02 |
| 12 | them at the time of your appearance, beginning with | 01:02 |
| 13 | the noticing attorney. | 01:02 |
| 14 | MR. BALOGH:  Good morning everybody.  My | 01:02 |
| 15 | name is Ethan Balogh.  I represent the defendant | 01:02 |
| 16 | Randall Curtis. | 01:02 |
| 17 | MS. HEPBURN:  Carol Hepburn on behalf of | 01:02 |
| 18 | plaintiffs. | 01:03 |
| 19 | THE WITNESS:  Kevin J. Laws, witness. | 01:03 |
| 20 | MS. BIANCO:  Deborah Bianco on behalf of | 01:03 |
| 21 | plaintiffs. | 01:03 |
| 22 | MS. MABIE:  Margaret Mabie with Marsh Law | 01:03 |
| 23 | Firm on behalf of plaintiffs. | 01:03 |
| 24 | THE VIDEOGRAPHER:  Would the court | 01:03 |
| 25 | reporter swear in the witness. | 01:03 |

Page 11

| | | |
|---|---|---|
| 1 | KEVIN J. LAWS, | 01:03 |
| 2 | being first duly sworn or affirmed to testify | 01:03 |
| 3 | to the truth, the whole truth, and nothing but | 01:03 |
| 4 | the truth, was examined and testified as follows: | 01:03 |
| 5 | EXAMINATION | 01:03 |
| 6 | BY MR. BALOGH: | 01:03 |
| 7 | Q.   Good morning, Mr. Laws.  Thank you for | 01:03 |
| 8 | bearing with us on this adventure today. | 01:03 |
| 9 | A.   Thank you and good morning. | 01:03 |
| 10 | Q.   I understand you have been tendered as an | 01:03 |
| 11 | expert on child pornography; is that correct? | 01:03 |
| 12 | A.   That is correct. | 01:03 |
| 13 | Q.   Why don't we start.  You testified in | 01:03 |
| 14 | deposition at trial before; is that right? | 01:03 |
| 15 | A.   No.  I've never given a deposition.  I've | 01:03 |
| 16 | testified in court many times but never at a | 01:03 |
| 17 | deposition. | 01:04 |
| 18 | Q.   Okay.  So let me go over the ground rules | 01:04 |
| 19 | of a deposition.  They are very similar to court. | 01:04 |
| 20 | You've taken the same -- you understand | 01:04 |
| 21 | the oath that you just took is identical as far as | 01:04 |
| 22 | your obligation to tell the truth today? | 01:04 |
| 23 | A.   Yes, sir. | 01:04 |
| 24 | MS. HEPBURN:  Could I ask you to speak a | 01:04 |
| 25 | little slower.  As with our problems yesterday in | 01:04 |

Page 12

| | | |
|---|---|---|
| 1 | understanding you, I'm having those problems today, | 01:04 |
| 2 | too. | 01:04 |
| 3 | MR. BALOGH:  Okay.  I didn't understand | 01:04 |
| 4 | you had a problem yesterday, but I'll do my best to | 01:04 |
| 5 | be clear. | 01:04 |
| 6 | MS. HEPBURN:  Thank you. | 01:04 |
| 7 | BY MR. BALOGH: | 01:04 |
| 8 | Q.   So the testimony you give today is | 01:04 |
| 9 | equivalent to court testimony and the oath is the | 01:04 |
| 10 | same.  Do you understand that? | 01:04 |
| 11 | A.   I do. | 01:04 |
| 12 | Q.   And we're going to go, as I said before we | 01:04 |
| 13 | got on the record, we'll probably go -- we can go | 01:04 |
| 14 | for up to seven hours.  At least once an hour we'll | 01:04 |
| 15 | take a break.  We'll take a breaking point for -- | 01:04 |
| 16 | for you to go to the bathroom, for the court | 01:04 |
| 17 | reporter to rest her hands, as it's a challenging | 01:04 |
| 18 | job. | 01:05 |
| 19 | But if there comes a time where you would | 01:05 |
| 20 | like to take a break, you need a break, except for | 01:05 |
| 21 | during the pendency of a question, we'll finish the | 01:05 |
| 22 | answer, we can accommodate you.  All you have to do | 01:05 |
| 23 | is let us know.  Is that all right? | 01:05 |
| 24 | A.   It is.  And thank you. | 01:05 |
| 25 | Q.   Have you taken any drugs or alcohol within | 01:05 |

Page 13

```
 1    the last 24 hours that would affect your ability to      01:05
 2    give honest and accurate testimony today?                01:05
 3         A.    I have not.                                    01:05
 4         Q.    Okay.  Is there any reason why you can't       01:05
 5    fulfill your role to give honest and accurate            01:05
 6    testimony today?                                         01:05
 7         A.    No, there isn't.                               01:05
 8         Q.    Okay.  Why don't we start with foundation.     01:05
 9               You have -- one of the documents I gave        01:05
10    you is Exhibit 45.  Can you pull that up on your         01:05
11    screen?  It's the declaration you supplied in -- in      01:05
12    this matter.                                             01:05
13                         (Exhibit 45 was marked for          01:05
14                          identification and attached         01:05
15                          hereto.)                            01:05
16    BY MR. BALOGH:                                           01:05
17         Q.    Why don't I start asking you foundational     01:05
18    questions.  Where are you educated?  So where did       01:06
19    you go to high school?                                   01:06
20         A.    South Range High School --                    01:06
21         Q.    You --                                         01:06
22         A.    -- North Lima, Ohio.                           01:06
23         Q.    Would you repeat the answer?  I               01:06
24    interrupted you.  I apologize for that, especially      01:06
25    to the court reporter.  I'll try to stop that to        01:06
```

Veritext Legal Solutions
866 299-5127

```
 1    avoid crosstalk.                                        01:06
 2            Could you say that again?  Where did you        01:06
 3    graduate high school, sir?                              01:06
 4        A.    South Range High School in North Lima,        01:06
 5    Ohio.                                                   01:06
 6        Q.    And what year did you graduate?               01:06
 7        A.    1980.                                         01:06
 8        Q.    Did you go to college after that?             01:06
 9        A.    I did not.                                    01:06
10        Q.    Did you have any higher education             01:06
11    whatsoever?                                             01:06
12        A.    No.                                           01:06
13        Q.    After you graduated high school in 1980,      01:06
14    what was your first job?                                01:06
15        A.    My very first job after graduating            01:06
16    high school?                                            01:06
17        Q.    Yes.                                          01:06
18        A.    Let's see.  I have to think about that for    01:06
19    a moment.                                               01:06
20            I believe it was Burns Security, but I'm        01:06
21    not 100 percent positive.                               01:06
22        Q.    And what was your role at Burns Security?     01:06
23        A.    I worked mobile security at a limestone       01:07
24    plant.                                                  01:07
25        Q.    And was that -- would that involve            01:07
```

                                                  Page 15

| | | |
|---|---|---|
| 1 | essentially driving around monitoring the plant to | 01:07 |
| 2 | make sure there was no criminal activity on the | 01:07 |
| 3 | plant? | 01:07 |
| 4 | A.   Yes.  It was all conducted after the plant | 01:07 |
| 5 | was closed for the evening. | 01:07 |
| 6 | Q.   Okay.  So nighttime security work | 01:07 |
| 7 | essentially? | 01:07 |
| 8 | A.   Yes. | 01:07 |
| 9 | Q.   How long were you at Burns Security for? | 01:07 |
| 10 | A.   Roughly maybe a year and a half. | 01:07 |
| 11 | Q.   What did you do after that? | 01:07 |
| 12 | A.   Went into the military. | 01:07 |
| 13 | Q.   What branch of service, sir? | 01:07 |
| 14 | A.   U.S. Army. | 01:07 |
| 15 | Q.   How long were you in the United States | 01:07 |
| 16 | Army? | 01:07 |
| 17 | A.   Four years and eight months. | 01:07 |
| 18 | Q.   When did you enlist? | 01:07 |
| 19 | A.   Let's see.  I think it was April of '81. | 01:07 |
| 20 | Q.   And so you -- and you were discharged in | 01:07 |
| 21 | '85? | 01:08 |
| 22 | A.   Let's see.  80, '81 -- it was around the | 01:08 |
| 23 | end of '84.  It's been a while ago.  Sorry. | 01:08 |
| 24 | Q.   That's fine.  Thank you for your service. | 01:08 |
| 25 | A.   Thank you. | 01:08 |

Page 16

```
 1        Q.    You're very welcome.                        01:08

 2              Was it an honorable discharge, Mr. Laws?    01:08

 3        A.    Yes, it was.                                01:08

 4        Q.    Okay.  After you ended your military        01:08

 5   service, what did you do thereafter, your next --      01:08

 6        A.    My first job was at a furniture store.      01:08

 7        Q.    Where was that located?                     01:08

 8        A.    That was in Boardman, Ohio.                 01:08

 9        Q.    And how long did you -- what was your job   01:08

10   title at the furniture store?                          01:08

11        A.    I didn't have a title.  The task was        01:08

12   loading furniture.                                     01:08

13        Q.    And for how long were you a furniture       01:08

14   loader?                                                01:08

15        A.    Not long.  Probably six months or less.     01:08

16        Q.    What did you do for your next job?          01:08

17        A.    I went -- we moved to Florida and I worked  01:08

18   for Eckerd Youth Alternatives.                         01:08

19        Q.    What is Eckerd Youth Alternatives?          01:09

20        A.    It was advertised as a boys school, but in  01:09

21   reality what it was was a juvenile prison.             01:09

22        Q.    And what was your job there?                01:09

23        A.    Counselor.                                  01:09

24        Q.    And how long were you -- did you take any   01:09

25   training to become a counselor at a high school?       01:09
```

Page 17

```
 1        A.    I did not.                              01:09

 2        Q.    How long were you a counselor at        01:09

 3   (inaudible) School, High School?                   01:09

 4        A.    I'm sorry, I didn't hear that part.     01:09

 5        Q.    How long were you -- what were the ages of  01:09

 6   the children at the Eckerd Youth Academy or -- what  01:09

 7   did you say, Eckerd Youth?                          01:09

 8        A.    Eckerd Youth Alternatives.              01:09

 9        Q.    What was the age group of the people    01:09

10   that -- the boys that were housed there?           01:09

11        A.    Between -- I think the youngest was 11 to  01:09

12   17.                                                 01:09

13        Q.    And how long were you a counselor at that  01:09

14   institution?                                        01:09

15        A.    Approximately a year and a half.        01:09

16        Q.    What did you do after that?             01:09

17        A.    I took a job as a corrections officer at  01:10

18   the St. Lucie County Sheriff's Department in Fort   01:10

19   Pierce, Florida.                                    01:10

20        Q.    And how long were you there?            01:10

21        A.    About another year and a half.          01:10

22        Q.    Okay.  Did you -- what was your rank?  Was  01:10

23   it officer?                                         01:10

24        A.    Yes.  Corrections officer.              01:10

25        Q.    Did you ever get a promotion to any higher  01:10
```

Page 18

| | | |
|---|---|---|
| 1 | rank than that in your position there? | 01:10 |
| 2 | A.   No. | 01:10 |
| 3 | THE REPORTER:  I'm sorry, your question | 01:10 |
| 4 | again, Mr. Balogh. | 01:10 |
| 5 | BY MR. BALOGH: | 01:10 |
| 6 | Q.   Did you ever get promoted or (inaudible) | 01:10 |
| 7 | to management while at the corrections -- as a | 01:10 |
| 8 | correctional officer?  And I believe the answer was | 01:10 |
| 9 | no. | 01:10 |
| 10 | After that year and a half as a | 01:10 |
| 11 | correctional officer, what did you do next? | 01:10 |
| 12 | A.   Then I got a job with U.S. Customs also in | 01:10 |
| 13 | Fort Pierce, Florida. | 01:10 |
| 14 | Q.   And what was your job title at U.S. | 01:10 |
| 15 | Customs? | 01:10 |
| 16 | A.   I was a marine enforcement officer. | 01:10 |
| 17 | Q.   What does a marine enforcement officer do? | 01:10 |
| 18 | A.   Easiest way to categorize it, if you | 01:10 |
| 19 | remember Miami Vice with the speed boats. | 01:11 |
| 20 | Q.   I do. | 01:11 |
| 21 | A.   It was like that but without any action. | 01:11 |
| 22 | So we were -- we did -- we did drive the speed boats | 01:11 |
| 23 | with the police markings on them, and we were tasked | 01:11 |
| 24 | with boarding vessels that was coming from foreign. | 01:11 |
| 25 | Q.   Okay.  And how long were you a marine | 01:11 |

Page 19

```
 1    enforcement officer for the United States Customs?         01:11
 2         A.    '89 to '95.                                      01:11
 3         Q.    And what was your title if you had one?          01:11
 4         A.    Marine enforcement officer.                      01:11
 5         Q.    Okay.  What did you do -- what was your          01:11
 6    next job after you were an enforcement officer for          01:11
 7    the United States Customs?                                  01:11
 8         A.    It was still with U.S. Customs.  I just          01:11
 9    took a different position as a special agent and was        01:11
10    transferred to Yuma, Arizona.                               01:11
11         Q.    And how long were you a special agent for        01:11
12    U.S. Customs in Arizona?                                    01:11
13         A.    Well, I was a special agent the whole time       01:11
14    until I retired.  It's just the name of the agency          01:12
15    changed.                                                    01:12
16         Q.    Okay.  How long were you a U.S. Customs          01:12
17    special agent based at Yuma?                                01:12
18         A.    The Yuma was '95 to 2001.                        01:12
19         Q.    And what were the -- what kind of things         01:12
20    did you do -- withdrawn.                                    01:12
21               Did you obtain any expertise while working      01:12
22    as a U.S. Customs special agent in Yuma, Arizona?          01:12
23         A.    Yes.                                             01:12
24         Q.    What areas?                                      01:12
25         A.    Computer forensics.                              01:12
```

Page 20

```
 1        Q.   Anything else?                              01:12

 2        A.   No.                                         01:12

 3        Q.   And what was -- can you give us a sense of  01:12

 4   your -- your yearly -- your yearly tasks, your        01:12

 5   regular tasks as a United States Customs special      01:12

 6   agent when you were based in Yuma, Arizona.           01:12

 7        A.   Actually I need to go back to the previous  01:12

 8   question.  I'm sorry.                                 01:12

 9        Q.   You're welcome.                             01:12

10        A.   I was -- that was the first time that I     01:12

11   was qualified as an expert witness was in Yuma,       01:12

12   Arizona.                                              01:12

13        Q.   And that was in the area computer           01:12

14   forensics; is that right?                             01:13

15        A.   Computer forensics as it pertains to        01:13

16   online exploitation of children.                      01:13

17        Q.   And from this period of 1995 to 2001, did   01:13

18   you testify in any trial regarding child -- the       01:13

19   exploitation of children?                             01:13

20        A.   Yes, I did.                                 01:13

21        Q.   How many trials?                            01:13

22        A.   One.                                        01:13

23        Q.   What was the name of that trial?            01:13

24        A.   I -- I believe the defendant's name was     01:13

25   Jeffrey Spears.                                       01:13
```

Page 21

```
 1        Q.   Do you remember the judge who was          01:13
 2   presiding over the case?                             01:13
 3        A.   No idea.                                   01:13
 4        Q.   Okay.  And so you testified in one case    01:13
 5   during that six-year period -- is that correct,      01:13
 6   sir -- regarding that subject matter; is that right? 01:13
 7        A.   That's correct.                            01:13
 8        Q.   Is there anything you learned during your  01:13
 9   time -- or expertise required during your time as a  01:13
10   Customs special agent in Yuma, Arizona, that applies 01:13
11   to the testimony that you are offering in this case? 01:13
12        A.   That's when I -- that's when I started     01:13
13   working child exploitation cases.  So that's when I  01:14
14   started gathering my knowledge about the online      01:14
15   exploitation of children, sexual exploitation of     01:14
16   children.                                            01:14
17        Q.   Okay.  Were you an expert in that field as 01:14
18   of November 2011?                                    01:14
19        A.   Yes.                                       01:14
20        Q.   Tell us the expertise you acquired during  01:14
21   this period that makes that statement true.          01:14
22        A.   I guess it would be based on the number of 01:14
23   hours that I did computer forensics and the time     01:14
24   that I spent online.                                 01:14
25        Q.   So tell us the areas -- can you be more    01:14
```

Page 22

```
1    specific with what expertise did you get?  I'll make      01:14
2    it easy.  The first one appears to be computer            01:14
3    forensics; is that right?                                 01:14
4         A.    That's correct.                                01:14
5         Q.    Computer forensics is the field where you      01:14
6    learned how to search media using various software        01:14
7    that's normally employed by law enforcement to            01:14
8    examine a digital forensic copy of other people's         01:14
9    media in search for illicit contraband with child         01:14
10   pornography?  Is that a fair and accurate                 01:15
11   assessment?                                               01:15
12        A.    That is fair and accurate.                     01:15
13        MS. HEPBURN:  And could you please read              01:15
14   back the question, Madam Court Reporter.                  01:15
15                  (The record was read by the                01:15
16                  court reporter, as requested.)             01:15
17        MS. HEPBURN:  Thank you.                             01:15
18        MR. BALOGH:  And we got that answer.                 01:15
19        Q.   Is there anything else about computer           01:15
20   forensic expertise that we have not discussed in my      01:15
21   previous question?                                        01:15
22        A.   I mean I could go into --                       01:15
23        MS. HEPBURN:  Objection.  Vague.  Vague as          01:15
24   to time period, Counsel.                                  01:15
25
```

Page 23

```
 1   BY MR. BALOGH:                                        01:15

 2       Q.   All these questions I'm asking, sir, right   01:15

 3   now are the expertise you contend you acquired as a   01:15

 4   United States Customs special agent working out of    01:16

 5   Yuma, Arizona, from November 1995 through November    01:16

 6   2001.  Do you understand that, sir?                   01:16

 7       A.   I do.                                        01:16

 8       Q.   Okay.                                        01:16

 9       A.   And I need to clarify that.  I didn't        01:16

10   start my computer forensics until '99.               01:16

11       Q.   Okay.  So you had two years of computer      01:16

12   forensics training while based out of Yuma, correct?  01:16

13       A.   No, I had -- I had about six weeks of        01:16

14   computer training and then it was -- and then it was  01:16

15   working as a computer forensic agent after the        01:16

16   training.                                             01:16

17       Q.   Okay.  Thank you.                            01:16

18            So we had discussed what basic computer      01:16

19   forensics is on the use of commercially available     01:16

20   software to search digitally forensic copies in       01:16

21   search of contraband.  Do you remember that           01:16

22   testimony from a few moments ago?                     01:16

23       A.   I do.                                        01:16

24       Q.   Is there anything else you learned either    01:16

25   through training or in the fieldwork that expanded     01:16
```

                                              Page 24

| | | |
|---|---|---|
| 1 | your expertise in computer forensics in any way | 01:16 |
| 2 | beyond what we just discussed? | 01:16 |
| 3 | MS. HEPBURN:  While in Arizona, Counsel? | 01:17 |
| 4 | MR. BALOGH:  Yes.  And, again, Counsel, I | 01:17 |
| 5 | just said all of the questions that are in the | 01:17 |
| 6 | subject matter area and I went over with the witness | 01:17 |
| 7 | would be for this time period.  And that's how I'd | 01:17 |
| 8 | address your objection.  Now when I'm doing that | 01:17 |
| 9 | you're objecting again. | 01:17 |
| 10 | Q.   So, again, Mr. Laws, do you understand | 01:17 |
| 11 | that until I move on, that all the questions I'm | 01:17 |
| 12 | asking you now are about the time you were a | 01:17 |
| 13 | United States Customs special agent in Yuma, | 01:17 |
| 14 | Arizona.  Is that clear to you, sir? | 01:17 |
| 15 | A.   Yes, it is. | 01:17 |
| 16 | Q.   Okay.  And at such time I move to a | 01:17 |
| 17 | different time frame I'll let you know.  Do we agree | 01:17 |
| 18 | that we now understand what time I'm talking about? | 01:17 |
| 19 | A.   Yes. | 01:17 |
| 20 | Q.   Okay.  Did you remember the last question | 01:17 |
| 21 | I asked before the objection? | 01:17 |
| 22 | A.   I do.  What other training -- what other | 01:17 |
| 23 | training did I have in Yuma while I was working as a | 01:17 |
| 24 | computer forensic agent. | 01:17 |
| 25 | Q.   Or any other -- or to clarify, I'll | 01:17 |

Page 25

```
 1    restate it.                                              01:17
 2              Apart from the use of the commercially         01:17
 3    available software that's normally used by law          01:17
 4    enforcement to search digital forensic copies, did      01:17
 5    you obtain any other specialized knowledge or           01:18
 6    training in this field of computer forensics during     01:18
 7    that time period while you were in Yuma?                 01:18
 8         A.   Yes, I did go to one class put on by the       01:18
 9    FBI.                                                     01:18
10         Q.   Okay.  What was that class about?              01:18
11         A.   Dealt with child exploitation, the online     01:18
12    exploitation of children.                               01:18
13         Q.   And how long was that class for?               01:18
14         A.   I believe it was one day.                      01:18
15         Q.   And did you in that class learn anything       01:18
16    new about computer forensics in particular?             01:18
17         A.   No.                                            01:18
18         Q.   Okay.  What did you learn during that          01:18
19    class?                                                   01:18
20         A.   What they talked about, the way children       01:18
21    was being exploited online.  At that time the field     01:18
22    was relatively new, so there wasn't that much           01:18
23    information.                                             01:18
24         Q.   Okay.  Did you learn anything else from        01:18
25    that FBI meeting that you applied to this case in        01:18
```

Page 26

| | | |
|---|---|---|
| 1 | support of the opinions you've rendered in the | 01:18 |
| 2 | declarations filed in this case? | 01:18 |
| 3 | A.   No. | 01:18 |
| 4 | Q.   Okay.  Apart from that FBI class, were | 01:18 |
| 5 | there any other specialized knowledge or training | 01:19 |
| 6 | you obtained during your time as a United States | 01:19 |
| 7 | Customs special agent in Yuma, Arizona, in the field | 01:19 |
| 8 | of computer forensics? | 01:19 |
| 9 | A.   Other than what I learned on my own on the | 01:19 |
| 10 | job, no. | 01:19 |
| 11 | Q.   Okay.  And so that seems to be exhausted | 01:19 |
| 12 | there. | 01:19 |
| 13 | After you were a Customs agent in Yuma, | 01:19 |
| 14 | Arizona, you then went and you were a special agent | 01:19 |
| 15 | for U.S. Customs out of the -- out of ICE; is that | 01:19 |
| 16 | correct? | 01:19 |
| 17 | A.   Well, I took a job in Anchorage, Alaska. | 01:19 |
| 18 | At the time it was still U.S. Customs. | 01:19 |
| 19 | Q.   Did there come a time where the name | 01:19 |
| 20 | changed? | 01:19 |
| 21 | A.   It did. | 01:19 |
| 22 | Q.   And do you know when that was? | 01:19 |
| 23 | A.   Well, this takes a bit of an explanation, | 01:19 |
| 24 | because the name changed several times rather | 01:19 |
| 25 | quickly. | 01:19 |

Page  27

| | | |
|---|---|---|
| 1 | Originally after 911 they merged the | 01:19 |
| 2 | special agents from U.S. Customs, special agents | 01:20 |
| 3 | from Immigration, and they renamed it BICE, B-I-C-E, | 01:20 |
| 4 | Bureau of Immigration and Customs Enforcement. | 01:20 |
| 5 | There was some conflict with that name. | 01:20 |
| 6 | So then they quickly dropped the B off of it and | 01:20 |
| 7 | then named it to ICE.  And then several years later | 01:20 |
| 8 | there was a conflict and people didn't like the | 01:20 |
| 9 | immigration part of it, so they renamed it again to | 01:20 |
| 10 | its final name which it is now, which is Homeland | 01:20 |
| 11 | Security Investigations. | 01:20 |
| 12 | Q.   It goes by HSI; is that right? | 01:20 |
| 13 | A.   Yes. | 01:20 |
| 14 | Q.   So you left Yuma in November 2011 and you | 01:20 |
| 15 | relocated to Anchorage, Alaska; is that right? | 01:20 |
| 16 | A.   2001 I went to Anchorage. | 01:20 |
| 17 | Q.   And you were there for 11 years, more or | 01:20 |
| 18 | less? | 01:20 |
| 19 | A.   Yes. | 01:20 |
| 20 | Q.   What training -- did you get any | 01:20 |
| 21 | additional training with respect to computer | 01:20 |
| 22 | forensics while in that capacity at Anchorage, | 01:20 |
| 23 | Alaska? | 01:21 |
| 24 | A.   I -- I did. | 01:21 |
| 25 | Q.   Could you describe that training to us? | 01:21 |

Page 28

```
 1          A.   I went to advanced computer evidence        01:21
 2   recovery -- excuse me -- advanced computer evidence     01:21
 3   recovery training, also called ACERT.  And I believe    01:21
 4   there might have been one other one.                    01:21
 5          And I need to back up back to Arizona.  I        01:21
 6   do remember that before I went to my initial            01:21
 7   training, there was a DOS class that was one week       01:21
 8   long.                                                   01:21
 9          Q.   What's a DOS class?                         01:21
10          A.   Disk -- disk operating system.  So          01:21
11   before -- that was before the advent of Windows.  So    01:21
12   everything -- everything of DOS-based, so keyboard,     01:21
13   keyboard-based.                                         01:21
14          Q.   And DOS -- this DOS technology is           01:21
15   antiquated and useless in the modern world, correct?    01:21
16          A.   Well, it still exists in a rudimentary      01:21
17   fashion, but for the most part, yes.                    01:21
18          Q.   And it has zero application to this case,   01:22
19   correct?                                                01:22
20          A.   That's correct.                             01:22
21          Q.   Thank you.                                  01:22
22          So let's go back to Anchorage.  You said         01:22
23   you took the ACERT class by its acronym.  What was      01:22
24   that training?  What did that entail?                   01:22
25          A.   More -- more additional computer forensics  01:22
```

Page 29

```
 1    training, additional hardware and software to be        01:22
 2    used.                                                   01:22
 3         Q.   And would it be fair to say that training     01:22
 4    was about identifying new commercially available        01:22
 5    software that had been developed and used by law        01:22
 6    enforcement to aid in the search for contraband on      01:22
 7    suspects' electronic media?                             01:22
 8         A.   That would be a part of the class, yes.       01:22
 9         Q.   What else -- what else was I missing in my    01:22
10    description?  Can you fill out what I didn't            01:22
11    include?                                                01:22
12         A.   Yes.  There was also new -- there's always    01:22
13    new hardware coming out.  So there was always           01:22
14    discussions about what new piece of equipment was       01:22
15    coming out, something that we could use to image the    01:22
16    new equipment.  The hard drives changed along the       01:22
17    way.  So there was different -- different items         01:22
18    coming out that we would need to use for imaging.       01:23
19         Q.   Okay.  And just to make sure the record is    01:23
20    clear, hardware (inaudible) computer, the standard      01:23
21    operating procedure at least today is media             01:23
22    (inaudible)--                                           01:23
23         THE REPORTER:  I'm sorry, Counsel.  Could          01:23
24    you slow down, please, and repeat your question?        01:23
25         MS. HEPBURN:  Yes, please.                         01:23
```

Page 30

```
 1    BY MR. BALOGH:                                    01:23

 2        Q.   Standard operating procedure today is to,  01:23

 3    when addressing suspect media, is to make a digital  01:23

 4    forensic copy of it and search the digital copy, not  01:23

 5    the original, such that the original device is --     01:23

 6    remains intact for inspection or presentation in      01:23

 7    court, and the investigators don't have to worry      01:23

 8    about altering the evidence because they're           01:23

 9    searching on an exact copy, digital copy.             01:23

10             Is that an accurate statement, sir?          01:23

11        A.   That is correct.                             01:24

12        Q.   And when we were talking a few moments ago   01:24

13    about hardware, you were describing how the training  01:24

14    is identifying new commercially available hardware    01:24

15    that's been developed commercially that can aide law  01:24

16    enforcement in multiple aspects including how to      01:24

17    best, most efficiently image certain types of         01:24

18    electronic media.  Is that a fair and accurate        01:24

19    statement?                                            01:24

20        A.   Yes, among -- among other things, yes.       01:24

21        Q.   Okay.  And in addition to hardware that we   01:24

22    were discussing in this training, over time there's   01:24

23    also the software that's continually developed        01:24

24    commercially to assist in the same function of        01:24

25    searching media for contraband.  Is that a fair and   01:24
```

Page 31

1    accurate statement?                                          01:24

2         A.    That is correct.                                  01:24

3         Q.    Is there anything else you learned in the         01:24

4    ACERT training that I have not described today in            01:24

5    broad strokes?                                               01:24

6         A.    Broadly that covers it.                           01:24

7         Q.    Is there anything else that you learned --        01:24

8    withdrawn.                                                    01:24

9            You said -- we now learned about the ACERT           01:25

10   training in the 11-year period in Anchorage, Alaska.         01:25

11   Was there any other training you underwent or took           01:25

12   during that time period that relates to your                 01:25

13   expertise you assert in this case?                            01:25

14        A.    Not that I recall.                                01:25

15        Q.    All right.  And then from -- after you            01:25

16   left Anchorage, Alaska, you relocated in 2012 to             01:25

17   Fairfax, Virginia; is that correct?                          01:25

18        A.    That is correct.                                  01:25

19        Q.    And you're still a special agent at this          01:25

20   time, but now, as you described earlier, the entity          01:25

21   has been renamed a series of names and it's now the          01:25

22   Department of Homeland Security; is that correct?            01:25

23        A.    Well, that's -- that's the broad -- that's        01:25

24   the broad name, but the specific agency I worked for         01:25

25   was Homeland Security Investigations.                        01:25

                                                    Page 32

```
 1        Q.   And did you, during this final -- you were        01:25

 2   there for three years before you retired; is that           01:25

 3   correct, sir?                                               01:26

 4        A.   Approximately three years, yes.                   01:26

 5        Q.   And is there any other training you               01:26

 6   undertook during those three years that -- with             01:26

 7   respect to computer forensics?                              01:26

 8        A.   No.                                               01:26

 9        Q.   Is there any training you took during             01:26

10   that -- that time period that provides -- supports          01:26

11   the expertise that you are asserting in this case?          01:26

12        A.   No.  By that -- by that time I was giving         01:26

13   the training.                                               01:26

14        Q.   Okay.  And what would you give trainings          01:26

15   in?                                                         01:26

16        A.   Various subjects dealing with online              01:26

17   sexual exploitation of children, predominantly              01:26

18   online undercover.                                          01:26

19        Q.   And why don't you describe that in broad          01:26

20   strokes, if you would.                                      01:26

21        A.   I started work -- working online                  01:26

22   undercover I believe while I was in Anchorage,              01:26

23   Alaska, in I believe it was -- I could be wrong on          01:26

24   the date.  I think it's 2009.  No, 2000 -- I'm              01:26

25   sorry, 2001.  It was shortly after I got to                 01:27
```

Page 33

| | | |
|---|---|---|
| 1 | Anchorage. | 01:27 |
| 2 | I originally was in Yahoo chat rooms | 01:27 |
| 3 | posing as a little girl, a juvenile girl, and then I | 01:27 |
| 4 | occasionally posed as a juvenile boy. | 01:27 |
| 5 | And then eventually I switched completely | 01:27 |
| 6 | and started working as an adult, for lack of a | 01:27 |
| 7 | better term, pimping out my children, my -- my fake | 01:27 |
| 8 | children. | 01:27 |
| 9 | Q.   So essentially trolling the Internet to | 01:27 |
| 10 | identify the group in our society that would be | 01:27 |
| 11 | prone to commit an act of sexual violence against a | 01:27 |
| 12 | child and performing in an undercover role so they | 01:27 |
| 13 | would let you in essentially and identify themselves | 01:27 |
| 14 | so you could gather evidence and make an arrest? | 01:27 |
| 15 | A.   Yes, that's correct, all except for the | 01:27 |
| 16 | trolling part. | 01:28 |
| 17 | Q.   Okay.  How would you identify people that | 01:28 |
| 18 | you're pretending to be a pedophile pimping out your | 01:28 |
| 19 | children? | 01:28 |
| 20 | A.   Well, initially when Yahoo had chat rooms, | 01:28 |
| 21 | which they no longer have, they were grossly named. | 01:28 |
| 22 | And this is -- this is going to be a little crude, | 01:28 |
| 23 | so I apologize for that, but it's the way it was. | 01:28 |
| 24 | Some of the chat rooms were user made, so | 01:28 |
| 25 | some of them were called like "9-Year-Olds for | 01:28 |

Page 34

```
 1    Daddy," or, you know, "5-Year-Old Blow Jobs," or        01:28
 2    something like that.  So they were really easy to       01:28
 3    find.  So you'd just pop into one of the rooms and      01:28
 4    just sit there until somebody contacted you.            01:28
 5            Once I started working as an adult persona      01:28
 6    undercover, I was introduced to Internet Relay Chat.    01:28
 7    And a portion of those chat channels were dedicated     01:28
 8    to the sexual abuse of children.  Chat rooms named      01:28
 9    "Baby and Toddler Love," "Child Slave Sex," "Kids R     01:29
10    Us."  So it is real easy to just go in and sit there   01:29
11    and chat people -- chat with people about molesting     01:29
12    children.                                               01:29
13        Q.   Let's go back if we can, during this          01:29
14    period when you were in Alaska, did you testify in      01:29
15    any capacity with respect to child pornography          01:29
16    cases?                                                  01:29
17        A.   Many times.                                   01:29
18        Q.   Can you give us a number?                     01:29
19        A.   I would have to look at my resume, but I'm    01:29
20    guessing five, six, seven, maybe.  And not only in     01:29
21    Anchorage, but I testified once in Denver, once in     01:29
22    Seattle.                                                01:29
23        Q.   So of those five or six trials, what was      01:29
24    the subject matter of your testimony?                  01:29
25        A.   Most of it dealt with the online sexual       01:29
```

Page 35

```
 1   abuse of children.  One them -- the one in Denver      01:29
 2   was specific to the availability of child              01:29
 3   pornography on the Internet and search terms used      01:30
 4   for locating child pornography.                        01:30
 5       Q.   So let's try to break that down if we can.    01:30
 6            With respect to your testimony in those       01:30
 7   five or six cases, some of them were embodying         01:30
 8   casework where you were essentially a fact witness     01:30
 9   that you would tell to a jury which chat room you      01:30
10   were in, which pseudonym you were using, your          01:30
11   interactions with the defendants or others, and it    01:30
12   was factual testimony as opposed to expert            01:30
13   testimony.  Is that an accurate statement?            01:30
14       A.   Well, I was qualified -- I was qualified     01:30
15   as an expert witness in the case.  I don't know the   01:30
16   nuances of -- of what you're asking.                  01:30
17       Q.   Well, I'm asking for the subject matter of   01:30
18   your testimony.  So in these five or six trials, how  01:30
19   many of those trials involved you detailing the       01:30
20   conduct you took in an undercover capacity for the    01:30
21   jury to understand the facts of that, what you        01:31
22   learned from your undercover work?                    01:31
23       A.   I believe -- I believe all of them except   01:31
24   for the one in Denver.                                01:31
25       Q.   So let's put Denver on the side for now.    01:31
```

Page 36

```
 1   Let's talk about the other, let's say, five.  And      01:31
 2   so -- is that all right with you, Mr. Laws?            01:31
 3       A.   Well, there could have been -- there could    01:31
 4   have been more than -- there could have been more      01:31
 5   than five.  Like I said, I would have to look at my    01:31
 6   resume for the exact amount.                           01:31
 7       Q.   Okay.  Well, you can look at your resume.      01:31
 8   It should be attached to Exhibit 45 that you have      01:31
 9   with you.  So why don't you take out Exhibit 45.       01:31
10           Let me know when you have it.                  01:31
11           MS. HEPBURN:  I believe that was the           01:31
12   exhibit that came via email shortly before we          01:31
13   started, Counsel, that Mr. Laws did not have when we   01:31
14   started the testimony.                                 01:31
15           MR. BALOGH:  That is true.                     01:31
16       Q.   Do you have that yet, Mr. Laws?               01:31
17       A.   Just a moment.                                01:31
18       Q.   Take your time.                               01:32
19           If you don't have it, I'll share my            01:32
20   screen.  I can pop it up.                              01:32
21       A.   No, no.                                       01:32
22       Q.   Okay.  Well, let me pop it up on my screen    01:32
23   and then I'll share my screen.                         01:32
24           Share screen is here.                          01:32
25           Are you seeing this, Mr. Laws?                 01:32
```

Page 37

```
 1          A.   Yes, I am.                                  01:32

 2          Q.   Okay.  I'm going to scroll down.  I'm       01:32

 3     showing you what's been marked for identification as  01:33

 4     Exhibit 45.  It's entitled Declaration of Kevin J.    01:33

 5     Laws in Support of Plaintiffs' Motion for Summary      01:33

 6     Judgment.  Do you see the cover sheet there?          01:33

 7          A.   I do.                                        01:33

 8          Q.   Have you seen this document before?          01:33

 9          A.   I have not.  Actually, yes, I have.          01:33

10          Q.   And what is it?                              01:33

11          A.   It summarizes the forensic analysis I did    01:33

12     in the Curtis case, in this case that we're speaking   01:33

13     about now.                                             01:33

14               MS. HEPBURN:  Excuse me.                     01:33

15               Madam Court Reporter, I do not have the      01:33

16     screen share mode.  I'm not sure how to get to that.  01:33

17               THE REPORTER:  Do you want to go off the     01:33

18     record for a minute?                                   01:33

19               MR. BALOGH:  Yes, please.                    01:33

20               THE VIDEOGRAPHER:  This marks the end of     01:34

21     Media Number 1.  The time is 1:34 p.m.  We are off    01:34

22     the record.                                            01:34

23               (Off-the-record discussion.)                01:36

24               THE VIDEOGRAPHER:  This marks the            01:38

25     beginning of Media Number 2.  The time is 1:38 p.m.   01:38
```

Page 38

```
 1    We are on the record.                              01:38

 2           MR. BALOGH:  Thank you.                      01:39

 3      Q.   Mr. Laws, before we took the break, we       01:39

 4    were looking at Exhibit 45, your declaration.  Do   01:39

 5    you see it in front of you?                         01:39

 6      A.   I do.                                         01:39

 7      Q.   I'm going to scroll down now to page 16 of   01:39

 8    the document.  Do you see your signature there?     01:39

 9      A.   Yes, I do.                                    01:39

10      Q.   Okay.  And is this the declaration you        01:39

11    signed on December 14, 2020, to support plaintiffs'  01:39

12    request for summary judgment in this matter?         01:39

13      A.   It is.                                        01:39

14      Q.   I'm going to turn to Exhibit 1, which is      01:39

15    your CV; is that right?                             01:39

16      A.   Yes.                                          01:39

17      Q.   Okay.  And I'm going to turn now to the       01:39

18    end of your CV on the fourth page.  It starts        01:39

19    "Computer Related Professional Training."  Do you    01:39

20    see that?                                            01:39

21      A.   Yes.                                          01:39

22      Q.   I'm going to scroll over.  It lists all       01:39

23    the training you've had; is that correct?            01:39

24      A.   Yes.                                          01:39

25      Q.   Which of this training, if any, relates to    01:39
```

Page 39

```
1    your testimony in this case?                          01:39

2         A.   Well, all of the -- all of the computer    01:40

3    would relate because it has -- you know, this case    01:40

4    has an aspect of the computer forensics in it.        01:40

5         Q.   Okay.  And so this training relates to      01:40

6    your computer forensics testimony; is that right?     01:40

7         A.   That's correct.                             01:40

8         Q.   That is the testimony being described at    01:40

9    some length earlier today with respect to the use of  01:40

10   commercially available software and hardware to both  01:40

11   image and search electronic media for contraband.     01:40

12   Is that correct?                                       01:40

13        A.   Yes, among other things.                    01:40

14        Q.   Tell me the other things.                   01:40

15        A.   I'm sorry?                                    01:40

16        Q.   Tell me the other things, please.           01:40

17        A.   Well, there was a lot of talk about          01:40

18   upcoming software, hardware, where the program is     01:40

19   going.  A little bit of talk about the child          01:40

20   exploitation field.  There was a myriad of speakers   01:40

21   that filtered through all the trainings that I don't  01:40

22   remember.  But, you know, the training had to do      01:41

23   with computer forensics, but there was also other     01:41

24   aspects thrown in there as well.                       01:41

25        Q.   Can you describe any of the other aspects    01:41
```

Page 40

```
 1   in more detail than you just did?                    01:41

 2         A.   That I -- that I can't do just because it  01:41

 3   was so long ago.   I know -- I know there was talk    01:41

 4   about the child exploitation field and how that was   01:41

 5   changing.   That's all I can say about that.          01:41

 6         Q.   Would you agree with the proposition that  01:41

 7   if you can't remember a training, you can't use the   01:41

 8   training to help you provide expert testimony in      01:41

 9   this case?                                            01:41

10           MS. HEPBURN:   Objection to the extent that   01:41

11   misstates the testimony of the witness.               01:41

12   BY MR. BALOGH:                                        01:41

13         Q.   You may answer.                            01:41

14           MS. HEPBURN:   Go ahead.                      01:41

15           THE WITNESS:   I -- I think that's fair.      01:41

16   BY MR. BALOGH:                                        01:41

17         Q.   Okay.   Let's go -- continuing going down  01:41

18   on this -- on your resume, I'm going to turn now to   01:41

19   page 23 of your declaration.   And I'll just          01:42

20   highlight it here, pop it out for clarity where it    01:42

21   says "Expert Testimony"; is that right?               01:42

22         A.   Yes.                                       01:42

23         Q.   Okay.   So let's go -- and these are -- if 01:42

24   you look on page 23 and 24 you list one, two, three,  01:42

25   four, five, six, seven, eight, nine, ten cases        01:42
```

Page 41

```
 1    total.  Is that right?                              01:42

 2        A.   Yes.                                        01:42

 3        Q.   All right.  So let's go in order.           01:42

 4    Starting with -- let's go in chronologic order at    01:42

 5    the beginning.  The first time you testified was in  01:42

 6    a state case against Jeffrey Spears in Yuma; is that 01:42

 7    right?                                               01:42

 8        A.   That is correct.                            01:42

 9        Q.   That was about your -- was that about your  01:42

10    undercover work?                                     01:42

11        A.   No.  That was -- that was specifically      01:42

12    about the child exploitation material that I found   01:42

13    on Spears's computer.                                01:42

14        Q.   So in broad strokes, would it be fair to    01:43

15    say you -- the subject of your testimony is          01:43

16    recounting the investigative steps you took as a     01:43

17    forensic investigator to --                          01:43

18            THE REPORTER:  I'm sorry, Counsel.  The      01:43

19    last part I have, "subject of your testimony was"... 01:43

20    BY MR. BALOGH:                                       01:43

21        Q.   -- to recount for a jury the steps you      01:43

22    took as a forensic investigator to identify          01:43

23    contraband found on the media ascribed to Jeffrey    01:43

24    Spears?                                              01:43

25        A.   Yes, along with what I found during that    01:43
```

Page 42

```
 1    examination.                                        01:43
 2         Q.   And then the next time you testified was  01:43
 3    the next year in federal court against Kenneth King 01:43
 4    in Seattle; is that right?                          01:43
 5         A.   That's correct.                           01:43
 6         Q.   What was the nature of that testimony?    01:43
 7         A.   The same as it was in Spears, about       01:43
 8    computer forensics and what I found on my forensic  01:43
 9    examination.                                        01:43
10         Q.   The next time you testified was twice in  01:43
11    2005 in Anchorage.  One time, as it indicates,      01:43
12    Hansen, United States versus Christian Jon Hansen;  01:43
13    is that right?                                      01:44
14         A.   That's correct.                           01:44
15         Q.   And what was the subject of that -- what  01:44
16    was the nature of that testimony about Mr. Spears?  01:44
17         A.   That was -- that was twofold.  That's was 01:44
18    -- that's when I was started doing undercover work, 01:44
19    and I was also doing computer forensics on my own   01:44
20    cases.                                              01:44
21         Q.   Okay.  So what was the subject -- what was 01:44
22    the nature of your testimony with Mr. Hansen's case? 01:44
23    Would you be able to summarize it briefly?          01:44
24         A.   Yes.  I testified about the chat that I   01:44
25    had with Mr. Hansen as the undercover, and then     01:44
```

Page 43

```
 1    about the results of my forensic -- computer          01:44
 2    forensic exam on Mr. Hansen's media.                  01:44
 3        Q.   And would it be accurate to say that the     01:44
 4    testimony of your work as an undercover was           01:44
 5    fact-based testimony, and then your testimony about   01:44
 6    the computer forensics was as an expert regarding     01:44
 7    how you were able to locate and identify and now      01:44
 8    present evidence of the contraband you found on       01:44
 9    Hansen's media?                                       01:44
10        A.   No.  I believe at that time I was also       01:45
11    qualified as an expert in chat rooms.                 01:45
12        Q.   Okay.  So even the fact of your testimony    01:45
13    about chatting with Mr. Hansen and the investigative  01:45
14    techniques you used to convince him to talk to you    01:45
15    or have that conversation, my understanding is        01:45
16    correct that you said that was expert testimony?      01:45
17        A.   That -- that was my understanding, if I      01:45
18    remember that trial correctly.                        01:45
19        Q.   Okay.  And is it -- by phrasing it that      01:45
20    way, are you suggesting you may not remember that     01:45
21    trial correctly?                                      01:45
22        A.   Yes, I -- I know I testified as an expert    01:45
23    in chat rooms on one of them.  I don't remember if    01:45
24    it was Hansen or Hull.                                01:45
25        Q.   Okay.  Let's talk about the next case        01:45
```

Page  44

| | | |
|---|---|---|
| 1 | where you testified, was also a federal case against | 01:45 |
| 2 | Woodrow Reed Hull.  Can you describe the nature of | 01:45 |
| 3 | your testimony of that one? | 01:45 |
| 4 | A.   That -- that was the same testimony as | 01:45 |
| 5 | with Hansen.  It was also -- it was also part of the | 01:45 |
| 6 | undercover and my computer forensics. | 01:46 |
| 7 | Q.   Was there any other subject of that | 01:46 |
| 8 | testimony or expertise in that case? | 01:46 |
| 9 | A.   No. | 01:46 |
| 10 | Q.   Thank you. | 01:46 |
| 11 | Let's move forward two years later -- a | 01:46 |
| 12 | year and a half later actually, February of 2007. | 01:46 |
| 13 | You testified in a matter United States versus Bryan | 01:46 |
| 14 | Ray Denton; is that correct, sir? | 01:46 |
| 15 | A.   Yes. | 01:46 |
| 16 | Q.   Tell us about the nature of the testimony | 01:46 |
| 17 | in that case. | 01:46 |
| 18 | A.   That's the same -- same testimony as with | 01:46 |
| 19 | the previous two, with Hull and Hansen. | 01:46 |
| 20 | Q.   Okay.  Seven months later you testified in | 01:46 |
| 21 | a case named United States versus Dan Harvey.  Do | 01:46 |
| 22 | you see that? | 01:46 |
| 23 | A.   I do. | 01:46 |
| 24 | Q.   What was the nature of your testimony in | 01:46 |
| 25 | that case? | 01:46 |

Page 45

```
 1        A.    Again, the same thing.  Only on a minor    01:46
 2   part of computer forensics on this one and more of    01:46
 3   the undercover.                                       01:46
 4        Q.    Okay.  And were you the case agent in all  01:46
 5   five of these federal prosecutions we have been       01:46
 6   discussing so far?                                    01:47
 7        A.    Of the federal ones, yes.                  01:47
 8              Actually, no, I'm sorry.  King, I was not. 01:47
 9        Q.    Okay.  That's a good -- that's a good      01:47
10   clarification.                                        01:47
11              Can you tell us for the record what is a   01:47
12   case agent?  What does that mean with respect to      01:47
13   federal prosecution?                                  01:47
14        A.    The case agent is the person that's        01:47
15   directing the investigation, that's in -- that's in   01:47
16   charge of it.                                         01:47
17        Q.    All right.  Is there anything about these  01:47
18   five federal cases, any testimony on any -- as an     01:47
19   expert on any other matter than either computer       01:47
20   forensics, describing what you found and how you      01:47
21   found it, or undercover work to identify the          01:47
22   perpetrator, the defendant, was there any other       01:47
23   expertise you testified to with respect to any of     01:47
24   the prosecution you've already discussed with me?     01:47
25        A.    Like I said a moment ago, one of them --   01:47
```

                                                    Page 46

```
 1    one of them I was qualified as -- actually, it          01:47

 2    wasn't an expert witness, I'm sorry.  I need to         01:47

 3    clarify.  It was a teaching witness.  I taught about    01:48

 4    the chat rooms.                                         01:48

 5         Q.   Okay.  Which case was that?                   01:48

 6         A.   I don't remember if it was Hull or Hansen.    01:48

 7         Q.   So one of those cases is differentiated in    01:48

 8    that way, but you're not sure which, is that            01:48

 9    accurate?                                               01:48

10         A.   That is accurate.                             01:48

11         Q.   Okay.  The next time you testified, we        01:48

12    were talking about, United States versus Kenneth        01:48

13    Dean Sturm.  Do you see that?                           01:48

14         A.   I do.                                         01:48

15         Q.   It has a range of dates from October 2008     01:48

16    to June 2009.  Do you see that?                         01:48

17         A.   I do.                                         01:48

18         Q.   What does that mean?                          01:48

19         A.   I testified -- I testified two times, once    01:48

20    in October and once in June.                            01:48

21         Q.   Was the one in October a motions hearing,     01:48

22    and then June would be the trial?                       01:48

23         A.   Yes.                                          01:48

24         Q.   Okay.  Let's go to the motions hearing in     01:48

25    October 2008.  What was the nature of your              01:48
```

Page 47

| 1 | testimony? | 01:48 |
| 2 | A.   I was being -- we had a Daubert hearing, | 01:48 |
| 3 | and I was qualified as the expert witness. | 01:48 |
| 4 | Q.   And what was the nature of the expertise? | 01:49 |
| 5 | A.   The availability of child pornography on | 01:49 |
| 6 | the Internet and child pornography search terms. | 01:49 |
| 7 | Q.   And what capacity -- was the defendant | 01:49 |
| 8 | denying that child pornography was available on the | 01:49 |
| 9 | Internet? | 01:49 |
| 10 | A.   I have no idea what it was. | 01:49 |
| 11 | Q.   Okay.  But that was the nature of your | 01:49 |
| 12 | testimony in October; is that correct? | 01:49 |
| 13 | A.   That is correct. | 01:49 |
| 14 | Q.   Am I missing anything about the October | 01:49 |
| 15 | 2008 testimony that's germane? | 01:49 |
| 16 | A.   I'm sorry, I didn't hear that. | 01:49 |
| 17 | Q.   Am I missing anything about the October | 01:49 |
| 18 | 2008 testimony? | 01:49 |
| 19 | A.   No. | 01:49 |
| 20 | Q.   Okay.  How about June 2009 at the trial, | 01:49 |
| 21 | what was the nature of your testimony on that | 01:49 |
| 22 | occasion? | 01:49 |
| 23 | A.   The same testimony as I gave in October. | 01:49 |
| 24 | Q.   That -- the next time you testified was in | 01:49 |
| 25 | a military court against Damian Pederson in April | 01:49 |

Page  48

```
 1    2010; is that right?                              01:50
 2         A.   That is correct.                        01:50
 3         Q.   What was the nature of your testimony in 01:50
 4    that matter?                                      01:50
 5         A.   That would have been about my computer  01:50
 6    forensic examination of the media and about what I 01:50
 7    found on the media.                               01:50
 8         Q.   What did you find on the media?         01:50
 9         A.   Child sexual abuse material.            01:50
10         Q.   And is there anything else about that   01:50
11    testimony that is different or -- withdrawn.      01:50
12              Is there anything else about what you   01:50
13    testified to in regards to the Pedersen matter    01:50
14    regarding your expertise on any other subject?    01:50
15         A.   No.                                     01:50
16         Q.   Okay.  Let's go one page forward.  Or flip 01:50
17    back to page 23, the final two cases.             01:50
18              The first one was also a military case  01:50
19    called United States versus Moore.  Do you see that, 01:50
20    sir?                                              01:50
21         A.   Yes, I do.                              01:50
22         Q.   What was the nature of your testimony in 01:50
23    that case?                                        01:50
24         A.   The same as the previous, about my      01:50
25    computer forensic examination and the child      01:50
```

Page 49

```
 1   exploitation material that I found during my          01:50

 2   examination.                                          01:50

 3        Q.   Anything else, sir?                         01:50

 4        A.   No.                                         01:50

 5        Q.   And finally there's a case called           01:50

 6   United States versus Larson.  Your swan song case as  01:51

 7   a federal agent, you testified in February of 2015;   01:51

 8   is that right?                                         01:51

 9             MS. HEPBURN:  Object to characterization.   01:51

10             You may answer.                             01:51

11             THE WITNESS:  Actually -- actually there's  01:51

12   one in there that I'm missing.                        01:51

13   BY MR. BALOGH:                                        01:51

14        Q.   Okay.  We'll get -- we'll get to the one    01:51

15   you're missing in a second, sir.  I appreciate you    01:51

16   calling that out for us.                              01:51

17             Let's talk about the Larson case.  Do you   01:51

18   remember testifying in that case in San Jose in       01:51

19   February of 2015?                                     01:51

20        A.   I do.                                       01:51

21        Q.   What was the nature of your testimony in    01:51

22   that case?                                            01:51

23        A.   I was called out as an expert in chat       01:51

24   rooms and chatting dealing with the exploitation,     01:51

25   sexual exploitation of children.                      01:51
```

Page 50

```
 1        Q.    Anything else?                              01:51

 2        A.    No.                                         01:51

 3        Q.    Okay.  And you've identified for us that    01:51

 4   missing from your CV is another trial testimony; is    01:51

 5   that correct?                                          01:51

 6        A.    That's correct.                             01:51

 7        Q.    What year did that testimony take place?    01:51

 8        A.    I have to remember.  I think that was       01:51

 9   either -- could have been 2015.  '14 or '15.           01:52

10        Q.    Okay.  Where was the trial?                 01:52

11        A.    In Alexandria, Virginia.                    01:52

12        Q.    And what was the name of the case?          01:52

13        A.    That I'm -- I'm trying to remember it.      01:52

14             Yeah, I don't -- I don't remember the name   01:52

15   of the defendant.                                      01:52

16        Q.    Okay.  And we can make an agreement, if we  01:52

17   will, as often happens, that we're going to have the   01:52

18   day together, there may come a time on a break or      01:52

19   otherwise where your memory is spurred and you         01:52

20   remember it.  It's not an uncommon human endeavor.     01:52

21             If that does happen, feel free to say,       01:52

22   Mr. Balogh, I remember the name of that case now.      01:52

23   I'd like to put it on the record, and we'll let you    01:52

24   do so.  Can we make that agreement, sir?               01:52

25        A.    Absolutely.                                 01:52
```

Page 51

```
 1        Q.    I appreciate that.                         01:52

 2              What was the nature of your testimony in   01:52

 3    the unnamed case in Alexandria, Virginia, in 2015?   01:52

 4        A.    That one solely dealt with my undercover.  01:52

 5        Q.    So just pure agent testimony about the     01:53

 6    action taken in an undercover capacity which led to  01:53

 7    the identification and prosecution of the defendant; 01:53

 8    is that right?                                        01:53

 9        A.    That's correct.                            01:53

10        Q.    Thank you, sir.                            01:53

11              Generally -- and we've now covered all the 01:53

12    testimony and expertise designation of the subject   01:53

13    matters regarding that testimony from this list; is  01:53

14    that right?                                           01:53

15        A.    That is correct.                           01:53

16        Q.    And you've never been deposed in any other 01:53

17    case; is that right?                                  01:53

18        A.    No, this is my first deposition.           01:53

19        Q.    And you've never been designated as an     01:53

20    expert witness in any civil case; is that right?     01:53

21        A.    That's correct.                            01:53

22        Q.    Okay.  A couple of other questions and     01:53

23    then we'll take a break, if that's all right.  I'll  01:53

24    just finish with this document and it seems to be a  01:53

25    natural breaking point.                              01:53
```

Page 52

```
 1              MR. BALOGH:  With regards to this          01:53
 2    declaration, Ms. Hepburn, I've now scrolled back to  01:53
 3    the first page in Exhibit 45.  And actually I'm       01:53
 4    going to stop -- I'm going to stop sharing now        01:53
 5    because we'll get back to this document later.  I'm   01:53
 6    not finished with it.  We'll come back at another     01:53
 7    point in time.                                        01:54
 8              I'll ask some general questions.  So I'm    01:54
 9    going to stop sharing now and gather us on the        01:54
10    screen.                                               01:54
11         Q.   We were discussing your declaration.  Do   01:54
12    you remember that, Mr. Laws?                          01:54
13         A.   Yes.                                        01:54
14         Q.   Can you tell me how that was made, the     01:54
15    process?                                              01:54
16         A.   Ms. Hepburn prepared it and then I -- I    01:54
17    read it and signed it.                                01:54
18         Q.   Okay.  Did you edit it at all?             01:54
19         A.   I don't remember if I -- I'm sure I did    01:54
20    make a few edits in there.  I believe I -- one that  01:54
21    distinctly sticks out was I always use my middle     01:54
22    initial, so I added that.                             01:54
23         Q.   Apart from adding your middle initial, do  01:54
24    you remember any material changes to the document    01:54
25    that was prepared for your signature?                01:54
```

Page 53

```
 1        A.   I don't.                                01:54

 2        Q.   Okay.  When did you see that document for   01:54

 3   the first time?                                   01:54

 4        A.   I -- I don't remember.                  01:54

 5        Q.   Okay.  How far before the December 2020  01:54

 6   signing of it?  Can you give us an estimate       01:54

 7   regarding days, weeks, months?                    01:54

 8        A.    I would have to say within probably -- and  01:55

 9   this is just a guess -- maybe -- maybe a week or 10  01:55

10   days, but that's -- that's just a guess.  I honestly  01:55

11   don't know.                                       01:55

12        Q.   Can you tell us how you --              01:55

13        A.   I don't remember, rather.               01:55

14        Q.   How long did you review the documents she  01:55

15   provided to you before you executed it?          01:55

16        A.    That, I don't remember either.          01:55

17        Q.   Can you give us an estimate?  Was it    01:55

18   hours, more than a day?                           01:55

19        A.    I'm sure it was -- I'm sure it was in the  01:55

20   hours.  It wouldn't have been -- I'm sure it wasn't  01:55

21   days.                                             01:55

22        Q.    And after that review you signed it and  01:55

23   attested to its accuracy under penalty of perjury;  01:55

24   is that correct?                                  01:55

25        A.    Yes.                                    01:55
```

                                                    Page 54

```
 1        Q.   What did you do to prepare for today?        01:55

 2        A.   I -- I reread a couple of my reports, and    01:55

 3   that was it.                                           01:55

 4        Q.   Okay.  And have you -- is there any          01:55

 5   reason -- withdrawn.                                   01:55

 6             Do you stand by all the statements you       01:55

 7   made in your declaration?                              01:55

 8        A.   I do.                                         01:55

 9        Q.   There's nothing you want to correct; is      01:55

10   that correct, sir?                                     01:55

11        A.   I'm -- I'm sure if I read it over again      01:55

12   there may be something I -- I've missed.               01:56

13        Q.   As far as to missing something, would you    01:56

14   say there's anything that you believe is incorrect?    01:56

15        A.   I'm sorry, I didn't hear that.               01:56

16        Q.   Apart from missing something, do you         01:56

17   believe there's anything incorrect in it, what you     01:56

18   actually did say?                                      01:56

19        A.   I -- I don't believe.                        01:56

20        Q.   Did you -- withdrawn.                         01:56

21             The last thing I'm going to do before we     01:56

22   take a break is I'm going to ask you a couple of       01:56

23   questions.                                             01:56

24             You said you received a deposition           01:56

25   subpoena in this case; is that right?                  01:56
```

Page 55

```
 1        A.   Yes.                                    01:56
 2        Q.   And that was provided to you by          01:56
 3   plaintiffs' counsel; is that right?               01:56
 4        A.   That is correct.                         01:56
 5        Q.   And do you remember searching for        01:56
 6   documents that were responsive to that subpoena?  01:56
 7        A.   I'm sorry, I don't understand the        01:56
 8   question.                                          01:56
 9        Q.   Do you remember taking a reasonable search 01:56
10   to obtain documents that were responsive to that  01:56
11   subpoena to provide them to me?                    01:56
12        A.   I'm sorry, but can you rephrase that?    01:57
13        Q.   I absolutely can.                         01:57
14             When you got the subpoena from           01:57
15   Ms. Hepburn, what did you do?                       01:57
16        A.   I -- I read it.                           01:57
17        Q.   Did you do anything else?                 01:57
18        A.   I don't recall.                           01:57
19        Q.   Did you gather documents -- did you gather 01:57
20   documents to be given to me?                        01:57
21        A.   Yes, at one -- I don't remember if that  01:57
22   was in response to the subpoena or -- or just     01:57
23   Ms. Hepburn asking we need these documents.        01:57
24        Q.   Okay.  And so one of the things we       01:57
25   requested was all documents or other materials that 01:57
```

Page 56

```
 1    you received from plaintiffs' counsel.  Did you        01:57
 2    gather those documents to be produced to me in this    01:57
 3    case?                                                   01:57
 4         A.   Yes.                                          01:57
 5         Q.   And we also asked for all documents           01:57
 6    reflecting communication with any plaintiff or any     01:57
 7    of their representatives, including their lawyer's     01:57
 8    office.  Did you gather those documents for            01:57
 9    production to me in this case?                         01:57
10         A.   I don't remember being asked about that,     01:58
11    but I -- I do remember being asked about all the       01:58
12    documents, and I provided everything that was asked    01:58
13    for.                                                   01:58
14         Q.   Okay.  Do you remember being -- searching    01:58
15    for all documents reflecting communications you may    01:58
16    have had with law enforcement in this case?            01:58
17         A.   Yes.                                          01:58
18         Q.   Okay.  You gathered those documents for      01:58
19    us?                                                    01:58
20         A.   Yes.                                          01:58
21         Q.   And finally, there was a request for all     01:58
22    documents you considered or relied upon with respect   01:58
23    to forming your opinions as it relates to this case.   01:58
24    Do you remember searching for documents for that?      01:58
25         A.   Yes.                                          01:58
```

Page 57

| | | |
|---|---|---|
| 1 | Q.   When did you gather those documents, if | 01:58 |
| 2 | you can tell us, to the best of your recollection? | 01:58 |
| 3 | A.   To the best of my recollection, within the | 01:58 |
| 4 | last several months.  That's -- that's the best I | 01:58 |
| 5 | can -- I can answer on that. | 01:58 |
| 6 | Q.   Okay.  Did you do anything in the last two | 01:58 |
| 7 | weeks? | 01:58 |
| 8 | A.   No. | 01:58 |
| 9 | Q.   So in the last two weeks you've not | 01:58 |
| 10 | undergone a search for any documents that are | 01:59 |
| 11 | responsive to the subpoena we served upon you? | 01:59 |
| 12 | A.   No, to the best of my knowledge. | 01:59 |
| 13 | Q.   Okay.  And when you were talking to -- I | 01:59 |
| 14 | know you went to -- you came to San Francisco where | 01:59 |
| 15 | I am to do a forensic review.  It wasn't John Kawai. | 01:59 |
| 16 | I think it was with Popper, you met with Special | 01:59 |
| 17 | Agent Popper.  Do you remember that? | 01:59 |
| 18 | A.   Yes. | 01:59 |
| 19 | THE REPORTER:  I'm sorry -- | 01:59 |
| 20 | BY MR. BALOGH: | 01:59 |
| 21 | Q.   Over the course of -- | 01:59 |
| 22 | THE REPORTER:  I'm sorry, "You met | 01:59 |
| 23 | with"...  I didn't understand the name. | 01:59 |
| 24 | MR. BALOGH:  Special Agent Popper, | 01:59 |
| 25 | P-O-P-P-E-R. | 01:59 |

Page 58

```
 1              Thank you, Miss Court Reporter.              01:59

 2        Q.   Did you communicate in writing with Agent     01:59

 3   Popper regarding your request in this case?            01:59

 4        A.   I'm sorry, I missed after "communicating."   01:59

 5        Q.   Did you communicate by writing, emails,       01:59

 6   texts or otherwise communicate in writing with Agent   01:59

 7   Popper regarding your investigation and tasks in       01:59

 8   this case?                                              01:59

 9        A.   I don't believe so.                           01:59

10        Q.   Okay.  Did you communicate in writing with   01:59

11   any other law enforcement personnel as relates with    01:59

12   respect to the work you did in this case?              02:00

13        A.   I -- I sent out a couple emails about        02:00

14   having -- having people call me back, like points of   02:00

15   contact.                                                02:00

16        Q.   Okay.  Anything else?                         02:00

17        A.   No.                                           02:00

18             MS. HEPBURN:  Counsel, I'm going to           02:00

19   interject for the record.                               02:00

20             Our agreement between you and I that any     02:00

21   emails about logistics about getting together or       02:00

22   sending this or that that don't convey any facts or    02:00

23   assumptions upon which the witness based his work in   02:00

24   this case, that we would not need to provide those,    02:00

25   and I have not asked for you to provide those, and     02:00
```

Page 59

```
 1    we agreed that we would not be providing those to       02:00
 2    you.  Is that correct?                                  02:00
 3              MR. BALOGH:  Yeah.  But I still get to         02:00
 4    inquire what exists in documents, because there         02:00
 5    might have been substantive documents that if I         02:00
 6    don't ask without being interrupted I can't find        02:00
 7    that out.  So I wasn't -- these are questions           02:00
 8    designed to get information, are there substantive      02:00
 9    communications.                                         02:00
10              So I appreciate your comments, but I'm        02:00
11    still entitled to inquire whether other documents       02:00
12    exist to determine whether they have been provided      02:01
13    or not.                                                 02:01
14              Would you agree with that?                    02:01
15              MS. HEPBURN:  So, Mr. Laws, you should        02:01
16    answer with regard to the existence of emails, or       02:01
17    whatever, that say will you be at X point at X time     02:01
18    or something like that, you know, not logistics, not   02:01
19    things that -- but we had an agreement that those      02:01
20    would not need to be produced.                          02:01
21              MR. BALOGH:  I'm just asking questions        02:01
22    that I'm entitled to ask.  So I'd appreciate not        02:01
23    being interrupted by your interpretation of what I'm   02:01
24    going after.  I'm just asking factual questions.        02:01
25              Did you have subsequent communications was   02:01
```

Page 60

```
 1    the question.  It's a legitimate question.  I don't      02:01
 2    appreciate the coaching of the witness because you        02:01
 3    don't like the question, and I respectfully ask that      02:01
 4    you don't do that again.                                  02:01
 5            MS. HEPBURN:  Well, as you did yesterday,          02:01
 6    Counsel, I will protect the record and I will put on      02:01
 7    the record those things which may be outside the          02:01
 8    record which need to clarify what is going on today.      02:01
 9    Thank you.                                                02:01
10    BY MR. BALOGH:                                            02:01
11        Q.   Did you have any communications with             02:02
12    plaintiffs' counsel regarding the substance -- in         02:02
13    writing regarding the substance of your testimony?        02:02
14        A.   No.                                              02:02
15        Q.   And you're sure of that?                         02:02
16        A.   I'm sorry, but can you ask the question          02:02
17    again?  Just a little bit louder.                         02:02
18        Q.   Are you sure of your -- you just answered        02:02
19    that you did not have substantive conversations in        02:02
20    writing with Carol Hepburn regarding the subject          02:02
21    matter of your testimony in this case.                    02:02
22        A.   Did we -- did we talk about my testimony?        02:02
23    Yes.                                                      02:02
24        Q.   No.  Did you have substantive                    02:02
25    communications in writing -- withdrawn.                   02:02
```

Page 61

```
 1            Did Carol Hepburn write you and provide      02:02

 2    directions in writing about what she wanted you to   02:02

 3    do?                                                  02:02

 4        A.    Absolutely not.                            02:02

 5        Q.    Absolutely?  You're sure of that           02:02

 6    testimony?                                           02:02

 7        A.    Positive.                                  02:02

 8        Q.    Good.  We'll get back to that in a little  02:02

 9    bit.                                                 02:02

10            This is a great breaking point for me.       02:02

11    It's after 2 -- 2 after 11:00.  So it's 2 after      02:02

12    2:00.  We've been going about an hour by my clock or 02:02

13    a little less.  But if this is a good time to break  02:03

14    for you, Ms. Hepburn, I would suggest taking five or 02:03

15    ten as you'd like.                                   02:03

16            MS. HEPBURN:  Ten is fine.                   02:03

17            MR. BALOGH:  Fine.  We can go off the        02:03

18    record, Ms. Tylor.                                   02:03

19            Ms. Tylor or Ms. Ortiz, can we go off the    02:03

20    record, please?                                      02:03

21            THE REPORTER:  Alexus, are you there?        02:03

22            THE VIDEOGRAPHER:  Do I need to go off the   02:03

23    record?                                              02:03

24            THE REPORTER:  Yes, please.                  02:03

25            THE VIDEOGRAPHER:  This marks the end of     02:03
```

Page 62

```
 1   Media Number 2.  The time is 2:03 p.m.  We are off        02:03
 2   the record.                                               02:04
 3           MR. BALOGH:  We'll be back in 10,                 02:04
 4   everybody.  Thank you very much.                          02:04
 5           THE VIDEOGRAPHER:  All right.  See                02:04
 6   everyone in 10.  Thank you.                               02:04
 7           (Recess.)                                         02:05
 8           (Off record:  2:03 p.m.)                          02:05
 9           (On record:  2:17 p.m.)                           02:05
10           THE VIDEOGRAPHER:  This marks the                 02:17
11   beginning of Media Number 3.  The time is 2:17 p.m.       02:17
12   We are on the record.                                     02:17
13   BY MR. BALOGH:                                            02:17
14       Q.   Good morning again, Mr. Laws.                    02:17
15       A.   Good morning.                                    02:17
16       Q.   I'm going to go back -- I'm going to go          02:17
17   forward in time now.  I want to talk about your           02:17
18   retention in this case.  Is that all right, sir?          02:17
19       A.   Yes, but if I could clarify.  You asked me       02:17
20   about the name, if I remembered it from the last          02:17
21   trial.                                                    02:17
22       Q.   Yes, sir.                                        02:17
23       A.   I quickly -- quickly checked.  I couldn't        02:17
24   find my list of -- list of cases, so I don't              02:18
25   remember the person's last name.                          02:18
```

Page 63

| | | |
|---|---|---|
| 1 | Q.  Okay.  When were you retained by | 02:18 |
| 2 | plaintiffs' counsel in this case? | 02:18 |
| 3 | A.  For this specific case or -- or when was | 02:18 |
| 4 | the first time that I was retained? | 02:18 |
| 5 | Q.  Well, let's start with that.  When was the | 02:18 |
| 6 | first time you were retained? | 02:18 |
| 7 | A.  I believe it was in April when I started | 02:18 |
| 8 | working for the -- for the group of attorneys. | 02:18 |
| 9 | Q.  April of what year? | 02:18 |
| 10 | A.  April of 2019.  Yes, because it would | 02:18 |
| 11 | be -- it would be coming up on two years. | 02:18 |
| 12 | Q.  And tell me the nature of that retention | 02:18 |
| 13 | that occurred in April of 2019. | 02:18 |
| 14 | A.  I received a call from a friend of mine | 02:18 |
| 15 | who asked me if I was interested in working for some | 02:18 |
| 16 | attorneys.  And he in turn got a call from another | 02:18 |
| 17 | agent who in turn had talked to Ms. Hepburn. | 02:19 |
| 18 | Q.  Okay.  What were the names -- what were | 02:19 |
| 19 | the names of these people? | 02:19 |
| 20 | A.  So -- so do you want me to recount the | 02:19 |
| 21 | whole story? | 02:19 |
| 22 | Q.  Yeah, tell me the story. | 02:19 |
| 23 | A.  Okay.  So I had -- I had retired.  And | 02:19 |
| 24 | then one of my -- one of my -- a good friend of mine | 02:19 |
| 25 | called, Agent Cole -- and asked me if he could give | 02:19 |

Page 64

```
 1    my information to Agent Finley because Agent Finley      02:19

 2    had talked to Ms. Hepburn about finding an agent who     02:19

 3    was retired who had worked in the field of child        02:19

 4    exploitation, computer forensics, and who had           02:19

 5    testified in court.                                     02:19

 6             So I told Jim it was okay to give Agent        02:19

 7    Finley my contact information, who in turn gave it      02:19

 8    to Ms. Hepburn.  And then they -- I believe it was a    02:19

 9    conference call between Ms. Hepburn and Mr. Marsh.      02:20

10        Q.   Okay.  And Agent Finley, was he an active      02:20

11    agent when he was soliciting your participation in      02:20

12    this case?                                              02:20

13        A.   He wasn't -- no, he wasn't asking about        02:20

14    this case.  He was just asking in general if I          02:20

15    wanted to work for a group of attorneys.                02:20

16        Q.   And did he -- was an active agent at the       02:20

17    time?                                                   02:20

18        A.   He's -- he was and he is still.               02:20

19        Q.   And what is his department?  Is he at          02:20

20    Homeland Security Investigations?                       02:20

21        A.   Yes.                                           02:20

22        Q.   And did you know Agent Finley before that      02:20

23    contact?                                                02:20

24        A.   Yes, I had met him several times before.       02:20

25        Q.   You said he had reached out to your            02:20
```

Page 65

| 1 | friend, I think you said his name was Jim Foley? | 02:20 |
| 2 | A.   Cole, Cole. | 02:20 |
| 3 | Q.   Oh, how do I spell that, C-O-L-E, sir? | 02:20 |
| 4 | A.   That's correct. | 02:20 |
| 5 | Q.   And so Agent Finley called Jim Cole in | 02:20 |
| 6 | search of identifying a retired agent who might be | 02:20 |
| 7 | of assistance to plaintiffs in this case.  Is that | 02:20 |
| 8 | an accurate summary? | 02:21 |
| 9 | A.   No.  Specifically an agent who is retired | 02:21 |
| 10 | who had worked in child exploitation and who also | 02:21 |
| 11 | had court experience. | 02:21 |
| 12 | Q.   Okay.  And when you had that initial call | 02:21 |
| 13 | with Ms. Hepburn and Mr. Marsh, what was the scope | 02:21 |
| 14 | of work that you understood you were being retained | 02:21 |
| 15 | to perform? | 02:21 |
| 16 | A.   There had been -- there was a -- a | 02:21 |
| 17 | relatively new law that was just passed, the Amy, | 02:21 |
| 18 | Vicky, Andy Act, and they were in search of someone | 02:21 |
| 19 | that had computer skills, namely computer forensics | 02:21 |
| 20 | and in the field of child exploitation, to go out to | 02:21 |
| 21 | various locations and search for images of their | 02:21 |
| 22 | clients on suspects' media.  And that's a broad | 02:21 |
| 23 | generalization of the conversation. | 02:21 |
| 24 | Q.   Okay.  And did you enter a retainer | 02:21 |
| 25 | agreement with either or both law firms at the time? | 02:21 |

Page 66

```
 1        A.   No.  I -- well, I agreed to work with      02:22

 2   them, but I've never signed a retainer agreement.    02:22

 3        Q.   Is there a reason for that?                02:22

 4        A.   No.                                        02:22

 5        Q.   Okay.  So it's just an oral agreement you  02:22

 6   have with the law firms regarding your activities?   02:22

 7   Is that fair to say?                                 02:22

 8        A.   Yes.                                        02:22

 9        Q.   Okay.  Regarding -- in the April 29        02:22

10   meeting you were recounting to us, did you enter an  02:22

11   agreement that day with the attorneys?               02:22

12        A.   Well, I don't know if it's specifically    02:22

13   that day but within -- within a number of days.  I   02:22

14   believe I asked a couple days to think about it.     02:22

15        Q.   Okay.  And what rate did you quote them     02:22

16   for your time?                                        02:22

17        A.   At that time I didn't.  It was probably a   02:22

18   week or so later when I -- when I came up with a      02:22

19   cost sheet and sent it to them.                       02:22

20        Q.   Okay.  And so you sent them a cost sheet.   02:22

21   What was on the cost sheet?  I don't believe I've     02:22

22   seen the cost sheet.                                  02:23

23        A.   I actually have it right here.  It was --   02:23

24   it was -- if I may.                                   02:23

25        Q.   You may.                                    02:23
```

Page 67

```
1        A.   I just have it -- it's a proposed fee          02:23
2   schedule, and it lists my hourly rate at home,           02:23
3   on-site work, report preparation, local travel, air      02:23
4   travel, court preparation, court testimony.              02:23
5        Q.   And what are the rates for each of those        02:23
6   activities, sir?                                          02:23
7        A.   Hourly at home work rate, 195 per hour,         02:23
8   not to -- excuse me -- not to exceed 1,500 per day;      02:23
9   on-site work rate, 195 per hour, minimum of three        02:23
10  hours, plus per diem if away from home longer than       02:23
11  four hours, not to exceed 1,500 per day; report          02:23
12  preparation, 780 flat rate; local travel, $195 per       02:23
13  hour, minimum of two hours, not to exceed 780 per        02:24
14  day plus per diem if away from home longer than four     02:24
15  hours, government per diem rate; air travel, 975 per     02:24
16  travel day regardless of travel time, plus per diem,     02:24
17  airfare, additional travel costs, meals, lodging,        02:24
18  rental car, et cetera; court preparation, 195 per        02:24
19  hour, minimum -- minimum of three hours, plus            02:24
20  per diem if away from home longer than four hours,       02:24
21  including meals and lodging; court testimony             02:24
22  including wait time, 2,500 per day, plus per diem if     02:24
23  away from home longer than four hours, including         02:24
24  meals and lodging.  Applies even if my testimony is      02:24
25  not needed, court is postponed, or other unforeseen      02:24
```

Page 68

```
 1    circumstances.                                        02:25

 2         Q.   Okay.  And is -- can I -- would            02:25

 3    Ms. Hepburn run me a copy of that cost sheet?  I     02:25

 4    don't believe that was in the production.  I could  02:25

 5    be wrong, but I didn't see that.  I don't recollect. 02:25

 6              MS. HEPBURN:  I had thought we did.  No    02:25

 7    problem providing it to you.                         02:25

 8    BY MR. BALOGH:                                       02:25

 9         Q.   Can I ask you -- so, Mr. Laws, so your     02:25

10    rate per hour, the highest rate I heard quoted was   02:25

11    195 an hour; is that right?                          02:25

12         A.   Well, the highest rate would be for court  02:25

13    testimony, would be 2,500 per day.                   02:25

14         Q.   When you're doing hourly rates, it's --    02:25

15    the highest rate you quoted Ms. Hepburn was $195 an  02:25

16    hour?                                                02:25

17         A.   That's correct.                            02:25

18         Q.   Why did you charge Mr. Curtis $300 an hour 02:25

19    for your testimony today?                            02:25

20         A.    Well, this -- this counts as court.  So   02:25

21    2,500 per day, divide that -- divide 8 by 2500, is,  02:25

22    roughly, a little over 300 -- $300 an hour.          02:25

23         Q.   Okay.  So you're considering this court    02:26

24    testimony?  That's how you arrived at that number?   02:26

25         A.    Absolutely.                               02:26
```

                                                    Page 69

```
 1        Q.   And did you maintain -- did you maintain      02:26
 2   time sheets with respect to your work in this case?     02:26
 3        A.   No.                                           02:26
 4        Q.   So if you are billing them by the hour for    02:26
 5   at-home work or on-site work and these rates apply,     02:26
 6   how do you bill them if you are not maintaining time    02:26
 7   sheets?                                                 02:26
 8        A.   Well, most of the -- most of the work I --    02:26
 9   or a good portion of the random time I don't -- I       02:26
10   don't bill for.  I mean a random email here and         02:26
11   there or a phone call, I don't -- I don't keep track    02:26
12   of precise hours.                                       02:26
13             If I'm on-site, that's easy because I         02:26
14   haven't -- I haven't did any local -- well, I did       02:26
15   one local work here, but the rest of it has been        02:26
16   travel.  So that's -- that's going to be a flat rate    02:26
17   because I'm working all day.                            02:26
18        Q.   Okay.  But you did -- as I understood it      02:26
19   in this case, you also did at-home work with respect    02:26
20   to a drive prepared for you by Agent Popper that        02:27
21   contains sanitized images; that after your trip to      02:27
22   San Francisco you compared your notes and               02:27
23   information and the child identification to a drive     02:27
24   that was at your home and you conducted the work at     02:27
25   your home.  Is that understanding correct?              02:27
```

Page 70

| | | |
|---|---|---|
| 1 | A.   No, that is completely inaccurate. | 02:27 |
| 2 | Q.   Okay.  We'll get to it later to clarify | 02:27 |
| 3 | where my interpretation went off. | 02:27 |
| 4 | MS. HEPBURN:  Again, can you speak up a | 02:27 |
| 5 | little bit?  When you look down your words all run | 02:27 |
| 6 | together. | 02:27 |
| 7 | I see the court reporter is nodding. | 02:27 |
| 8 | MR. BALOGH:  Got it. | 02:27 |
| 9 | Q.   Let me ask you this.  So in April 2019, | 02:27 |
| 10 | were you retained to do anything specific with | 02:27 |
| 11 | respect to this case against Mr. Curtis? | 02:27 |
| 12 | A.   No. | 02:27 |
| 13 | Q.   Okay.  It was generally you being engaged | 02:27 |
| 14 | to do examinations with respect to unidentified | 02:27 |
| 15 | cases where the employers wanted you to go to law | 02:28 |
| 16 | enforcement point of contacts and do reviews of | 02:28 |
| 17 | materials seized in criminal cases to determine | 02:28 |
| 18 | whether or not you could locate contraband of | 02:28 |
| 19 | plaintiffs in those cases for the lawyers to | 02:28 |
| 20 | understand what you found; is that -- | 02:28 |
| 21 | MS. HEPBURN:  Objection to the extent | 02:28 |
| 22 | misstates the testimony. | 02:28 |
| 23 | BY MR. BALOGH: | 02:28 |
| 24 | Q.   Is that accurate, sir? | 02:28 |
| 25 | A.   Well, I was going out to the sites to look | 02:28 |

Page 71

1    for images of the various firm's clients, whether          02:28
2    they're child pornography or not.                          02:28
3        Q.   And it was multiple cases, it wasn't just         02:28
4    Mr. Curtis; is that correct?                               02:28
5             MS. HEPBURN:   What is -- could you repeat         02:28
6    that?                                                      02:28
7    BY MR. BALOGH:                                             02:28
8        Q.   It just wasn't Mr. Curtis's case; it             02:28
9    related to other cases going on for plaintiffs'            02:28
10   counsel?                                                   02:28
11            MS. HEPBURN:   Thank you.                          02:28
12            THE WITNESS:   In other words, have I did         02:28
13   it on other cases?                                         02:28
14   BY MR. BALOGH:                                             02:28
15       Q.   I'm trying to find out in April '19 what         02:28
16   the scope of work you were understanding you were          02:28
17   going to do.  Was it just Mr. Curtis's case or was         02:29
18   it, generally, we have these cases and we're going         02:29
19   to need you to go to various locations to identify         02:29
20   contraband that we can -- with respect to multiple         02:29
21   cases?                                                     02:29
22       A.   In April it was just the general                 02:29
23   discussion about multiple cases.                           02:29
24       Q.   Okay.  And since that time have you              02:29
25   engaged in that work for multiple cases for                02:29

                                              Page 72

```
 1   plaintiffs' counsel?                                02:29

 2       A.   Yes.                                        02:29

 3       Q.   How many cases?                             02:29

 4       A.   I believe this is the -- I believe this is  02:29

 5   only the second -- yes, second one.  So I've done    02:29

 6   three.                                               02:29

 7       Q.   Okay.  What was the first one?              02:29

 8       A.   First one was in Las Vegas, and I don't     02:29

 9   remember the -- the defendant's name.                02:29

10            Oh, I do remember his name, but I can't     02:29

11   pronounce it.  It was a really long last name;       02:29

12   something unusual.                                   02:29

13       Q.   Can you give us your best approximation of  02:29

14   this long, unusual name?                             02:29

15       A.   I think it was Futche -- Futchener.         02:30

16       Q.   Can you spell that to the best of your      02:30

17   ability?  And we won't hold you to it, obviously,    02:30

18   and it seems challenging.                            02:30

19       A.   This is going to be a complete guess.  I    02:30

20   believe F-U -- what was it? -- F-U-T-C-H-E-N-E-R?     02:30

21   I'm sure that's completely wrong, but it's --        02:30

22       Q.   I know the case of which you speak.  We'll  02:30

23   get the spelling later.                              02:30

24            What was the second case that you assisted  02:30

25   with?                                                02:30
```

Veritext Legal Solutions
866 299-5127

```
 1        A.   Well, the second case would be -- would be    02:30

 2   this one.                                               02:30

 3        Q.   Okay.  I thought you said a few moments        02:30

 4   ago this was the third case.  So it's only the          02:30

 5   second case?                                            02:30

 6        A.   Well, this would have been the second case    02:30

 7   and then I did another one after.                       02:30

 8        Q.   What was the other case you've done?          02:30

 9        A.   I'm sorry, I didn't hear that.                02:30

10        Q.   What was the other case?                      02:30

11        A.   The -- the last case, I don't remember the    02:30

12   defendant's name.                                       02:30

13        Q.   Where was it?                                 02:30

14        A.   In San Diego.                                 02:30

15        Q.   Do you remember the agent you talked to on    02:31

16   the San Diego matter?                                   02:31

17        A.   It was not an agent.  It was a U.S.           02:31

18   attorney.                                               02:31

19        Q.   And do you remember his or her name?         02:31

20        A.   I do not.                                     02:31

21        Q.   It happened out in Vegas.  Do you remember    02:31

22   your point of contact in Vegas?                         02:31

23             THE REPORTER:  I'm sorry, Counsel, one        02:31

24   more time.                                              02:31

25                                                           02:31
```

Page 74

```
 1    BY MR. BALOGH:                                    02:31

 2         Q.   Do you remember your point of contact in   02:31

 3    Las Vegas?                                        02:31

 4         A.   I don't.  I do know -- I remember it was   02:31

 5    an FBI agent.                                     02:31

 6         Q.   And so let's talk about the Las Vegas    02:31

 7    case.                                             02:31

 8              What was the -- was the scope of         02:31

 9    responsibility just to inspect the media that had  02:31

10    been seized by the federal agents to determine if  02:31

11    you could locate contraband with respect to the   02:31

12    specific plaintiffs that had a civil suit going    02:31

13    related to those activities?                      02:31

14         A.   I'm sorry, but the first part of your    02:31

15    question was completely cut off.                  02:31

16         Q.   That's all right.  I'll try again.      02:31

17              Was the work -- why don't you describe the  02:31

18    work you did in Vegas.  What was your assignment?  02:31

19         A.   To look at copies of media that was seized  02:32

20    from the defendant and locate child exploitation   02:32

21    images from the firm's -- for the firm's clients.  02:32

22         Q.   And do you remember which clients were at  02:32

23    issue in the Las Vegas case?                      02:32

24         A.   I don't.                                02:32

25         Q.   Okay.  How about the San Diego case?  What  02:32
```

Page 75

```
1    was the scope of work you undertook with respect to      02:32
2    that matter?                                             02:32
3         A.   Exactly the same.                              02:32
4         Q.   Okay.  Can you remember the plaintiffs         02:32
5    that were at issue in the San Diego case?                02:32
6         A.   I don't.                                       02:32
7         Q.   Okay.  And do you remember how many were       02:32
8    involved in either case?                                 02:32
9         A.   I don't.                                       02:32
10        Q.   Okay.  And when did the San Diego -- this      02:32
11   San Diego scope of work, when did that happen?           02:32
12        A.   Directly after Curtis.                         02:32
13        Q.   Can you give me a date, a month and year,      02:32
14   please?                                                  02:32
15        A.   It would be July of 2019.                      02:32
16        Q.   And how about the Vegas case?                  02:33
17        A.   The Vegas case was December of '19, I          02:33
18   believe.                                                 02:33
19        Q.   So if Vegas was in 2019 and San Diego was      02:33
20   in July of '19, how could San Diego be the third         02:33
21   case chronologically?                                    02:33
22        A.   No, you're right.  I'm trying to think         02:33
23   when was -- when was -- when was Vegas.  I remember       02:33
24   it was in December.  I'm sorry.                          02:33
25        Q.   That's all right.                              02:33
```

Page 76

| | | |
|---|---|---|
| 1 |      Is it possible that you're misremembering | 02:33 |
| 2 | the San Diego case and that actually occurred in | 02:33 |
| 3 | July of 2020? | 02:33 |
| 4 |    A.   Actually, yes, you are correct. | 02:33 |
| 5 |    Q.   When did you do the Curtis inspection? | 02:33 |
| 6 |    A.   The Curtis was also in July of '20. | 02:33 |
| 7 |    Q.   So they were both one after each other; is | 02:33 |
| 8 | that right? | 02:34 |
| 9 |    A.   Yes. | 02:34 |
| 10 |    Q.   Did you go back to Fairfax, Virginia, | 02:34 |
| 11 | between the assignments or did you travel directly | 02:34 |
| 12 | from San Francisco, California, to San Diego, | 02:34 |
| 13 | California, with respect to those twin projects? | 02:34 |
| 14 |    A.   Directly from San Francisco to San Diego. | 02:34 |
| 15 |    Q.   And that -- withdrawn. | 02:34 |
| 16 |      And the dates, how much money have you | 02:34 |
| 17 | billed the law firms for? | 02:34 |
| 18 |    A.   Total since I have been employed by them? | 02:34 |
| 19 |    Q.   Yes. | 02:34 |
| 20 |    A.   I'm sorry, I -- I didn't hear you. | 02:34 |
| 21 |    Q.   Yes, the total.  Total since -- | 02:34 |
| 22 |    THE REPORTER:  I'm sorry, Counsel, one | 02:34 |
| 23 | more time. | 02:34 |
| 24 | BY MR. BALOGH: | 02:34 |
| 25 |    Q.   Yes, the total you first received since | 02:34 |

Page 77

```
 1    you were first engaged by them in 2019.              02:34
 2         A.   I believe my total billing to date is a    02:34
 3    little under $50,000.                                02:35
 4         Q.   Did there come a time where you met with   02:35
 5    the plaintiffs in this matter?                       02:35
 6         A.   You mean Mrs. Hepburn and --               02:35
 7         Q.   No, I'm talking about the actual           02:35
 8    plaintiffs, the women, or some minors, that have     02:35
 9    made allegations against Mr. Curtis in this civil    02:35
10    lawsuit.                                             02:35
11         A.   Oh, I'm sorry.  Yes.  Yes, I have -- I     02:35
12    have met them.                                       02:35
13         Q.   Okay.  Let's go through that.  Did you     02:35
14    have -- withdrawn.                                   02:35
15              Did you have a protocol with respect to    02:35
16    how you would conduct the interviews of plaintiffs   02:35
17    with respect to this civil litigation against        02:35
18    Randall Curtis?                                      02:35
19         A.   Well, roughly.                             02:35
20         Q.   Tell me what that was.                     02:35
21         A.   I needed -- I needed to meet them, and     02:36
22    then I needed a photograph of them at the time the   02:36
23    abuse occurred.  And then I'd ask them several       02:36
24    specific questions:  Who is their attorney?  I would 02:36
25    show them the picture and ask the obvious question:  02:36
```

Page 78

| | | |
|---|---|---|
| 1 | Who is this in the picture?  At what age were you | 02:36 |
| 2 | during the time that this photo was taken? | 02:36 |
| 3 | They produced an identification.  And then | 02:36 |
| 4 | I -- I signed and dated the picture and they signed | 02:36 |
| 5 | and dated the picture as well. | 02:36 |
| 6 | Q.   Okay.  Was there anything else to your | 02:36 |
| 7 | protocol or methodology that you applied with | 02:36 |
| 8 | respect to interviews with the plaintiffs on the | 02:36 |
| 9 | question of identity? | 02:36 |
| 10 | A.   No. | 02:36 |
| 11 | Q.   Who was the first plaintiff you met? | 02:36 |
| 12 | A.   I -- I don't recall. | 02:36 |
| 13 | Q.   Do you recall meeting -- withdrawn. | 02:36 |
| 14 | Do you remember meeting a woman who | 02:36 |
| 15 | identified herself as Amy? | 02:37 |
| 16 | A.   Yes. | 02:37 |
| 17 | Q.   Okay.  When did that interview take place? | 02:37 |
| 18 | A.   I -- I do not recall. | 02:37 |
| 19 | Q.   How many times did you interview Amy? | 02:37 |
| 20 | A.   Just once. | 02:37 |
| 21 | Q.   How long did the interview last? | 02:37 |
| 22 | A.   Approximately 15 minutes. | 02:37 |
| 23 | Q.   Okay.  And can you recollect the state | 02:37 |
| 24 | that it took place in? | 02:37 |
| 25 | A.   I -- I don't. | 02:37 |

Page  79

```
 1        Q.   Can you --                              02:37

 2        A.   Or I can't.  Sorry.                     02:37

 3        Q.   That's okay.                            02:37

 4             Can you recollect anything else about the    02:37

 5   interview with Amy?                               02:37

 6        A.   No.                                     02:37

 7        Q.   Okay.  So you -- would it be accurate to    02:37

 8   summarize your testimony as you remember that you    02:37

 9   interviewed her, but you cannot provide any other    02:37

10   specifics with respect to the substance of the    02:37

11   actual interview; you can't recollect it?  Is that    02:37

12   accurate?                                         02:37

13        A.   That's accurate.  Excuse me.  That is    02:37

14   accurate.                                         02:38

15        Q.   Okay.  How about a woman named Erika?  Did    02:38

16   you meet a woman named Erika?                     02:38

17        A.   Yes.                                    02:38

18        Q.   When did you meet Erika?                02:38

19        A.   I do not recall.                        02:38

20        Q.   What state was Erika located when you    02:38

21   interviewed her?                                  02:38

22        A.   That, I don't recall either.           02:38

23        Q.   Was the interview with Erika in person?    02:38

24        A.   All the interviews were -- well, all    02:38

25   except for one was in person.                     02:38
```

Page 80

| | | |
|---|---|---|
| 1 | Q.   Okay.  Can you tell me, do you have any | 02:38 |
| 2 | recollection of the interview of Erika at all? | 02:38 |
| 3 | A.   I don't. | 02:38 |
| 4 | Q.   Did you take notes during these | 02:38 |
| 5 | interviews? | 02:38 |
| 6 | A.   No.  Well, yes, I -- yes, I did.  I | 02:38 |
| 7 | took -- well, what we wrote -- what we wrote on the | 02:38 |
| 8 | photograph. | 02:38 |
| 9 | Q.   Okay.  Apart from writing on the | 02:38 |
| 10 | photograph, did you take any other notes regarding | 02:38 |
| 11 | these interviews? | 02:38 |
| 12 | A.   Yes. | 02:38 |
| 13 | Q.   Okay.  And where are those notes? | 02:38 |
| 14 | A.   I believe they're in my safe. | 02:38 |
| 15 | MR. BALOGH:  Okay.  I'd make a formal | 02:38 |
| 16 | request to have those notes produced for me before | 02:39 |
| 17 | we adjourn this deposition.  We can address that at | 02:39 |
| 18 | a break, Ms. Hepburn. | 02:39 |
| 19 | MS. HEPBURN:  Yes, we'll look at that, | 02:39 |
| 20 | yeah. | 02:39 |
| 21 | BY MR. BALOGH: | 02:39 |
| 22 | Q.   And is there -- do you have any reason why | 02:39 |
| 23 | you believe you shouldn't share your notes with us, | 02:39 |
| 24 | Mr. Laws? | 02:39 |
| 25 | A.   Not at all. | 02:39 |

Page 81

```
 1        Q.   Can you remember interviewing -- do you      02:39
 2   have any specific memory of interviewing any of the    02:39
 3   plaintiffs in this case?                               02:39
 4        A.   No.                                          02:39
 5        Q.   Can you name the plaintiffs in this -- in    02:39
 6   this litigation?                                       02:39
 7        A.   I -- I can't.                                02:39
 8        Q.   Okay.  Can you describe to me what any of    02:39
 9   these plaintiffs look like today?                      02:39
10        A.   You mean their age that they look now or     02:39
11   the pictures that I see, or both?                      02:39
12        Q.   No.  Thank you for the clarifying            02:39
13   question.                                              02:40
14             Can you remember how -- what their ages      02:40
15   are today?  For example, how old is Skylar today?      02:40
16        A.   I don't recall their exact age now.          02:40
17        Q.   Can you give me approximation?  Is Skylar    02:40
18   a juvenile, a teenager, an adult woman?                02:40
19        A.   I would have to look at my notes.            02:40
20        Q.   In the absence of looking at your notes,     02:40
21   you don't have sufficient recall to recollect what     02:40
22   any of these women look like today; is that correct?   02:40
23        A.   That's correct.                              02:40
24        Q.   You said that one of these plaintiffs you    02:40
25   did not -- you did not meet in person.  Do you         02:40
```

                                                    Page 82

```
 1    remember that testimony?                              02:40
 2         A.   Well, I said I didn't -- it might not have  02:40
 3    been a plaintiff in this case, but there was one of   02:40
 4    them that I did not meet in person.                   02:40
 5         Q.   Can you tell me who that was?               02:40
 6         A.   I -- I don't remember who it was.  I know   02:40
 7    it was a sister and we -- we did the meeting.  It     02:40
 8    was in person with Mom and one of the daughters, and  02:40
 9    then the other daughter was via video.                02:41
10         Q.   When you met with these plaintiffs, you     02:41
11    said you shared government ID.  Do you remember       02:41
12    that?                                                 02:41
13         A.   Yes.                                        02:41
14         Q.   Did you take photographs or otherwise       02:41
15    document the identification papers they showed you?   02:41
16         A.   I did not.  Well, I took -- I didn't take   02:41
17    pictures of it, but I made notes in my notes.         02:41
18         Q.   You did not take photographs or otherwise   02:41
19    get documentary evidence of this is a valid ID for    02:41
20    future reference; is that right?                      02:41
21         A.   That's correct.                             02:41
22         Q.   One of the things you've done in this case  02:41
23    is you talked about, in your declaration,             02:41
24    recognizing the plaintiffs from their photographs.    02:41
25    Do you recollect that testimony?                      02:41
```

                                                    Page 83

1    A.   Yes.                                           02:41

2    Q.   Did you have any special training            02:41

3    regarding your ability to identify people?        02:41

4    A.   No.   So I mean it's pretty easy if you      02:42

5    have a photo and you have another photo.   You just   02:42

6    compare the photos.                               02:42

7    Q.   So that's not -- withdrawn.                  02:42

8         So you have just, if I understand your       02:42

9    testimony, a layman's ability to compare          02:42

10   photography, you think you have that skill.   Is that   02:42

11   a fair and accurate statement?                    02:42

12   A.   That's fair and accurate, yes.               02:42

13   Q.   For each of these plaintiffs that you had    02:42

14   these interviews with, you met them -- except for   02:42

15   the sole exception, which you can't remember her   02:42

16   name, you met with family members but not the     02:42

17   plaintiff herself, you met each of them once and   02:42

18   only once; is that correct?                       02:42

19        MS. HEPBURN:   Objection to the extent       02:42

20   misstates the testimony.                          02:42

21        You may answer.                              02:42

22        THE WITNESS:   Yes.                          02:42

23   BY MR. BALOGH:                                    02:42

24   Q.   And in each of those visits you asked --     02:42

25   you applied the protocol you described to us earlier   02:42

Page 84

```
 1    with respect to addressing with them their ability        02:43

 2    to identify themselves in pictures that were related       02:43

 3    to their sexual abuse, correct?                            02:43

 4         A.   I'm sorry, but can you ask that again,           02:43

 5    please?                                                    02:43

 6         Q.   Yes, I can.                                      02:43

 7              With respect to each of these individuals,       02:43

 8    you asked them to verify that they -- from                 02:43

 9    photographs that you showed them -- that they were        02:43

10    the -- they were the person depicted in photographs       02:43

11    documenting their child abuse?                             02:43

12         A.   They --                                          02:43

13              MS. HEPBURN:   Objection.   Objection.           02:43

14    Misstates the testimony.                                   02:43

15              Go ahead and answer.                             02:43

16              THE WITNESS:   They provided the photos to       02:43

17    me.                                                        02:43

18    BY MR. BALOGH:                                             02:43

19         Q.   Okay.   And when they provided the photos        02:43

20    to them, you discussed with them whether they --          02:43

21    whether they contended that they were the subject of      02:43

22    these pornographic photographs?                            02:43

23              MS. HEPBURN:   Objection.   Again misstates      02:43

24    the testimony.                                             02:43

25    BY MR. BALOGH:                                             02:43
```

Page 85

| | | |
|---|---|---|
| 1 | Q.   Is that correct? | 02:43 |
| 2 | A.   Well, they provided -- they provided the | 02:43 |
| 3 | photo, and I asked them if this -- the photo that | 02:44 |
| 4 | they provided, was this -- did this depict them at | 02:44 |
| 5 | the age range where the abuse took place? | 02:44 |
| 6 | Q.   Okay.  Did you go over with them any of | 02:44 |
| 7 | the sanitized photographs for them to confirm that | 02:44 |
| 8 | they were the subject of child pornography | 02:44 |
| 9 | photographs? | 02:44 |
| 10 | A.   No. | 02:44 |
| 11 | Q.   So the sole content was to get a | 02:44 |
| 12 | photograph of them during the age range when they | 02:44 |
| 13 | claimed they were victims of child sexual abuse; is | 02:44 |
| 14 | that correct? | 02:44 |
| 15 | A.   That's correct. | 02:44 |
| 16 | Q.   Did you ever ask them to confirm -- | 02:44 |
| 17 | withdrawn. | 02:44 |
| 18 | At the time you met with them, were you in | 02:44 |
| 19 | possession of sanitized photos that are alleged to | 02:44 |
| 20 | be contraband found on Mr. Curtis's media depicting | 02:44 |
| 21 | the plaintiffs or a subset of them? | 02:44 |
| 22 | A.   No. | 02:44 |
| 23 | Q.   At what point of time did you acquire | 02:44 |
| 24 | sanitized photographs reflecting alleged contraband | 02:44 |
| 25 | that was alleged to be in the possession of | 02:45 |

Page 86

| | | |
|---|---|---|
| 1 | Mr. Curtis? | 02:45 |
| 2 | A.    Sometime after the exam of Curtis. | 02:45 |
| 3 | Q.    Excuse me? | 02:45 |
| 4 | A.    Sometime after the time that I did the | 02:45 |
| 5 | examination of Mr. Curtis's digital media. | 02:45 |
| 6 | Q.    So can you give me a chronology of the | 02:45 |
| 7 | task?  Did you -- did you meet with the girl -- | 02:45 |
| 8 | withdrawn. | 02:45 |
| 9 | Did you meet with the plaintiffs, all the | 02:45 |
| 10 | plaintiffs, before you conducted your -- your -- | 02:45 |
| 11 | your forensic examination in San Francisco? | 02:45 |
| 12 | A.    Yes. | 02:45 |
| 13 | Q.    Before you went to San Francisco, did you | 02:45 |
| 14 | undertake any other tasks with respect to the | 02:45 |
| 15 | testimony and reports you are anticipating providing | 02:45 |
| 16 | in this case? | 02:45 |
| 17 | A.    No. | 02:45 |
| 18 | Q.    So you met with the girls in various | 02:45 |
| 19 | places that you cannot recollect, and then you went | 02:45 |
| 20 | to San Diego -- you went to San Francisco; is that | 02:45 |
| 21 | correct? | 02:45 |
| 22 | A.    That's correct. | 02:45 |
| 23 | Q.    And in San Francisco, tell me what you did | 02:45 |
| 24 | while you were in San Francisco. | 02:46 |
| 25 | A.    I met with Agent -- Agent Popper and his | 02:46 |

Page 87

1    supervisor separately.  Actually, I think there was          02:46

2    a short time where they were both together.                  02:46

3            Briefly discussed the digital media that             02:46

4    was seized from Curtis, and then Agent Popper               02:46

5    provided me a hard drive which, according to him,           02:46

6    had the forensic images from the media that was             02:46

7    seized from Curtis.                                          02:46

8        Q.   Okay.  And what --                                  02:46

9            THE REPORTER:  I'm sorry.  Your question?           02:46

10           THE WITNESS:  I'm sorry.  I couldn't hear           02:46

11   that.                                                        02:46

12   BY MR. BALOGH:                                               02:46

13       Q.   What did you do with that hard drive?               02:46

14       A.   That hard drive, I brought the images into        02:46

15   my software and then looked for the plaintiffs'             02:46

16   images in this case.                                         02:46

17       Q.   Where particularly were you when you were          02:46

18   doing this examination?                                      02:46

19       A.   I was at the HSI office in San Diego.              02:46

20   They have a specific office used for defense and            02:46

21   expert review.                                               02:47

22       Q.   I thought you did the review for the               02:47

23   Curtis matter in San Francisco.  Is that incorrect?        02:47

24       A.   Yes, I'm sorry.  I thought you said               02:47

25   San Francisco.                                               02:47

Page 88

```
 1        Q.   You just said San Diego, sir.              02:47

 2        A.   I'm sorry, my mistake.                     02:47

 3        Q.   Okay.  So let's just ask the question      02:47

 4   again to get a clear record.  Where were you         02:47

 5   specifically when you did your forensic review of    02:47

 6   the hard drive you described being given by Agent     02:47

 7   Popper?                                              02:47

 8        A.   I was at an office in San Francisco, at an 02:47

 9   HSI office that's specifically used for defense and  02:47

10   expert reviews.                                      02:47

11        Q.   You were at the --                         02:47

12             THE REPORTER:  I'm sorry, one more time.   02:47

13   "You were at the"...                                 02:47

14   BY MR. BALOGH:                                       02:47

15        Q.   You were at the offices of Homeland        02:47

16   Security?                                            02:47

17        A.   I'm sorry, I still didn't hear that.       02:47

18             MR. BALOGH:  Withdrawn.  I'll just move    02:47

19   forward.  It doesn't matter.                         02:47

20        Q.   So tell me -- so when you got the          02:48

21   hard drive, you said you imported it into your       02:48

22   software or something like that.  I didn't get that. 02:48

23   Can you tell us specifically what you did with       02:48

24   regard to your search of the media?                  02:48

25        A.   Yes.  I'm using a forensic program called  02:48
```

Page 89

```
1    Griffeye.  And Agent Popper provided me a       02:48
2    hard drive, and on that hard drive was specific 02:48
3    digital media files.  They're called E01 files. 02:48
4    They're produced by Encase, which is another    02:48
5    forensic software.  And I believe other imaging 02:48
6    devices also use the E01 files.                 02:48
7            Specifically they are a number of files. 02:48
8    It depends on -- how many files depends on how large 02:48
9    the media is that you're doing the examination of. 02:48
10           So the E01 files are segmented, E01      02:48
11   through E0 whatever it takes to get the end of the 02:48
12   media, and they are linked together by a hash value. 02:49
13   And then I import those into Griffeye, and then I'm 02:49
14   able to search for the specific images for the  02:49
15   plaintiffs.                                      02:49
16      Q.  How did you then undertake the search?  Be 02:49
17   specific on the activities that you took to      02:49
18   undertake the search of the media with respect to 02:49
19   looking for images of plaintiffs.                02:49
20      A.    Two ways.  The first way is to use a hash 02:49
21   value.  And let me explain a hash value.  This is 02:49
22   MD5 hash.  It's a mathematical calculation of a  02:49
23   file.  It doesn't have to be a picture, it could be 02:49
24   a document.  But it's a 32-character alphanumeric. 02:49
25   It's as accurate or better than DNA.  Okay.  So  02:49
```

Page 90

```
 1    that's the first thing I do, I do hash value search.      02:49
 2    Okay.                                                      02:49
 3              And I'm only allowed to search for the           02:50
 4    images of the plaintiff.  So I'll use just -- I'll         02:50
 5    use "Vicky" off the top of my head.  So if I'm             02:50
 6    looking for "Vicky," that's the only thing I'm             02:50
 7    allowed to search for.  So in my hash -- it's called       02:50
 8    a hash library, I can search for a number of               02:50
 9    pictures for "Vicky."  Okay.                               02:50
10              If I don't find them or that picture isn't       02:50
11    in my hash value -- in my hash library, which I'll         02:50
12    explain in just a moment, then the only other way I        02:50
13    can do it is search by file name.                          02:50
14              Okay.  So a hash library needs a bit of          02:50
15    explaining.  So let's just say "Vicky" in the             02:50
16    "Vicky" series of child exploitation photos, there's      02:50
17    50 images.  I'm just using this as an example.  I          02:50
18    don't know for certain.  And I have 12 of the hash         02:50
19    values.                                                    02:50
20              I'm absolutely going to miss some of those       02:50
21    images, because if they're not -- if I can't search       02:50
22    for them in my hash value, then I have to search for      02:50
23    them manually.  And if I search for them manually          02:51
24    and the -- the file name is wrong or something else        02:51
25    is wrong, then I'm not going to find the image.            02:51
```

Page 91

```
 1              So it's -- it's -- the forensic exam is      02:51
 2    extremely narrow as compared to when I was working,    02:51
 3    and you're just looking for every child exploitation   02:51
 4    image.                                                 02:51
 5         Q.   So how did you acquire your hash value        02:51
 6    library?                                               02:51
 7         A.   I wouldn't even call it a library yet.  I     02:51
 8    have -- I have a small number of hash values that I    02:51
 9    got -- I gleaned off of reports from the National      02:51
10    Center for Missing and Exploited Children.  I've       02:51
11    gotten several from a couple U.S. attorneys.  And      02:51
12    then I've gotten a number of them from the Canadian    02:51
13    Center for Child Abuse.  That's not the exact name     02:51
14    of the Canadian center because I don't recall it       02:51
15    exactly.                                               02:52
16         Q.   Okay.  And in this case when you did your     02:52
17    work in San Francisco for plaintiffs, in addition to   02:52
18    using the hash -- withdrawn.                           02:52
19              With respect to the hash value search you     02:52
20    did in San Francisco, which, if any, plaintiffs did    02:52
21    you claim to identify as being -- appearing in the     02:52
22    media?                                                 02:52
23         A.   A number -- a number -- I believe there      02:52
24    were six or seven.  I would have to go through my      02:52
25    reports to recall exactly which ones I found.          02:52
```

Page 92

```
 1        Q.   But it wasn't all of them; is that right?      02:52

 2        A.   No, it was not all of them.                    02:52

 3        Q.   So what did you do -- did you complete          02:52

 4   your hash value search before you moved on to             02:52

 5   another mode of investigation?                            02:52

 6        A.   Yes.  I always do hash values first and         02:52

 7   then I search by file name.                               02:52

 8        Q.   And tell us about the file name search,         02:52

 9   please.                                                   02:52

10        A.   The file name search is just a -- what          02:52

11   they call a boolean search.  So you can type in a         02:52

12   portion of the name, say if I'm searching for             02:53

13   "Kevin."  I can type in K-E-V and it will bring up        02:53

14   all the files that start with K-E-V, and then I can       02:53

15   look for the rest of the -- the rest of the file          02:53

16   name.                                                     02:53

17        Q.   And how did you get the file names to           02:53

18   apply to a file name search?                              02:53

19        A.   They came from a report from the National       02:53

20   Center for Missing and Exploited Children.                02:53

21        Q.   Did you do any other investigative              02:53

22   techniques with respect to your time in                   02:53

23   San Francisco on this case?                               02:53

24        A.   No.  The law prohibits me from doing that.      02:53

25        Q.   So that was -- have you described the full      02:53
```

Page 93

```
1    extent of the work you did in San Francisco with        02:53
2    respect to the testimony you're giving today?           02:53
3         A.   Yes.   There was a hash value search and      02:53
4    then a name search.                                      02:53
5         Q.   Okay.   And what steps did you take to         02:53
6    verify that the media that you were searching was in     02:53
7    fact possessed at some point by Randall Curtis?          02:53
8         A.   Just from the word of Agent Popper.            02:54
9         Q.   Did you ask Agent Popper to review any         02:54
10   chain of custody documents?                              02:54
11        A.   I did not.                                     02:54
12        Q.   What is it -- do you understand what I         02:54
13   mean when I say "chain of custody documents"?            02:54
14        A.   I do.                                          02:54
15        Q.   Can you, for the record, please explain        02:54
16   what chain of custody documents are?                     02:54
17        A.   A chain of custody document for HSI would      02:54
18   be called a 6051.   That's the form name, unless         02:54
19   they've changed it since I retired.   But when I was     02:54
20   working, it was called a 6051 chain of custody.          02:54
21             When somebody signs a piece of evidence        02:54
22   out of the evidence room, they sign and date the         02:54
23   6051 and then what piece of evidence they're             02:54
24   removing from the -- from the evidence room.             02:54
25        Q.   When the evidence is maintained in the         02:54
```

Page 94

1   evidence room, is it protocol to have it in a bag                02:55

2   that has been sealed and initialed by the last                  02:55

3   person to touch the -- the exhibit?                              02:55

4        A.   Well, when it comes to typical evidence.              02:55

5   But we're talking about -- we're talking about the              02:55

6   E01 files from a -- from a copy of the media.                   02:55

7            So the original media, once you do the                 02:55

8   forensic -- once you make a forensic copy of it,                02:55

9   that original goes back in the evidence room and               02:55

10  then you're working off a copy.                                 02:55

11       Q.   Okay.   And did you ask Agent Popper to               02:55

12  show you any chain of custody forms?   Is that right?          02:55

13       A.   I did not ask him.                                    02:55

14       Q.   Did you make any inquiries with respect to           02:55

15  him verifying in any documentary way that the copy             02:55

16  he was providing you was in fact a complete and                02:55

17  accurate copy of the original media seized by law              02:55

18  enforcement in a criminal matter designated                    02:55

19  United States versus Curtis?                                    02:56

20       A.   I had -- I had a one-page -- a portion of           02:56

21  a ROI, report of investigation, that listed the                02:56

22  media that was searched -- that was seized.                    02:56

23       Q.   Okay.   And did you take any steps to               02:56

24  verify that the copy that you were provided, or the           02:56

25  hard drive you were provided, was in fact a copy of           02:56

Page 95

```
 1   what was seized from Mr. -- a copy from the media      02:56
 2   seized from Mr. Curtis?                                 02:56
 3        A.   No, because actually that's -- that's also    02:56
 4   outside of the scope of the law.                        02:56
 5        Q.   Can you amplify what's outside the scope      02:56
 6   of the law, please?                                     02:56
 7        A.   So the law -- the Amy, Vicky, and Andy Act    02:56
 8   only allows me or someone similar to look at the        02:56
 9   images from the victims, from the survivors.  It        02:56
10   doesn't allow me to search the media for any other      02:56
11   pictures or documents or something like that that I     02:56
12   could verify like what I would typically do when I      02:56
13   was working.                                            02:57
14        Q.   Right.  My question is, what steps, if        02:57
15   any, did you take to verify that the purported copy     02:57
16   of a hard drive in fact came from Mr. Curtis?          02:57
17        A.   From the word of Agent Popper and his         02:57
18   supervisor.                                             02:57
19        Q.   Was it -- withdrawn.                          02:57
20             I'd like to go to -- do you have -- I         02:57
21   provided earlier as deposition exhibits, Exhibits 2     02:57
22   through -- 3 through 24.  Did you receive those         02:57
23   exhibits?                                               02:57
24        A.   Let me -- let me recheck my email.            02:57
25        Q.   Those should have been provided yesterday     02:57
```

Page 96

```
 1    by Ms. Hepburn.                                    02:57
 2           MS. HEPBURN:  Those would have been in the  02:57
 3    Dropbox.                                           02:57
 4           THE WITNESS:  Okay.  Let me check the       02:57
 5    Dropbox.                                           02:57
 6    BY MR. BALOGH:                                     02:57
 7       Q.   Take your time.                            02:57
 8           MS. HEPBURN:  Counsel, we're almost to      02:58
 9    lunchtime.  Will you let us know when a good time to 02:58
10    take the lunch break would be?                     02:58
11           MR. BALOGH:  Certainly.  Why don't I do --  02:58
12    I think that's a great idea, Carol.  If it makes   02:58
13    sense to you, what I want to do is orient Mr. Laws  02:58
14    to these documents, tell him what I'm going to ask  02:58
15    him, and then take the lunch break.  I'm going to   02:58
16    break my rule on a pending question because I want  02:58
17    him to verify that these are the expert reports that 02:58
18    you provided to me.                                02:58
19           And so once we get them up -- all I'm       02:58
20    going to -- the question won't be pending, but I'm  02:58
21    going to ask, when we get back from our break, for  02:58
22    Mr. Laws to review Exhibits 3 through 24 and to     02:58
23    either have them available on his screen -- I can   02:58
24    also share his screen if you want -- but I'm going  02:58
25    to have him confirm that these are the expert       02:58
```

Page 97

| | | |
|---|---|---|
| 1 | materials that he provided to you and you provided | 02:58 |
| 2 | to me with respect to his testimony in this case. | 02:59 |
| 3 | Does that make sense, Carol? | 02:59 |
| 4 | MS. HEPBURN:  It does. | 02:59 |
| 5 | MR. BALOGH:  Okay.  So with that -- are | 02:59 |
| 6 | you tracking with us too, Mr. Laws?  Does that make | 02:59 |
| 7 | sense to you? | 02:59 |
| 8 | THE WITNESS:  Yes.  And I have the Dropbox | 02:59 |
| 9 | open and I have -- I have -- and I have Exhibit -- | 02:59 |
| 10 | whoops.  Sorry about that.  I have Exhibit 1 | 02:59 |
| 11 | through -- scroll down -- through 41. | 02:59 |
| 12 | (Exhibit 41 was marked for | 02:59 |
| 13 | identification and attached | 02:59 |
| 14 | hereto.) | 02:59 |
| 15 | BY MR. BALOGH: | 02:59 |
| 16 | Q.   Great.  What I'm going to ask you to do | 02:59 |
| 17 | first over the break is to -- and I'm going to break | 02:59 |
| 18 | right after this -- just take a look at 3 through | 02:59 |
| 19 | 24, those specific documents.  And I want you to | 02:59 |
| 20 | just be able to confirm that these are your | 02:59 |
| 21 | expert -- these are either your expert declarations | 02:59 |
| 22 | or reports of work with respect to this case. | 02:59 |
| 23 | Also included in there, I believe, is -- | 02:59 |
| 24 | he knows what they are.  But go through them.  When | 02:59 |
| 25 | we go back, we're going to go through some of these | 03:00 |

Page 98

```
 1    together.  Does that make sense to you, Mr. Laws?      03:00

 2         A.    Yes.  And if you don't mind me writing a    03:00

 3    note?                                                  03:00

 4         Q.    No, I don't at all.                         03:00

 5         A.    Okay.  So I'm looking at 3 through 24.       03:00

 6         Q.    Yes, exactly.                               03:00

 7         A.    Okay.                                        03:00

 8         Q.    And we'll get back on the record then.       03:00

 9               MR. BALOGH:  What would you like to do for   03:00

10    the lunch break?  I'm amenable.  Your choice.          03:00

11               THE VIDEOGRAPHER:  Do you guys want to go    03:00

12    off the record?                                        03:00

13               MR. BALOGH:  Yes, please.  Let's go off      03:00

14    the record, Ms. Ortiz.                                 03:00

15               THE VIDEOGRAPHER:   Thank you.               03:00

16               This marks the end of Media Number 3.  The  03:00

17    time is 2:59 p.m.  We're off the record.               03:00

18         (Whereupon, a luncheon recess was had.)           03:00

19

20

21

22

23

24

25
```

Page 99

```
 1              Tuesday, January 26, 2021              03:00

 2                  4:07 p.m. (EST)                    03:00

 3                     --o0o--                         03:00

 4                                                     03:00

 5              THE VIDEOGRAPHER:  This marks the      04:08

 6    beginning of Media Number 4.  The time is 4:07 p.m.  04:08

 7    We are on the record.                           04:08

 8              MS. HEPBURN:  Over the break I'd like to   04:08

 9    state that Mr. Laws did go into his safe and pulled  04:08

10    out the notes that were referenced in the earlier   04:08

11    testimony concerning his meeting with the clients.   04:08

12              I did mail -- or email those to you,   04:08

13    Mr. Balogh, over the break.                      04:08

14              We have redacted out the references that   04:08

15    were to clients who were not plaintiffs in this     04:08

16    matter, and as the notes did combine references to  04:08

17    several different individuals on a page.         04:08

18              MR. BALOGH:  Okay.  And -- okay.  Let me  04:08

19    do this.  I'm going to save this document as -- no.  04:08

20    Let's go back.                                   04:09

21              I'm going to save this document as    04:09

22    Exhibit 50.  I'll refer to it as such.  And at the  04:09

23    appropriate -- at the next break I will upload it to  04:09

24    the system, and I will then also email it to you,   04:09

25    Ms. Tylor, so you have a copy in both places, as is  04:09
```

Page 100

| | | |
|---|---|---|
| 1 | the prior protocol, if that's acceptable. | 04:09 |
| 2 | THE REPORTER:  Thank you. | 04:09 |
| 3 | MS. HEPBURN:  And, Mr. Laws, I did | 04:09 |
| 4 | email -- copy you on that email as well.  So you | 04:09 |
| 5 | should have the redacted version in your email feed, | 04:09 |
| 6 | I hope. | 04:09 |
| 7 | THE WITNESS:  Okay.  I can check that | 04:09 |
| 8 | right now.  And I do. | 04:09 |
| 9 | MR. BALOGH:  Brilliant.  Okay. | 04:10 |
| 10 | Are we back on the record or are we | 04:10 |
| 11 | waiting? | 04:10 |
| 12 | THE REPORTER:  We are on the record. | 04:10 |
| 13 | MR. BALOGH:  That was a clarification from | 04:10 |
| 14 | Carol. | 04:10 |
| 15 | Thank you, Ms. Hepburn. | 04:10 |
| 16 | | 04:10 |
| 17 | EXAMINATION  (resumed) | 04:10 |
| 18 | BY MR. BALOGH: | 04:10 |
| 19 | Q.   Mr. Laws, right before the break we were | 04:10 |
| 20 | discussing -- or I asked you to review some of the | 04:10 |
| 21 | materials, Exhibits 2 through -- 3 through 24, as | 04:10 |
| 22 | materials regarding expert disclosures about your | 04:10 |
| 23 | performance in this case.  Do you remember that | 04:10 |
| 24 | conversation? | 04:10 |
| 25 | A.   Yes.  But if I could, before I start with | 04:10 |

Page 101

| | | |
|---|---|---|
| 1 | that, I'd like to go back and clarify a couple | 04:10 |
| 2 | things. | 04:10 |
| 3 |     Q.   Okay.  Before you clarify a couple of | 04:10 |
| 4 | things, let me ask you this question. | 04:10 |
| 5 |        During the break did you have a | 04:10 |
| 6 | conversation with any counsel for plaintiffs about | 04:10 |
| 7 | today's testimony? | 04:10 |
| 8 |     A.   I did. | 04:10 |
| 9 |     Q.   With whom? | 04:11 |
| 10 |     A.   Ms. Hepburn, Ms. Bianco, and Ms. Mabie. | 04:11 |
| 11 |     Q.   Okay.  And what was said during that | 04:11 |
| 12 | conversation? | 04:11 |
| 13 |     A.   We just talked about how it was going. | 04:11 |
| 14 |     Q.   Anything else besides how it's going? | 04:11 |
| 15 |     A.   No.  Oh, about the notes. | 04:11 |
| 16 |     Q.   Okay.  Anything else besides how it's | 04:11 |
| 17 | going and the notes? | 04:11 |
| 18 |     A.   No. | 04:11 |
| 19 |     Q.   Okay.  You said you wanted to add | 04:11 |
| 20 | something.  Please feel free to amend your testimony | 04:11 |
| 21 | and otherwise set forth what you wanted to say. | 04:11 |
| 22 |     A.   Yes.  The first thing that I remembered | 04:11 |
| 23 | was the last person I testified about was Clark. | 04:11 |
| 24 |     Q.   Clark? | 04:11 |
| 25 |     A.   Yeah, that's not on my CV because I didn't | 04:11 |

Page 102

```
 1    testify as an expert.                                04:11
 2         Q.   Okay.  And the Clark matter, can you just  04:11
 3    refresh my recollection, what was that about?        04:11
 4         A.   That was -- that was when I was an online   04:11
 5    undercover, and he was arrested.                     04:11
 6         Q.   Got it.  So that was fact testimony about  04:11
 7    how you caught Mr. Clark doing something illegal?    04:11
 8         A.   Yes.                                       04:11
 9         Q.   Okay.                                      04:12
10         A.   And I'll further clarify that there were  04:12
11    other times that I testified in court as not an     04:12
12    expert, but just there was a few of them.  And those 04:12
13    ones I don't -- I don't remember.  I know there was  04:12
14    a couple times for the military where I testified as 04:12
15    not a witness -- not an expert witness.             04:12
16         Q.   And those would be you are a fact witness. 04:12
17    You had fact -- you had observations that were      04:12
18    germane to a criminal prosecution and you were      04:12
19    called as a fact witness to recount your memory of  04:12
20    those events to a jury or panel of judges in the    04:12
21    military; is that right?                            04:12
22         A.    Well, yes.  For the military, it was just 04:12
23    the -- just the judge.  It was a -- they call it an  04:12
24    Article 32 hearing.  It's like a grand jury for us, 04:12
25    but there are grand jurors, if that makes sense.    04:12
```

Page 103

| | | |
|---|---|---|
| 1 | Q.   Right.  It's a presiding jurist who is an | 04:12 |
| 2 | officer who is making a decision under Article 32 | 04:12 |
| 3 | whether there's sufficient evidence to call a | 04:12 |
| 4 | military court-martial of the accused serviceman? | 04:12 |
| 5 | A.   Yes, that's exactly what it is. | 04:13 |
| 6 | Q.   Is there anything else you'd like to | 04:13 |
| 7 | clarify from this morning's testimony? | 04:13 |
| 8 | A.   Yes.  In reference to -- in reference to | 04:13 |
| 9 | the survivors, about remembering survivors. | 04:13 |
| 10 | Q.   Yes. | 04:13 |
| 11 | A.   You know, I've looked at -- because you -- | 04:13 |
| 12 | and you clarified it as, can a lay witness look at | 04:13 |
| 13 | the image and tell if it's the same person?  And I | 04:13 |
| 14 | think that needs a little bit more explanation. | 04:13 |
| 15 | In my opinion, a lay witness is going to | 04:13 |
| 16 | look at the child pornography and that's the only | 04:13 |
| 17 | thing they're going to see.  They're going to see | 04:13 |
| 18 | the sexual abuse of the child, and that's the only | 04:13 |
| 19 | thing they want to see. | 04:13 |
| 20 | I've looked at some of these images | 04:13 |
| 21 | hundreds, you know, sometimes thousands of times, | 04:13 |
| 22 | unfortunately.  I purposely didn't want to remember | 04:13 |
| 23 | a series name or someone's name, because there's | 04:13 |
| 24 | enough stuff in my mind, you know, triggering PTSD | 04:13 |
| 25 | that I don't want to remember, if that makes sense. | 04:14 |

Page 104

```
 1              Although I do know that I met survivors in        04:14
 2    Chicago, in New York, Texas, Canada, Washington            04:14
 3    State, Colorado, a number of places.  And a lot of         04:14
 4    the survivors I was meeting in a series, in days at        04:14
 5    a time.  So I'd meet a couple people one day, a            04:14
 6    couple people the next day, and on and on like that.       04:14
 7              So -- you know, so I do remember them.  I        04:14
 8    don't remember the specifics, the names and stuff          04:14
 9    like that.  And I purposely don't try to remember          04:14
10    that stuff.  That's why I have notes and that's why       04:14
11    I have a report.  So if I need to -- if I need to          04:14
12    refresh my recollection, that's what I do.                 04:14
13         Q.   Let's break that down if we can.                 04:14
14              You talked about meeting survivors at            04:14
15    various -- in various cities in the United States.         04:14
16    Do you recollect that testimony?                           04:14
17         A.   Yes.                                             04:14
18         Q.   Were any of those individuals plaintiffs         04:14
19    in this case?                                              04:14
20         A.   Yes.                                             04:14
21         Q.   Which ones?                                      04:14
22         A.   I don't -- I don't remember.                     04:15
23         Q.   So you -- and would these meetings,              04:15
24    in-person meetings with survivors, if they were in        04:15
25    this case, how could you know they were in this case      04:15
```

Page 105

```
 1   if you don't remember them?                              04:15

 2       A.   Well, I get -- I get a list of the              04:15

 3   plaintiffs in this case and then I pull up the -- I      04:15

 4   have the exemplar folder in my safe.                     04:15

 5           Say it's Amy.  I pull out the Amy folder,        04:15

 6   look at the photo.  Okay, this is Amy.  And I look       04:15

 7   at the chart exploitation image, that's Amy; compare    04:15

 8   the two.  I remember that, yes, I met Amy at X, Y, Z     04:15

 9   at this time.  She showed me either a government ID      04:15

10   or passport.  Or if the survivor is a juvenile, then    04:15

11   I talk to Mom and also seen the juvenile there at        04:15

12   the same time.                                           04:15

13       Q.   So you're saying besides the meeting Amy        04:15

14   in this case, you met Amy previously on at least one     04:15

15   occasion?                                                04:15

16       A.   No.  I met -- I met the survivors only one      04:15

17   time, but I got the image from them.  And then when     04:16

18   I'm looking -- then I'm looking at the child            04:16

19   pornographic image.                                      04:16

20           And I'll give you a perfect example.             04:16

21           One of the images in this case deals             04:16

22   with -- deals with a young lady -- I say young          04:16

23   lady -- juvenile that's with a dog.  I remember that    04:16

24   vividly.  I can pick out -- I can tell you nearly       04:16

25   every image in that series.                              04:16
```

Page 106

| | | |
|---|---|---|
| 1 | I don't remember the survivor's name, but | 04:16 |
| 2 | when I look at the image I can remember that it's X, | 04:16 |
| 3 | Y, Z person because I've seen that image, you know, | 04:16 |
| 4 | 5,000 times during my career as -- you know, looking | 04:16 |
| 5 | at child exploitation images. | 04:16 |
| 6 | Q.   So let's talk about that bestiality | 04:16 |
| 7 | series.  You said when you see it you can remember | 04:16 |
| 8 | that person. | 04:16 |
| 9 | A.   Absolutely. | 04:16 |
| 10 | Q.   Who is that person? | 04:16 |
| 11 | A.   I don't remember.  I don't remember the | 04:16 |
| 12 | name.  I'm saying I can remember by looking at her. | 04:16 |
| 13 | Oh, I know -- I know I have a picture of this girl. | 04:16 |
| 14 | Okay.  Who is it? | 04:16 |
| 15 | Q.   I'm asking you. | 04:17 |
| 16 | A.   That's what I ask myself.  And then I have | 04:17 |
| 17 | the stack of folders I can go through.  Okay.  Who | 04:17 |
| 18 | do we have in this case?  And then I go through the | 04:17 |
| 19 | stack of folders that I have in this case.  And I'm | 04:17 |
| 20 | saying, okay, I found the folder.  This is the image | 04:17 |
| 21 | of whoever it is.  And I compare it to the child | 04:17 |
| 22 | pornographic image and it's the same person. | 04:17 |
| 23 | Q.   So when you see the child pornographic | 04:17 |
| 24 | images, you can't, based on memory, identify who | 04:17 |
| 25 | they are; is that right? | 04:17 |

Page 107

1        A.    That's right.   And I specifically don't        04:17

2    commit that to memory.                                    04:17

3        Q.    Okay.   I just want to make sure we're          04:17

4    clear.                                                    04:17

5            You go to San Francisco.   Popper gives you       04:17

6    the hard drive.   You're running your searches.   You     04:17

7    see an image of a girl involved in an act of              04:17

8    bestiality, a child.   You know you've seen that          04:17

9    image before, but you don't remember who it is; is        04:17

10   that right?                                               04:17

11       A.    Yes.                                            04:17

12       Q.    Okay.   And with regard to any plaintiff in     04:17

13   this case, you don't remember what they look like;        04:17

14   is that correct?                                          04:17

15       A.    No.   No, that is correct.                      04:17

16       Q.    And with respect to -- you said you only        04:18

17   met them once.   I want to get back to where we           04:18

18   started.                                                  04:18

19            You talked about meeting with survivors          04:18

20   all over the country.   Those were one-on-one in this     04:18

21   case as opposed to some sort of seminar or -- or          04:18

22   event where there's multiple survivors; is that           04:18

23   right?                                                    04:18

24       A.    It was all -- it was all one-on-one.   I        04:18

25   met -- I met a group of them at one time, but I did       04:18

                                                Page 108

```
 1    not meet them as a group.                            04:18
 2         Q.   Okay.  And you say you've seen some of     04:18
 3    these images thousands of times.  Do you remember    04:18
 4    that testimony?                                       04:18
 5         A.   Absolutely.                                 04:18
 6         Q.   Which of -- which of these groups have you 04:18
 7    seen thousands of times?                              04:18
 8         A.   Well, I don't want -- I don't want to      04:18
 9    speak out of turn and mention somebody that's not    04:18
10    involved in this case.  But I will say -- I will use 04:18
11    the example of the little girl with the dog, with    04:18
12    the bestiality.  I know that's in this -- in this    04:18
13    case.  I've seen that one hundreds of times.         04:18
14         Q.   I'm asking in this case if there's any     04:18
15    plaintiffs' photographs that you've seen thousands   04:18
16    of times.                                             04:19
17         A.   Yes, but I would have to go through --     04:19
18    I'll say the one with the dog, I've probably seen    04:19
19    that one thousands of times, the still images plus   04:19
20    the -- plus the videos.                               04:19
21         Q.   And you haven't done thousands of cases,   04:19
22    right?                                                04:19
23         A.   I have not.                                 04:19
24         Q.   So how is it that you have seen these      04:19
25    images thousands of times?                            04:19
```

Page 109

```
 1        A.   Well, some -- some people have multiple    04:19
 2   media.  So you find one picture on a hard drive.      04:19
 3   You find one on a thumb drive.  You find one on a CD   04:19
 4   or a floppy disk back in the day or printed images.    04:19
 5   Some people, you know, that I've been -- cases I've    04:19
 6   been involved with have printing -- printed images.    04:19
 7        Q.   Okay.  Well, let's try to break out the     04:19
 8   difference between seeing something on thousands of    04:19
 9   occasions or seeing thousands of images.  Do you       04:19
10   understand that there could be a difference between    04:19
11   those two ideas?                                       04:19
12        A.   Yes.                                         04:19
13        Q.   The thousands of times would be occasions   04:19
14   separated in place and time; is that right?            04:19
15        A.   Or -- or during the day.                     04:19
16        Q.   Oh, so if you saw a thousand images in one  04:20
17   day, you would have seen those images thousands of     04:20
18   times?  Is that what you mean?                         04:20
19        A.   Yes, or on a day or in separate occasions.  04:20
20   I'm saying over -- over my career I've seen some of    04:20
21   those images hundreds, some of them thousands of       04:20
22   times.                                                 04:20
23        Q.   How many cases have you been involved with  04:20
24   where you viewed child pornography?                    04:20
25        A.   I did 353 exams, if my memory serves me.    04:20
```

Page 110

```
 1    And I've seen child pornography outside of exams --    04:20
 2    I don't know -- a couple hundred, probably.            04:20
 3         Q.    Couple hundred, okay.                        04:20
 4              Okay.  And one of the things you said is      04:20
 5    you purposely try not to commit these things to         04:20
 6    memory because it would trigger your PTSD.  Did I       04:20
 7    understand that correctly?                              04:20
 8         A.    That is correct.                             04:21
 9         Q.    And I'm going to tread lightly here.  This   04:21
10    is an expert deposition.  This isn't your personal      04:21
11    capacity.  And I'm going to be very sensitive to        04:21
12    that.                                                   04:21
13              You know, you're an expert witness.  But I    04:21
14    just want to understand the effect.  You brought it     04:21
15    up that it affects your performance on your work,       04:21
16    and I want to explore it a little bit.                  04:21
17              Is your PTSD diagnosis related to child       04:21
18    pornography, your work in the military, or something    04:21
19    completely different?                                   04:21
20         A.    Well, I've never been -- I've never been     04:21
21    clinically diagnosed with PTSD.  You know, I know       04:21
22    the symptoms of it, and it would be related to my       04:21
23    work investigating crimes against children, child      04:21
24    exploitation.                                           04:21
25         Q.    And tell me how your -- despite the fact     04:21
```

Page 111

1    that you don't have a clinical diagnosis, you used          04:21
2    the expression "trigger your PTSD" because you             04:21
3    believe you exhibit -- you exhibit PTSD based on           04:21
4    your work in this field.                                   04:22
5            Did I say that accurately, sir?                     04:22
6       A.   You did.                                            04:22
7       Q.   Okay.  How, if in any way, does PTSD, your          04:22
8    PTSD, affect your ability to perform the functions         04:22
9    of a forensic examiner in the child pornography            04:22
10   field?                                                     04:22
11      A.   It doesn't.                                         04:22
12      Q.   Okay.  So it just triggers you.  So when            04:22
13   it triggers you, what are the ill effects you suffer       04:22
14   from the triggering?                                       04:22
15      A.   A little bit of depression.  And I'll --            04:22
16   you know, I used to be an avid viewer of the news.         04:22
17   I used to be an avid reader of the newspaper.  When        04:22
18   I -- after a few years of working these cases, I           04:22
19   stopped looking at the newspaper.  I stopped               04:22
20   watching the news.                                         04:22
21      Q.   Are there --                                        04:22
22      A.   I don't -- I don't need to hear about bad           04:22
23   things when I've spent -- when I've spent my days          04:22
24   looking at children being, you know, brutally raped.       04:22
25      Q.   Are there any other ill effects or                 04:22

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | debilitating effects that PTSD has on you related to | 04:22 |
| 2 | your work in the child pornography field? | 04:23 |
| 3 | A.   No, not that I know of. | 04:23 |
| 4 | Q.   Well, let us go back to where we were. | 04:23 |
| 5 | Let's go back to Exhibits 3 through 24.  Do you have | 04:23 |
| 6 | them available to you? | 04:23 |
| 7 | A.   I do. | 04:23 |
| 8 | Q.   Okay.  We're going to go through these out | 04:23 |
| 9 | of order, but I want to go through them.  If you | 04:23 |
| 10 | will pull up Exhibit 15 and Exhibit 21. | 04:23 |
| 11 | (Exhibit 15 was marked for | 04:23 |
| 12 | identification and attached | 04:23 |
| 13 | hereto.) | 04:23 |
| 14 | THE WITNESS:  I can only pull up one at a | 04:23 |
| 15 | time. | 04:23 |
| 16 | BY MR. BALOGH: | 04:23 |
| 17 | Q.   Okay.  We'll start with 15. | 04:23 |
| 18 | MR. BALOGH:  Are you okay, Carol?  What's | 04:23 |
| 19 | your problem, Ms. Hepburn? | 04:23 |
| 20 | MS. HEPBURN:  It didn't show up at first, | 04:24 |
| 21 | but I got it now. | 04:24 |
| 22 | MR. BALOGH:  Okay.  Problem solved. | 04:24 |
| 23 | That's enough. | 04:24 |
| 24 | Q.   Back to the witness. | 04:24 |
| 25 | Mr. Laws, what is Exhibit 15? | 04:24 |

Page 113

```
 1        A.   Declaration of Kevin J. Laws.  It says         04:24
 2   "Ex. 15 Mya signed, 3 dots, 0.PDF."                      04:24
 3        Q.   But what is it actually?  Can you just         04:24
 4   describe -- as opposed to what I've labeled              04:24
 5   Exhibit 15, can you, from your review of it, tell me     04:24
 6   what it is?                                              04:24
 7        A.   Yes, it's my declaration about Mya.            04:24
 8        Q.   Okay.                                          04:24
 9        A.   About when I met her and how she was           04:24
10   identified.                                              04:24
11        Q.   Okay.  And who -- who prepared this?           04:24
12        A.   Ms. Hepburn.                                   04:24
13        Q.   And tell me the dynamics of how she -- of      04:24
14   how you received this document.                          04:24
15        A.   I just -- I got it via email.                  04:24
16        Q.   Okay.  And prior to the time that you got      04:24
17   this email from Ms. Hepburn, did you provide her         04:24
18   notes or data for the purpose of preparing this          04:25
19   declaration?                                             04:25
20        A.   Yes.                                           04:25
21        Q.   Okay.  And did you maintain copies of          04:25
22   those notes?                                             04:25
23        A.   It wasn't -- it wasn't a note.  It was a       04:25
24   draft report.                                            04:25
25        Q.   Oh, it was a draft report.  So you saw         04:25
```

Page 114

```
 1    that draft report and one of the things that came       04:25
 2    out of it, from the draft -- she prepared this for       04:25
 3    you; is that right?                                      04:25
 4         A.   That's correct.                                04:25
 5         Q.   Is that true -- withdrawn.                      04:25
 6                        (Exhibit 21 was marked for           04:23
 7                         identification and attached          04:23
 8                         hereto.)                             04:23
 9    BY MR. BALOGH:                                            04:23
10         Q.   And can you open Exhibit 21?  Take a look       04:25
11    at it and let me know when you have had the              04:25
12    opportunity to have done so.                             04:25
13              (Pause while witness peruses document.)         04:25
14         A.   Okay.                                           04:25
15         Q.   What is 21?                                     04:25
16         A.   That -- that is my report in reference to      04:25
17    the forensic exam I did on Curtis investigation.         04:25
18         Q.   Okay.  And did you sign it?                     04:25
19         A.   Yes.                                            04:26
20         Q.   Who prepared this report?                       04:26
21         A.   I did.                                          04:26
22         Q.   So all the words in here you typed              04:26
23    yourself?                                                 04:26
24         A.   Yes.                                            04:26
25         Q.   Okay.  Did you have counsel comment on the      04:26
```

                                                Page 115

| | | |
|---|---|---|
| 1 | draft before you submitted -- signed and submitted | 04:26 |
| 2 | this report? | 04:26 |
| 3 | A.   Yes. | 04:26 |
| 4 | Q.   As a result of providing that draft, did | 04:26 |
| 5 | you and/or the lawyers edit the report to change -- | 04:26 |
| 6 | to change portions of it? | 04:26 |
| 7 | A.   Yes. | 04:26 |
| 8 | Q.   Is there anything in this report that | 04:26 |
| 9 | you'd like to change at this point in time? | 04:26 |
| 10 | A.   Not that I know of. | 04:26 |
| 11 | Q.   Okay.  And I want to -- please take a look | 04:26 |
| 12 | at the bottom of page 2 of the case. | 04:26 |
| 13 | MS. HEPBURN:  Exhibit 21 you mean? | 04:26 |
| 14 | BY MR. BALOGH: | 04:26 |
| 15 | Q.   Yeah, page 2 of Exhibit 21.  If you look | 04:26 |
| 16 | at the bottom of it, it says "In addition to the | 04:26 |
| 17 | aforementioned materials," and then it lists other | 04:27 |
| 18 | materials you were provided.  Do you see that? | 04:27 |
| 19 | A.   I do. | 04:27 |
| 20 | Q.   Turning to the top of page 3, it notes the | 04:27 |
| 21 | declaration of Deborah Behymer dated November 23, | 04:27 |
| 22 | 2020.  Do you see that? | 04:27 |
| 23 | A.   I do. | 04:27 |
| 24 | Q.   How -- how -- withdrawn. | 04:27 |
| 25 | Was the declaration of Deborah Behymer | 04:27 |

Page 116

```
 1    material to the opinions you've formed as presented    04:27
 2    in your declaration in this report with respect to     04:27
 3    the pending summary judgment motion?                   04:27
 4         A.   No.                                          04:27
 5         Q.   How about the declaration of Thomas          04:27
 6    Rothrock?                                              04:27
 7         A.   No.                                          04:27
 8         Q.   So those were immaterial to you?  You just   04:27
 9    received them, but they don't affect your testimony    04:27
10    in any way, shape, or form; is that correct?           04:27
11         A.   That is correct.                             04:27
12         Q.   Okay.  Is there anything missing from this   04:27
13    report to describe what you did with respect to your   04:27
14    investigation of the -- the hard drive held in         04:27
15    San Francisco?                                         04:27
16         A.   No.                                          04:28
17         Q.   Okay.  Would it be fair to say -- and if     04:28
18    you don't recollect Exhibit 15, please let me know     04:28
19    and I'll give you a chance to take another look --     04:28
20    that Exhibit 15 addresses your work on the question    04:28
21    of identifying plaintiffs.                             04:28
22              And the Exhibit 21 sets forth your work      04:28
23    with regards to the forensics examination of           04:28
24    materials represented by Special Agent Popper to you   04:28
25    as having been seized from Mr. Curtis; is that         04:28
```

Page 117

```
 1   correct?                                              04:28

 2       A.   Yes.  If I heard that correctly, yes.        04:28

 3       Q.   And I want you to take a look at Exhibit 6   04:28

 4   and -- 16 and 22, and let me know after you've        04:28

 5   reviewed them.  I'll give you the question while       04:28

 6   you're reviewing them to make it easy.                04:28

 7                        (Exhibit 16 was marked for        04:28

 8                         identification and attached      04:28

 9                         hereto.)                         04:28

10   BY MR. BALOGH:                                         04:28

11       Q.   Is Exhibit 16 your report regarding the      04:28

12   investigation of Pia's identity, and Exhibit 2 being  04:28

13   the companion report of your investigation of the     04:29

14   San Francisco hard drive with respect to finding      04:29

15   images of Pia?                                         04:29

16       A.   Okay.  You said 16 and 2?                     04:29

17       Q.   22.                                           04:29

18       A.   22.                                           04:29

19                        (Exhibit 22 was marked for        04:29

20                         identification and attached      04:29

21                         hereto.)                         04:29

22            THE WITNESS:  Yes.                            04:29

23   BY MR. BALOGH:                                         04:29

24       Q.   Okay.  And I'm going to continue on this     04:29

25   line of questioning for a moment with regard to the   04:29
```

Page 118

| | | |
|---|---|---|
| 1 | rest of the reports.  But let me step away for one | 04:29 |
| 2 | moment.  It just dawned on me, we didn't finish your | 04:29 |
| 3 | clarification. | 04:29 |
| 4 | When we came back from the break, you | 04:29 |
| 5 | wanted to clarify stuff about providing lay | 04:29 |
| 6 | testimony or testimony about identifying the | 04:29 |
| 7 | plaintiffs.  And you referred to the number of times | 04:30 |
| 8 | you've seen the images, your memory, meetings with | 04:30 |
| 9 | survivors, your memory suppression techniques, and | 04:30 |
| 10 | your fear of triggering PTSD in yourself by virtue | 04:30 |
| 11 | of the work that you do in this field. | 04:30 |
| 12 | Do you remember that testimony? | 04:30 |
| 13 | A.   I do. | 04:30 |
| 14 | MS. HEPBURN:  Objection to the extent | 04:30 |
| 15 | incomplete.  Answer stands. | 04:30 |
| 16 | BY MR. BALOGH: | 04:30 |
| 17 | Q.   Have you received any particular training | 04:30 |
| 18 | when you were employed as a law enforcement officer | 04:30 |
| 19 | with respect to identifying survivors of child | 04:30 |
| 20 | pornography as -- as your role? | 04:30 |
| 21 | A.   No. | 04:30 |
| 22 | Q.   Have you taken any classes in that field? | 04:30 |
| 23 | A.   No. | 04:30 |
| 24 | Q.   Have you obtained any specialized | 04:30 |
| 25 | knowledge in that field? | 04:30 |

Page 119

| | | |
|---|---|---|
| 1 | A.   Just what I learned from -- from on the | 04:30 |
| 2 | job. | 04:30 |
| 3 | Q.   And what did you learn on the job of | 04:30 |
| 4 | identifying survivors from child pornography | 04:30 |
| 5 | collections? | 04:30 |
| 6 | A.   Well, once you recognize -- once you | 04:31 |
| 7 | recognize the image as child pornography, then you | 04:31 |
| 8 | recognize the person in the -- in the photo. | 04:31 |
| 9 | Q.   And so you're saying you -- you -- and in | 04:31 |
| 10 | those cases when you were an agent, did you get -- | 04:31 |
| 11 | did you have cases where you identified the victim | 04:31 |
| 12 | by looking at a photograph of her, not in the child | 04:31 |
| 13 | pornography context, and comparing that photograph | 04:31 |
| 14 | to the child pornography? | 04:31 |
| 15 | A.   Actually, it was the -- actually, it was | 04:31 |
| 16 | the other way around. | 04:31 |
| 17 | Q.   Can you please explain that? | 04:31 |
| 18 | A.   Yes.  So in one specific instance, I was | 04:31 |
| 19 | doing an examination, found a picture of a juvenile | 04:31 |
| 20 | female that was being sexually abused.  We found out | 04:31 |
| 21 | who it was and got a picture.  I think we got a | 04:31 |
| 22 | picture from law enforcement.  I don't exactly | 04:31 |
| 23 | remember.  And then compared it to the abuse photo. | 04:31 |
| 24 | Q.   And so there was no -- you didn't undergo | 04:32 |
| 25 | any training for that; you just did it on this | 04:32 |

Page 120

```
 1    occasion as part of the job of trying to identify        04:32
 2    the victim of child abuse; is that correct?              04:32
 3         A.    That's correct.                               04:32
 4         Q.    Do you remember the name of that case?        04:32
 5         A.    Charles Neyhart.                              04:32
 6         Q.    Can you spell Neyhart for me, sir?            04:32
 7         A.    N-E-Y-H-A-R-T.                                04:32
 8         Q.    And was that a federal case?                  04:32
 9         A.    Yes.                                          04:32
10         Q.    Was that in Yuma, Arizona, or Anchorage,      04:32
11    Alaska, or someplace else?                               04:32
12         A.    Well, it started in -- I believe it was in    04:32
13    Chicago, and then we got the lead in Anchorage.          04:32
14         Q.    Was he prosecuted in Anchorage?               04:32
15         A.    I'm trying to remember.  I believe he was.    04:32
16    I believe they did a global agreement and rolled the     04:32
17    Chicago charges in with the Anchorage charges.           04:32
18         Q.    I think that's all.  Is there any other       04:32
19    specialized knowledge or training that you've had        04:32
20    that -- that -- on the issue of identifying people       04:33
21    in photographs as compared to child pornography?         04:33
22         A.    No.                                           04:33
23         Q.    Okay.  Going back to your expert exhibits.    04:33
24    I'm going to next ask you to look at Exhibits 19, 5      04:33
25    and 6.  And the question will be, is 19 your             04:33
```

Page 121

```
 1   declaration on the identification procedures you        04:33
 2   used regarding Savannah and Skylar; and Exhibit 5,      04:33
 3   the companion report on the hard drive search           04:33
 4   related to Savannah; and Exhibit 6, the report --       04:33
 5   the same hard drive investigation report regarding      04:33
 6   Skylar?                                                 04:33
 7        A.   Okay.  That's a complicated question, so      04:33
 8   let me make sure I can get it right.                    04:33
 9        Q.   We can break it down.  I'll make it slow      04:34
10   for you.  We don't need to do it fast.  I'd rather      04:34
11   do it right.                                            04:34
12             Let's start with just 19.  I'll ask the      04:34
13   question and do it one at a time.                       04:34
14                       (Exhibit 19 was marked for          04:34
15                        identification and attached        04:34
16                        hereto.)                           04:34
17   BY MR. BALOGH:                                          04:34
18        Q.   Okay.  I'm on -- I'm on 19, and that is       04:34
19   the document used to identify Savannah and Skylar.      04:34
20                       (Exhibit 5 was marked for           04:34
21                        identification and attached        04:34
22                        hereto.)                           04:34
23   BY MR. BALOGH:                                          04:34
24        Q.   Okay.  And then Exhibit 6 -- what is          04:34
25   Exhibit 5?                                              04:34
```

Page 122

```
 1        A.    Exhibit 5 is the examination of media       04:34

 2   belonging to Curtis in reference to Jan Socks --       04:34

 3   sorry.  I misspoke there.  I need to scroll down a     04:34

 4   moment.  In reference to Savannah.                     04:34

 5                     (Exhibit 6 was marked for            04:34

 6                     identification and attached          04:34

 7                     hereto.)                             04:34

 8   BY MR. BALOGH:                                         04:34

 9        Q.    And Exhibit 6.                              04:34

10        A.    Exhibit 6 is my forensic report again from 04:35

11   media seized from Curtis referencing Skylar.           04:35

12        Q.    So those three exhibits together concern    04:35

13   the identification of Skylar and Savannah as well      04:35

14   the results of your forensic examination as relates    04:35

15   to their images; is that correct?                      04:35

16        A.    That's correct.                             04:35

17        Q.    Next, let's do the same for Exhibits 20, 4  04:35

18   and 7, which should be about Sierra and Sally.         04:35

19        A.    24 and 7 or 20, 4 and 7?                    04:35

20        Q.    20, 4, 7.  Thank you, Mr. Laws.             04:35

21        A.    20 is my identification of Sierra and       04:36

22   Sally.                                                 04:36

23                     (Exhibit 20 was marked for           04:36

24                     identification and attached          04:36

25                     hereto.)                             04:36
```

Page 123

```
 1                    (Exhibit 4 was marked for        04:36

 2                    identification and attached      04:36

 3                    hereto.)                         04:36

 4                    (Exhibit 7 was marked for        04:36

 5                    identification and attached      04:36

 6                    hereto.)                         04:36

 7           THE WITNESS:  Exhibit Number 7 is my      04:36

 8   forensic report from media seized from Curtis in  04:36

 9   reference to images of Sally.                     04:36

10   BY MR. BALOGH:                                    04:36

11        Q.   So again, we can confirm that these three  04:36

12   documents are both containing identification --   04:36

13           THE REPORTER:  I'm sorry.  Counsel, can   04:36

14   you repeat your question?                         04:36

15           MR. BALOGH:  Certainly.                   04:36

16        Q.   Exhibit 20 then is the identification   04:36

17   report reflecting the procedures applied to identify  04:36

18   Sierra and Sally, followed by Exhibit 14 --       04:37

19   Exhibits 4 and 7, which are the reports of the    04:37

20   forensic examination as relates to those two same 04:37

21   plaintiffs; is that correct?                      04:37

22        A.   Number 4 is the identification of Skylar.  04:37

23                    (Exhibit 14 was marked for       04:37

24                    identification and attached      04:37

25                    hereto.)                         04:37
```

Page 124

```
 1   BY MR. BALOGH:                                      04:37

 2       Q.   Is there a forensic report in here that   04:37

 3   relates to -- withdrawn.  That's fine.             04:37

 4           Can you take a look at 24 followed by 3,    04:37

 5   and let us know if that's the identification report 04:37

 6   and forensic report regarding Violet.              04:37

 7                        (Exhibit 24 was marked for     04:38

 8                         identification and attached   04:38

 9                         hereto.)                      04:38

10                        (Exhibit 3 was marked for      04:38

11                         identification and attached   04:38

12                         hereto.)                      04:38

13           THE WITNESS:  Exhibit 24 is my             04:38

14   identification report of Violet.                   04:38

15           And what was the next one, please?         04:38

16   BY MR. BALOGH:                                      04:38

17       Q.   3.                                         04:38

18       A.   And Exhibit 3 is my forensic report from  04:38

19   media seized from Curtis identifying images of     04:38

20   Violet.                                             04:38

21       Q.   My next question is -- I see your         04:38

22   identification report for Amy as Exhibit 9.  Would 04:38

23   you check that for me, sir?                         04:38

24       A.   Yes.                                       04:38

25
```

Page 125

```
 1                    (Exhibit 9 was marked for        04:38

 2                    identification and attached      04:38

 3                    hereto.)                         04:38

 4   BY MR. BALOGH:                                    04:38

 5       Q.   I haven't seen -- first of all, is that 04:39

 6   correct that Exhibit 9 is --                      04:39

 7       A.   That is correct.                         04:39

 8            THE REPORTER:  I'm sorry.  Counsel, your 04:39

 9   question again.  "Exhibit 9"...                   04:39

10   BY MR. BALOGH:                                    04:39

11       Q.   -- your identification report as relates 04:39

12   to Amy?                                           04:39

13       A.   Yes, it is.                              04:39

14       Q.   Okay.  I was not provided a forensic     04:39

15   report that relates to Amy.  Did you not produce  04:39

16   one?                                              04:39

17       A.   If there wasn't a forensic report, then  04:39

18   the survivor didn't appear in my forensic exam.   04:39

19       Q.   Okay.  And so I'll ask you to take a look 04:39

20   at, also, 10.  Would you tell me what that is?     04:39

21                    (Exhibit 10 was marked for        04:39

22                    identification and attached       04:39

23                    hereto.)                          04:39

24            THE WITNESS:  Exhibit Number 10 is the    04:39

25   identification report in reference to Erika.       04:39
```

Veritext Legal Solutions
866 299-5127

```
 1    BY MR. BALOGH:                                    04:39

 2        Q.   And, again, it does not -- it was not   04:39

 3    produced to the defense with your --             04:40

 4            THE REPORTER:  I'm sorry.  Counsel, we're 04:40

 5    losing you on the audio.  One more time, please. 04:40

 6    BY MR. BALOGH:                                    04:40

 7        Q.   In the materials we were provided with, 04:40

 8    your expert disclosures on November 30th, we do not 04:40

 9    have a forensic report regarding Erika.  Can you  04:40

10    explain why that is?                              04:40

11        A.   If there wasn't a forensic report, then 04:40

12    that image did not appear in my examination.      04:40

13        Q.   Okay.  And I'd ask you to look at        04:40

14    Exhibit 12 regarding Jessica.                     04:40

15                    (Exhibit 12 was marked for        04:40

16                     identification and attached      04:40

17                     hereto.)                         04:40

18            THE WITNESS:  That is my identification   04:40

19    report of Jessica.                                04:40

20    BY MR. BALOGH:                                    04:40

21        Q.   And with the report, again, we were not 04:40

22    provided a forensic report regarding Jessica.  Does 04:40

23    that mean there was no -- that you were unable to 04:40

24    identify Jessica from the files that were contained 04:40

25    during your forensic review?                      04:41
```

Page 127

```
 1        A.    Either I couldn't identify her or the          04:41

 2   picture wasn't there.                                     04:41

 3        Q.    Okay.  Next, Tori, Exhibit 13.  Could you       04:41

 4   take a look at that.                                      04:41

 5                         (Exhibit 13 was marked for          04:41

 6                         identification and attached         04:41

 7                         hereto.)                            04:41

 8             THE WITNESS:  Yes.                              04:41

 9   BY MR. BALOGH:                                            04:41

10        Q.    And this is the identification report with     04:41

11   respect to your meeting with Tori; is that correct?      04:41

12        A.    Correct.                                        04:41

13        Q.    And, again, we do not have a forensic          04:41

14   report from you.  What does that indicate?               04:41

15        A.    That I could not -- either her picture         04:41

16   wasn't there or I couldn't identify her during the       04:41

17   examination.                                             04:41

18        Q.    Finally, I'd ask you to look at Exhibit 18     04:41

19   and tell us if that is the identification report for      04:41

20   Sarah.                                                   04:41

21                         (Exhibit 18 was marked for          04:41

22                         identification and attached         04:41

23                         hereto.)                            04:41

24             THE WITNESS:  Yes, it is.                       04:41

25   BY MR. BALOGH:                                            04:41
```

Page 128

1     Q.    Okay.   And does that -- excuse me.   There      04:41

2  is no individualized report, forensic report, for      04:42

3  Sarah.   Do you know what that means?                   04:42

4     A.    The same -- the same as the previous.          04:42

5     Q.    Okay.  Did you ever have a conversation         04:42

6  with plaintiffs' counsel about your inability to         04:42

7  identify any of the plaintiffs in this case as           04:42

8  having images possessed by Curtis?                       04:42

9     A.    I'm sorry, can you say that again?              04:42

10     Q.    Following your forensic examination of the     04:42

11  hard drive in San Francisco and the work you did        04:42

12  there to create forensic reports, did there come a      04:42

13  time when you had a conversation with plaintiffs'       04:42

14  counsel with respect to your inability to locate        04:42

15  images of one or more plaintiffs in this case?          04:42

16     A.    Yes.                                            04:42

17     Q.    And can you tell me about that                 04:42

18  conversation?                                            04:42

19     A.    Well, there was -- it was just asked when      04:42

20  we were doing the exam, you know, why -- why can't      04:42

21  you find all the images that Agent Popper found?       04:42

22  And that's an easy -- it's an easy answer.             04:43

23         As I said earlier, when I was a -- when I       04:43

24  was a working agent, we didn't concern ourselves        04:43

25  with what series was found on a computer or what        04:43

Veritext Legal Solutions
866 299-5127

1    survivor victim was found on a computer.  We just          04:43

2    found all the child pornography, child exploitation        04:43

3    material, and forwarded that for charges.                  04:43

4             Now I'm in a position where I'm -- where          04:43

5    I'm severely narrowed at what I can look at.  So if        04:43

6    I don't have a hash value that matches the picture         04:43

7    or if I don't have the correct name, then there's no       04:43

8    way for me to find that image on the media.                04:43

9        Q.   Okay.  Did you ever document in writing           04:43

10   the identity of the plaintiffs you could not find          04:43

11   images --                                                  04:43

12            THE REPORTER:  I'm sorry.  Counsel, one           04:43

13   more time, please.                                         04:43

14   BY MR. BALOGH:                                             04:43

15       Q.   Did you ever document in any way the names        04:43

16   or identities of the plaintiffs whose images you           04:43

17   failed to find in the San Francisco hard drive?            04:44

18       A.   No.                                               04:44

19       Q.   Can you -- withdrawn.                             04:44

20            MS. HEPBURN:  I'm sorry, what did you say,        04:44

21   Counsel?                                                   04:44

22            MR. BALOGH:  Withdrawn.  I do that when I         04:44

23   start a question and then realize I want to ask a          04:44

24   different question.                                        04:44

25       Q.   I want to talk -- you in your expert              04:44

                                                     Page 130

```
 1    opinion in this case, I believe, have applied a         04:44

 2    definition of what constitutes child pornography; is     04:44

 3    that correct, sir?                                       04:44

 4         A.   Yes.                                           04:44

 5         Q.   And tell me what constitutes child            04:44

 6    pornography.                                             04:44

 7         A.   Lewd -- lewd and -- lewd and lascivious       04:44

 8    display of the genitals or actual or simulated           04:44

 9    sexual contact.  And that's the short version.          04:44

10         Q.   Give me the most exact version you're         04:44

11    capable of, please.                                      04:44

12         A.   That's it.  Lewd and lascivious display of    04:44

13    the genitals, meaning the focal point of the camera      04:45

14    is on the genitals, or actual or simulated sexual        04:45

15    conduct.                                                 04:45

16         Q.   When you say "the focal point," does that     04:45

17    mean that there's something about the photograph,        04:45

18    the way it's posed, that brings the viewer's             04:45

19    attention to that's what they should focus on?           04:45

20         A.   Yes.                                           04:45

21         Q.   Okay.  And so can you give me an example      04:45

22    of a nude photograph that would have that focal          04:45

23    point on the genitals and give me an example of a        04:45

24    nude photograph that wouldn't.                           04:45

25         A.   One of the -- one of the images in this       04:45
```

                                                    Page 131

1   case, the little girl is bent over at the waist, her   04:45

2   feet are planted on the ground, her palms are in   04:45

3   front of her, and the focal point is from behind.   04:45

4   So focusing on the anus and the vaginal area of the   04:45

5   girl.  So when you look at the photo, that's   04:45

6   immediately what you are drawn to.   04:45

7            As opposed to that would be what I'd   04:46

8   classify as a nudist shot.  One that I can remember   04:46

9   distinctly, there's a young boy and he's completely   04:46

10  naked, merely sitting in a tree.   04:46

11       Q.  So would it be a fair description to the   04:46

12  definition you are adopting of the focal point   04:46

13  assessment is some pictures, by their posing, call   04:46

14  attention to that they are supposed to be sexual   04:46

15  photographs on display, if you would, legs spread,   04:46

16  touching the genitals, it brings the viewer clearly   04:46

17  to focus on the pubis versus --   04:46

18       A.  It doesn't --   04:46

19       Q.  Go ahead.  You can correct me.   04:46

20       A.  It doesn't have to be -- it doesn't have   04:46

21  to be the pose.  It could be -- it could be an   04:46

22  innocuous pose from a child, but then whoever is   04:46

23  taking the photo, you know, zooms in on the genitals   04:46

24  or --   04:46

25       Q.  Okay.  So the focal point could be caused   04:46

Page 132

| | | |
|---|---|---|
| 1 | by the fact the way that a photograph is cropped, | 04:46 |
| 2 | it's only a picture of the pubis, it's not a full | 04:47 |
| 3 | body shot, and it's obvious that the photographer is | 04:47 |
| 4 | trying to exhibit that portion of the child as | 04:47 |
| 5 | opposed to a picture of the child.  Would you agree? | 04:47 |
| 6 | MS. HEPBURN:  Objection.  Objection. | 04:47 |
| 7 | Misstatement of testimony. | 04:47 |
| 8 | BY MR. BALOGH: | 04:47 |
| 9 | Q.   Would you agree with that? | 04:47 |
| 10 | A.   Basically, yes. | 04:47 |
| 11 | Q.   Okay.  Is that -- | 04:47 |
| 12 | A.   There's other -- there's other ways to | 04:47 |
| 13 | take a photo to draw your attention to the -- to the | 04:47 |
| 14 | pubic area of a child. | 04:47 |
| 15 | Q.   Can you tell me those other ways, please. | 04:47 |
| 16 | A.   Say, for instance, someone is taking a | 04:47 |
| 17 | picture from the top down, and it's a boy, and you | 04:47 |
| 18 | can see the -- see the erection.  Or it's taken | 04:47 |
| 19 | from, you know, from the top again.  The child is | 04:47 |
| 20 | sitting in the bathtub.  Rather than seeing the | 04:47 |
| 21 | picture from the side like, you know, all this is -- | 04:47 |
| 22 | this is my child splashing around in the tub, it's | 04:47 |
| 23 | taken from the top, so it's a clear indication that | 04:47 |
| 24 | the reason they are taking the photo is to display | 04:47 |
| 25 | the genitals. | 04:48 |

Page 133

1      Q.    Okay.  Any other examples you can give me?         04:48

2      A.    Not -- not off the top of my head.                 04:48

3      Q.    Let's say in the photograph the child is           04:48

4  fully clothed.  Can the photograph still qualify as          04:48

5  child pornography?                                            04:48

6      A.    No.                                                 04:48

7      Q.    So if a child is fully clothed --                   04:48

8            MS. HEPBURN:  Objection.  Incomplete                04:48

9  hypothetical.                                                 04:48

10           MR. BALOGH:  I'll leave it for now.                 04:48

11           THE WITNESS:  Actually, let me clarify              04:48

12  that previous answer.  It would depend on what else          04:48

13  is happening in the photo.                                   04:48

14  BY MR. BALOGH:                                               04:49

15     Q.    Okay.  Let me ask you this question.  Have          04:49

16  you communicated with anybody else by email or              04:49

17  otherwise during this deposition?                            04:49

18     A.    I'm sorry, you're completely broken up.            04:49

19     Q.    Are you communicating by email or                   04:49

20  otherwise with anyone during this deposition?               04:49

21     A.    No.                                                 04:49

22     Q.    If you do read an email or a text from             04:49

23  anyone regarding this case during this deposition,          04:49

24  would you agree to inform me immediately on the             04:49

25  record?                                                      04:49

Page 134

| | | |
|---|---|---|
| 1 | A.    Absolutely. | 04:49 |
| 2 | Q.    The next thing I would like to do is, I | 04:49 |
| 3 | would like you to look at the invoices you provided | 04:49 |
| 4 | to us -- | 04:49 |
| 5 | THE REPORTER:  I'm sorry, Counsel.  You | 04:49 |
| 6 | cut off again.  "The invoices you provided to us"... | 04:49 |
| 7 | BY MR. BALOGH: | 04:49 |
| 8 | Q.    -- or provided to counsel.  I will tell | 04:49 |
| 9 | you the exhibit numbers you should look at.  You | 04:49 |
| 10 | should now look at Exhibits 30 through 41.  Take a | 04:49 |
| 11 | look at those and let me know when you have had a | 04:50 |
| 12 | time to have done so. | 04:50 |
| 13 | A.    Okay. | 04:50 |
| 14 | MS. HEPBURN:  30 through what, Counsel? | 04:51 |
| 15 | MR. BALOGH:  41. | 04:51 |
| 16 | MS. HEPBURN:  41. | 04:51 |
| 17 | You know, this Dropbox, for me, I have to | 04:51 |
| 18 | download each and every one.  I can't just click on | 04:51 |
| 19 | it and have it expand like the Dropbox thing we were | 04:51 |
| 20 | working with yesterday.  So I'm a little bit slow, I | 04:51 |
| 21 | have to say. | 04:51 |
| 22 | MR. BALOGH:  Oh.  I would have hoped you | 04:51 |
| 23 | had downloaded them previously so they would be | 04:51 |
| 24 | available without the Internet.  But we'll take our | 04:51 |
| 25 | time.  We got plenty. | 04:51 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | MS. HEPBURN:  Only so many hours in the | 04:51 |
| 2 | day, my dear. | 04:51 |
| 3 | BY MR. BALOGH: | 04:52 |
| 4 | Q.   Are you ready, Mr. Laws? | 04:52 |
| 5 | A.   Yes, I am. | 04:52 |
| 6 | Q.   Have you reviewed those documents? | 04:52 |
| 7 | A.   Yes, I have, briefly. | 04:52 |
| 8 | Q.   Are those the invoices you presented to | 04:52 |
| 9 | Carol Hepburn for payment in this case? | 04:52 |
| 10 | A.   Yes. | 04:52 |
| 11 | Q.   They have been paid? | 04:52 |
| 12 | A.   No. | 04:52 |
| 13 | Q.   Let's ask about Exhibit 30. | 04:52 |
| 14 | A.   Actually, let me rephrase that.  I believe | 04:52 |
| 15 | some of them have been paid. | 04:52 |
| 16 | Q.   Okay.  Let's go to Exhibit 30.  Let me | 04:52 |
| 17 | know when you have it before you. | 04:52 |
| 18 | (Exhibit 30 was marked for | 04:52 |
| 19 | identification and attached | 04:52 |
| 20 | hereto.) | 04:52 |
| 21 | BY MR. BALOGH: | 04:52 |
| 22 | Q.   This is a bill regarding Lily; is that | 04:52 |
| 23 | correct? | 04:52 |
| 24 | A.   Yes. | 04:52 |
| 25 | Q.   And as I understand it, Lily used to go by | 04:52 |

Page 136

```
 1    the name Vicky; is that correct?                    04:52

 2         A.   Yes, that one I do remember.              04:52

 3         Q.   And you provided the invoice on August 7, 04:52

 4    and it was due on September 6; is that correct?     04:52

 5         A.   Yes.                                       04:52

 6         Q.   Okay.  And if I'm reading this correctly,  04:52

 7    there are two things you're billing for on this     04:53

 8    invoice.  The first is the evidence review in       04:53

 9    San Francisco for Lily; is that correct?            04:53

10         A.   Yes.                                       04:53

11         Q.   And the rate of 1,043.83, is that your day 04:53

12    rate?                                                04:53

13         A.   Yeah.  That's not for the entire day, but  04:53

14    yes.                                                 04:53

15         Q.   So how many hours does the 1,043.83 for    04:53

16    Lily represent?                                      04:53

17         A.   So what I did, for ease of accounting for  04:53

18    all the attorneys involved, I took my -- my day rate 04:53

19    through the time of the exam and divided it by the   04:53

20    number of plaintiffs in the case.                    04:53

21         Q.   Okay.  And so what's your day rate?        04:53

22         A.   The day rate maximum is -- actually, I     04:53

23    have to look, sorry.                                 04:53

24         Q.   You can do so.                             04:53

25         A.   1,500.                                      04:54
```

Page 137

```
 1        Q.   And so hold on one second.              04:54

 2             Okay.  So as I understand it, what you did   04:54

 3   was you were there in San Francisco for three days;   04:54

 4   correct?                                          04:54

 5        A.   Yes.                                    04:54

 6        Q.   Did you bill for any more than three days?  04:54

 7        A.   No.                                     04:54

 8        Q.   So -- and you billed three days at $1,500   04:54

 9   a day, correct?                                   04:54

10        A.   Well, actually, I did bill more because   04:54

11   the travel day didn't count.  The travel day is also  04:54

12   included in there.                               04:54

13        Q.   So was it one travel day or two travel   04:54

14   days?                                             04:54

15        A.   Two travel days.  One there, one back.   04:54

16        Q.   Okay.  And so you took five days at $1,500   04:54

17   a day and then divided among the plaintiffs in this   04:55

18   case, correct?                                   04:55

19        A.   No, because the travel days is set at 950.   04:55

20        Q.   Oh, so you charged 1500 times 3 plus 950   04:55

21   times 2, and then you apportioned that among the   04:55

22   plaintiffs.  Am I understanding that?            04:55

23        A.   That -- that sounds accurate, but I would   04:55

24   have to go back over the math myself.            04:55

25        Q.   Okay.  Well, let me -- so if it's 1500   04:55
```

Veritext Legal Solutions
866 299-5127

```
 1    times 3, we would agree that adds up to $4,500,          04:55

 2    right?                                                    04:55

 3         A.   Yes.                                            04:55

 4         Q.   And if it's 950 times 2, we would agree         04:55

 5    that that adds up to $1,900, right?                       04:55

 6         A.   Correct.                                        04:55

 7         Q.   And we would then agree that 4,500 plus         04:55

 8    1,900 equals 6,400, correct?                              04:55

 9         A.   I'll have to take your word for that.           04:55

10         Q.   Let's work it out.  If it was 4,500 plus        04:55

11    2,000, that would be 6,500, right?                        04:55

12         A.   Correct.                                        04:56

13         Q.   So if it's 4,500 plus 1,900, it would be        04:56

14    6,400 because it's $100 less.                             04:56

15         A.   Correct.                                        04:56

16         Q.   And there's 14 plaintiffs in this case,         04:56

17    correct?                                                  04:56

18         A.   I don't remember how many.                      04:56

19         Q.   Let's assume that that's correct, that          04:56

20    there's 14.  6,400 divided by 14 equals 457.14.           04:56

21              Would you like to check my math or would        04:56

22    you like to agree to it for the purpose of our            04:56

23    discussion?                                               04:56

24         A.   I will agree with the purpose of this           04:56

25    discussion.                                               04:56
```

Page 139

| | | |
|---|---|---|
| 1 | MS. HEPBURN:  I think 15 plaintiffs, | 04:56 |
| 2 | Counsel. | 04:56 |
| 3 | BY MR. BALOGH: | 04:56 |
| 4 | Q.   Oh, 15 plaintiffs.  So 6400 divided by 15 | 04:56 |
| 5 | equals $426.  Can you explain why you billed Lily | 04:56 |
| 6 | $1,000 for that -- for the San Francisco visit? | 04:56 |
| 7 | A.   I would have to go back over my accounting | 04:56 |
| 8 | of how that came out. | 04:56 |
| 9 | Q.   And was this bill paid? | 04:57 |
| 10 | A.   Yes. | 04:57 |
| 11 | Q.   And the -- the "Prepare evidence for | 04:57 |
| 12 | review (Hash sets)," do you see that entry for $195? | 04:57 |
| 13 | A.   I do. | 04:57 |
| 14 | Q.   What was that?  Can you describe the work? | 04:57 |
| 15 | A.   Yes.  I had to -- I had to prepare my | 04:57 |
| 16 | software for the exam.  So I have to manually import | 04:57 |
| 17 | the hash sets. | 04:57 |
| 18 | So I get them in an email, then I have to | 04:57 |
| 19 | copy them to a text document, and then I have to | 04:57 |
| 20 | bring them into my software. | 04:57 |
| 21 | Q.   Okay.  And who did you get the email from | 04:57 |
| 22 | with the hash values? | 04:57 |
| 23 | A.   From -- either from the attorneys or I | 04:57 |
| 24 | gleaned them off of the NCMEC reports or from the | 04:57 |
| 25 | child exploitation center in Canada. | 04:57 |

Page 140

```
 1        Q.   Okay.  And that's with respect to all of       04:57

 2   these people, the plaintiffs in this case --             04:57

 3   withdrawn.                                                04:57

 4             With respect to Lily, can you tell us           04:57

 5   where you got the hash sets that you used for             04:57

 6   review?                                                   04:58

 7        A.   Specifically, no.                               04:58

 8        Q.   Can you -- with respect to information you      04:58

 9   got from Canada, how did you verify the accuracy of      04:58

10   the information provided by the Canadians?                04:58

11        A.   Well, if it brought up -- if it brought up     04:58

12   a child exploitation picture, that's how it's            04:58

13   verified.                                                 04:58

14        Q.   Okay.  And that's a nonprofit organization     04:58

15   in Canada or is it a governmental organization?          04:58

16        A.   I have no idea.                                 04:58

17        Q.   Okay.  And -- withdrawn.  I'll go forward.     04:58

18             Let's open up Exhibit 31, please.              04:58

19                       (Exhibit 31 was marked for            04:58

20                        identification and attached          04:58

21                        hereto.)                             04:58

22   BY MR. BALOGH:                                            04:58

23        Q.   Was this bill paid?                             04:58

24        A.   Yes.                                            04:58

25        Q.   It's for Sierra and it relates to the same     04:58
```

                                                      Page 141

```
 1    July 2020 evidence review over three days in        04:58

 2    San Francisco as assisted by Special Agent Popper;   04:59

 3    is that correct?                                     04:59

 4         A.   Well, I wouldn't say Agent Popper assisted 04:59

 5    me.  I did the exam.                                 04:59

 6         Q.   Sorry.  That was a poorly framed question. 04:59

 7    Thank you for correcting me.                         04:59

 8              It relates to the same evidence review you 04:59

 9    undertook in San Francisco; is that correct?         04:59

10         A.   That's correct.                            04:59

11         Q.   And this review in San Francisco you       04:59

12    charged $1229.83 for Sierra; is that correct?        04:59

13         A.   That's correct.                            04:59

14         Q.   You didn't do any hash tag -- hash value   04:59

15    preparation for Sierra; is that correct?             04:59

16         A.   No, I did.                                 04:59

17         Q.   Okay.  Can you explain why that's not      04:59

18    listed on the bill at the same hourly rate of $195   04:59

19    an hour for such hash value preparation?             04:59

20         A.   I didn't break -- I didn't break the time  04:59

21    for the hash values down by survivor, just by --     04:59

22    just by one.                                         04:59

23         Q.   I don't -- oh.  So you only did it once    04:59

24    for Sierra?                                          05:00

25         A.   No, I only did it one -- only did it one   05:00
```

Page 142

```
 1   time -- well, I did it more than one time, but I        05:00
 2   didn't -- I didn't break it down, the hourly rate,      05:00
 3   by plaintiff.                                           05:00
 4        Q.   So when did you do the hash value            05:00
 5   preparation in relation to the review in                05:00
 6   San Francisco?                                          05:00
 7        A.   Before -- before I went to San Francisco.    05:00
 8   And then I also did some of it while I was in           05:00
 9   San Francisco.                                          05:00
10        Q.   Okay.  And -- okay.  Can you explain any     05:00
11   other reason for why this bill just includes 1229,      05:00
12   which is almost your complete day rate on a day --      05:00
13   on this project?                                        05:00
14        A.   No.                                          05:00
15        Q.   Let's go forward to Exhibit 32 relating --   05:00
16        A.   I'm sorry.                                    05:00
17        Q.   Exhibit 32.                                   05:00
18                       (Exhibit 32 was marked for          05:00
19                        identification and attached        05:00
20                        hereto.)                           05:00
21   BY MR. BALOGH:                                          05:00
22        Q.   Was this bill paid?                           05:01
23        A.   Yes.                                          05:01
24        Q.   It relates to the San Francisco evidence     05:01
25   review for plaintiff Skylar; is that correct?          05:01
```

Page 143

```
 1        A.    That's correct.                                05:01

 2        Q.    And you billed a total of $1,229 for her?      05:01

 3        A.    Correct.                                       05:01

 4        Q.    Can you explain why that rate is so high       05:01

 5   considering the methodology you described further --      05:01

 6   previously about dividing costs?                          05:01

 7        A.    No.  And I forgot to add that the costs        05:01

 8   also includes airfare, my per diem, hotel.  It's         05:01

 9   just not my -- my daily rate.  There's the               05:01

10   additional costs that are added in there.                05:01

11        Q.    And the plaintiffs' lawyers never asked        05:01

12   for more backup or any sort of justification for         05:01

13   these numbers to show that they were actually done       05:01

14   correctly?                                                05:01

15        A.    Well, it's in my -- everyone -- everyone       05:01

16   involved has my -- has my document that has my pay       05:01

17   rate on there.                                            05:01

18        Q.    Let's take a look at -- excuse me.             05:02

19              I think we were just at -- we were just       05:02

20   doing Exhibit 32; is that correct, Mr. Laws?             05:02

21        A.    Yes.                                           05:02

22        Q.    Let's go to Exhibit 33.                        05:02

23                        (Exhibit 33 was marked for           05:02

24                         identification and attached         05:02

25                         hereto.)                            05:02
```

Page 144

```
 1              THE WITNESS:  Okay.                    05:02

 2   BY MR. BALOGH:                                    05:02

 3        Q.   And what is that?                       05:02

 4        A.   That is the invoice for the San Francisco   05:02

 5   exam for Curtis, for Violet.                      05:02

 6        Q.   And that's just like all the other ones,   05:02

 7   but the first one is for 1,229.83, correct?       05:02

 8        A.   Correct.                                05:03

 9            MS. HEPBURN:  First one what?  Objection.   05:03

10   Vague.                                            05:03

11   BY MR. BALOGH:                                    05:03

12        Q.   The first exhibit we looked at regarding   05:03

13   your invoices, Exhibit 30, which reflects that Lily   05:03

14   was charged $1,034 and change for the same forensic   05:03

15   review.  And the other exhibits we reviewed since   05:03

16   then all reflect a higher number of $1,229.83.    05:03

17            MS. HEPBURN:  That misstates the record,   05:03

18   Counsel.  All of these invoices are for $1,229.83.   05:03

19   The only difference is the first one had the hash   05:03

20   set information broken out.  But they are all the   05:03

21   same.                                             05:03

22            MR. BALOGH:  Thank you for the           05:03

23   clarification.                                    05:03

24                      (Exhibit 34 was marked for     05:03

25                       identification and attached   05:03
```

                                        Page 145

```
 1                              hereto.)                    05:03

 2    BY MR. BALOGH:                                        05:03

 3         Q.   Let's turn to Exhibit 35.                   05:03

 4         A.   Okay.                                       05:03

 5                         (Exhibit 35 was marked for       05:03

 6                          identification and attached     05:03

 7                          hereto.)                        05:03

 8    BY MR. BALOGH:                                        05:03

 9         Q.   This is an examination -- this is a bill    05:03

10    that was provided in January of 2021; is that        05:03

11    correct?                                             05:04

12         A.   Yes.                                        05:04

13         Q.   It refers to the Jenny examination report;  05:04

14    is that right?                                        05:04

15         A.   Yes.                                        05:04

16         Q.   Let's go down.  Take a look at Exhibit 36.  05:04

17         A.   Yes.                                        05:04

18                         (Exhibit 36 was marked for       05:04

19                          identification and attached     05:04

20                          hereto.)                        05:04

21    BY MR. BALOGH:                                        05:04

22         Q.   This is an exam report for Lily; is that    05:04

23    correct?                                             05:04

24         A.   Yes.                                        05:04

25
```

Page 146

```
 1                    (Exhibit 37 was marked for        05:04

 2                    identification and attached        05:04

 3                    hereto.)                           05:04

 4   BY MR. BALOGH:                                      05:04

 5        Q.   And then we look at 37.                   05:04

 6        A.   Okay.                                     05:04

 7        Q.   And what is that?                         05:04

 8        A.   That's the invoice for -- exam report for 05:04

 9   Sierra.                                             05:04

10        Q.   Okay.  So that's the third exam report   05:04

11   we've seen so far; is that right?                   05:04

12        A.   I wasn't keeping track.                   05:04

13        Q.   Let's go back to -- go to 35, which I    05:04

14   believe is the first one that lists an exam report  05:05

15   and check 35, 36, 37, 38, 39, 40, and 41, and see if 05:05

16   those are all of the examination reports that you   05:05

17   invoiced.                                           05:05

18        A.   Yes, it is.                               05:05

19                         (Exhibit 38 was marked for    05:05

20                         identification and attached   05:05

21                         hereto.)                      05:05

22                         (Exhibit 39 was marked for    05:05

23                         identification and attached   05:05

24                         hereto.)                      05:05

25
```

Page 147

```
 1                    (Exhibit 40 was marked for        05:05

 2                    identification and attached       05:05

 3                    hereto.)                          05:05

 4     BY MR. BALOGH:                                   05:05

 5         Q.   Okay.  So that is a total of -- one, two,  05:05

 6     three, four, five, six -- seven examination reports;  05:05

 7     is that correct?                                 05:05

 8         A.   I actually have more than that.         05:05

 9         Q.   Okay.  Tell me what --                  05:05

10         A.   Maybe I'm -- maybe I'm double-counting  05:05

11     them.                                            05:05

12         Q.   Okay.  Tell me.                         05:05

13         A.   Okay.  So I have invoice -- no, you are 05:05

14     correct.                                         05:06

15         Q.   So that you prepared seven examination  05:06

16     reports on behalf of seven plaintiffs; is that   05:06

17     correct?                                         05:06

18         A.   That's correct.                         05:06

19         Q.   And for the other eight plaintiffs you  05:06

20     were unable -- you didn't create an examination  05:06

21     report because you were unable to verify that    05:06

22     Mr. Curtis possessed images of plaintiffs that   05:06

23     constituted child pornography; is that correct?  05:06

24         A.   That's correct.                         05:06

25         Q.   Did plaintiffs' counsel ever express upset 05:06
```

Page 148

```
 1    that you were unable to identify as victims of        05:06
 2    Mr. Curtis's crime eight of the 15 plaintiffs in      05:06
 3    this case?                                             05:06
 4         A.   Not at all.                                 05:06
 5         Q.   Did they have any response from your        05:06
 6    inability to identify eight of the 15 plaintiffs in   05:06
 7    this case?                                             05:06
 8         A.   Yes.                                         05:06
 9         Q.   What was that?                               05:06
10         A.   Just merely asking why -- why some of them  05:06
11    weren't found.                                         05:06
12         Q.   Okay.  And what did you -- and what did     05:06
13    you explain to them?  I may have -- you might have    05:06
14    said something earlier in this, but I'm not           05:07
15    recollecting.                                          05:07
16         A.   I did.  Just as I testified earlier, I      05:07
17    don't expect to find them all, just for the mere      05:07
18    fact at this point I don't have a complete hash       05:07
19    value library of all the images of all the survivors  05:07
20    in all of the series.                                 05:07
21         Q.   Are you able to -- with respect -- strike   05:07
22    that.  Withdrawn.                                      05:07
23              When we looked at the invoices from 35      05:07
24    on -- bless you -- when we looked at the invoices     05:07
25    from 35 to 41, we identified seven plaintiffs that    05:07
```

Page 149

```
 1   you -- I believe it's your testimony -- that you've      05:07
 2   concluded they are who they purport to be, and that      05:07
 3   Mr. Curtis possessed images of them that qualify         05:07
 4   for -- as child pornography, and you would be able       05:07
 5   to testify to this honestly in a court of law; is        05:07
 6   that accurate?                                           05:07
 7        A.   Absolutely.                                    05:08
 8        Q.   With respect to the other eight, is it         05:08
 9   thus true that you would not be able to testify in a     05:08
10   court of law that Mr. Curtis possessed child            05:08
11   pornography images of those other eight?                05:08
12        A.   That's correct.                               05:08
13        Q.   Okay.  Let me ask you this question, if I     05:08
14   may, and then we'll take a break, if that's all         05:08
15   right with you.  We have been going an hour.            05:08
16           MR. BALOGH:  I'm trying to do the hour          05:08
17   thing, Ms. Hepburn.  Obviously we have more to go.      05:08
18   But is that acceptable to you, that after this          05:08
19   question we take a quick break to give Ms. Tylor a      05:08
20   minute?                                                 05:08
21           MS. HEPBURN:  Sure.                             05:08
22           MR. BALOGH:  Thank you.                         05:08
23        Q.   With respect to the work you've done in       05:08
24   this case, is it fair to say -- I'm going to try to     05:08
25   list the material information you relied on.  And if    05:08
```

                                                        Page 150

```
 1    I get anything wrong, or I omit anything in your          05:08
 2    answer, I'd like you to tell me what I've omitted or      05:08
 3    stated incorrectly.                                       05:08
 4           Can we agree to that process, Mr. Laws?            05:08
 5      A.   Yes.                                               05:09
 6      Q.   Okay.  As I understand it, your testimony          05:09
 7    in this case relies on the material facts of your         05:09
 8    meeting with the agents -- Agent Popper and his           05:09
 9    supervisor in San Francisco -- with respect to            05:09
10    obtaining what they represented to you was a              05:09
11    hard drive containing images seized from Mr. Curtis.      05:09
12           Two, the hashtag values you were provided          05:09
13    by plaintiffs' counsel and the National Missing           05:09
14    Children's -- I can't get the name right -- the NMEC      05:09
15    [sic] materials and -- or the Canadian equivalent,        05:09
16    but you can't tell which hash values came from            05:09
17    where.                                                    05:09
18           And your meetings with the plaintiffs              05:09
19    and/or their representatives where they provided you      05:09
20    with photographs from the relative time frame for         05:09
21    your future comparison.                                   05:10
22           Are those the material things you                  05:10
23    considered to form the opinions you have in this          05:10
24    case, the hard core materials in this case?  Your         05:10
25    experience is obviously different, but the things         05:10
```

                                                    Page 151

```
 1    you obtained in this case to render your opinions.        05:10
 2              Did I state all those three material            05:10
 3    factors correctly?  Am I getting anything wrong?  Am      05:10
 4    I omitting anything?                                      05:10
 5         A.    You got a little bit of it wrong.              05:10
 6         Q.    Good.   That's fine.                           05:10
 7         A.    You're correct with me speaking with Agent     05:10
 8    Popper and his supervisor.  Agent Popper provided         05:10
 9    the hard drive with the image files on it.                05:10
10              The hash values, it's not accurate to say       05:10
11    that I got them directly from the NCMEC, from the         05:10
12    National Center for Missing and Exploited Children.       05:10
13    I got those off the reports that NCMEC provided to        05:10
14    Agent Popper.                                             05:10
15         Q.    Okay.                                          05:10
16         A.    And then counsel never provided me the         05:11
17    hash values directly.  I mean I was forwarded some        05:11
18    emails from an attorney that had some hash values         05:11
19    and from NCMEC reports that had hash values.              05:11
20         Q.    Understood.  Are there any other you           05:11
21    relied on in forming and presenting the expert           05:11
22    opinions that appear in your declaration in support      05:11
23    of summary judgment for plaintiffs?                       05:11
24         A.    The -- the ROI, the one-page portion of        05:11
25    the ROI provided by Agent Popper.                         05:11
```

Veritext Legal Solutions
866 299-5127

```
 1        Q.    Okay.   Anything else, sir?                  05:11
 2        A.    No.                                          05:11
 3        Q.    Okay.                                        05:11
 4        A.    Actually, sorry --                           05:11
 5        Q.    I'm sorry, please, Mr. Laws.                 05:11
 6        A.    The -- the exemplar pictures that I had      05:11
 7   from the survivors.                                     05:11
 8        Q.    And I thought I had covered that in my       05:11
 9   question.   And that's something I got right in my      05:11
10   question.                                               05:11
11              It was material to you to both meet with     05:11
12   the plaintiffs and obtain photographs and              05:11
13   identification from them as part of forming the         05:11
14   opinions you furnished in this case; is that right?     05:12
15        A.    That's correct.                              05:12
16        Q.    Okay.   Is there anything else you want to   05:12
17   add to that, Mr. Laws?                                  05:12
18        A.    No.                                          05:12
19        Q.    Thank you for that.                          05:12
20              MR. BALOGH:   Ms. Hepburn, do you want to    05:12
21   say 10?                                                 05:12
22              MS. HEPBURN:   I want to say that I want to  05:12
23   object to relying on the invoices to state who he      05:12
24   can identify and who he can't, because you have the     05:12
25   forensic reports.   The reports speak to the           05:12
```

                                                Page 153

```
 1    substance of who got identified.                      05:12

 2           I don't think all the invoices have been       05:12

 3    put in the record as exhibits.  And so we're missing  05:12

 4    some victims that he obviously identified per the     05:12

 5    forensic reports and which you've even asked him      05:12

 6    about those reports.  So --                           05:12

 7           MR. BALOGH:  First of all, I have supplied     05:12

 8    in my exhibits a carbon copy.  Every exhibit --       05:12

 9    every document you produced to me with the expert     05:12

10    disclosures is an exhibit in this case.               05:12

11           So if you'd like to tell me the exhibits       05:12

12    that reflect invoices that I -- that you haven't      05:12

13    submitted, if you want to supplement that later,      05:13

14    have a basis for that, we can talk about it.          05:13

15           But I will represent to you the expert         05:13

16    disclosures you made, every one was labeled an        05:13

17    exhibit and every one has been produced in this       05:13

18    case, and every one will be attached to this          05:13

19    deposition.                                           05:13

20           So if there's anything missing or              05:13

21    incomplete, it's because plaintiffs have not          05:13

22    provided information to the defense in accordance     05:13

23    with their responsibilities.                          05:13

24           We can address that at a different time.       05:13

25    But I cannot be faulted for using the evidence        05:13
```

Page 154

```
 1    you've provided and not showing evidence that I've        05:13

 2    not been provided --                                      05:13

 3            MS. HEPBURN:  I'm not saying that you are         05:13

 4    doing that, Counsel.  I'm noting that there are at        05:13

 5    least two that I quickly identified here in this          05:13

 6    moment, two invoices that aren't on the table.            05:13

 7            So having Agent Laws limit his testimony          05:13

 8    concerning identification based on invoices instead       05:13

 9    of forensic reports I'm objecting to.  And I'm going      05:13

10    to take this break and I'm going to scurry around         05:13

11    and look for those invoices for you.                      05:13

12            MR. BALOGH:  Look at that.                        05:13

13            Well, thank you very much.  We'll see you         05:13

14    at -- it's 2:13.  If Ms. Ortiz would read us out, we      05:14

15    will be back at 2:23 California Time, 5:23 East           05:14

16    Coast Time.                                               05:14

17            THE VIDEOGRAPHER:  This marks the end of          05:14

18    Media Number 4.  The time is 5:13 p.m.  We are off       05:14

19    the record.                                               05:14

20            (Recess.)                                         05:25

21            (Off record:  5:13 p.m.)                          05:25

22            (On record:  5:31 p.m.)                           05:25

23            THE VIDEOGRAPHER:  This marks the               05:31

24    beginning of Media Number 5.  The time is 5:31 p.m.       05:31

25    We are on the record.                                     05:32
```

Page 155

```
 1    BY MR. BALOGH:                                    05:32

 2        Q.   Okay.  Mr. Laws, I'm going to go back to a    05:32

 3    subject we touched upon, but I want to get a little    05:32

 4    more granular if I could.  And this is regarding the    05:32

 5    identification portion of your work.                05:32

 6             Are you focused?  Do you understand what I    05:32

 7    mean when I say the identification portion of your     05:32

 8    work?                                               05:32

 9        A.   The identification while I'm doing the       05:32

10    exam or the identification of the survivors?        05:32

11        Q.   The identification of the plaintiffs.       05:32

12        A.   Okay.                                       05:32

13        Q.   Okay.  Did you apply any scientific          05:32

14    knowledge to make identifications of the plaintiffs?  05:32

15        A.   Scientific knowledge?  On three of them I    05:32

16    did.                                                05:32

17        Q.   Tell me the scientific knowledge -- first,   05:32

18    which three?                                        05:32

19        A.   I know that they were the ones in           05:32

20    Colorado.                                           05:33

21        Q.   Okay.                                       05:33

22        A.   I don't remember their names, but they      05:33

23    were still -- they are still juveniles.  And they    05:33

24    are with their adopted -- adoptive parents.         05:33

25        Q.   So there's three juveniles in this case     05:33
```

Page 156

```
1    that live in Colorado; is that correct?          05:33
2         A.   Yes.                                    05:33
3         Q.   And you met them at the same time with  05:33
4    respect to -- are they plaintiffs in this case or 05:33
5    are you thinking about another case?              05:33
6         A.   They could -- you know, I don't know -- 05:33
7    actually, no, I don't think they are plaintiffs in 05:33
8    this case.                                        05:33
9              MS. HEPBURN:  They are.                 05:33
10             THE WITNESS:  They are?                 05:33
11             MS. HEPBURN:  Yes.                      05:33
12             MR. BALOGH:  So could we please not coach 05:33
13   the witness again, Ms. -- I'm going to object to  05:33
14   that.  And if it happens again, we'll address it. 05:33
15             But, Ms. Hepburn, you have plenty of    05:33
16   knowledge about this case.  We're not deposing you. 05:33
17   If you'd like the opportunity to suffer questioning 05:33
18   from me, I'll provide it.  But until then let's be 05:33
19   lawyers, not witnesses.  Can we agree to that     05:33
20   protocol?                                         05:34
21             MS. HEPBURN:  Wanted to make the record 05:34
22   correct, Counsel.  Thank you.                     05:34
23             MR. BALOGH:  I want to make a record from 05:34
24   the witness, not a lawyer.  I think it's misconduct. 05:34
25   It's not correcting the record.  It's the witness. 05:34
```

Page 157

| | | |
|---|---|---|
| 1 | He's the witness.  He took the oath. | 05:34 |
| 2 | MS. HEPBURN:  Thank you, Counsel. | 05:34 |
| 3 | BY MR. BALOGH: | 05:34 |
| 4 | Q.  So as I understand it, there's three | 05:34 |
| 5 | juveniles that are still juveniles.  They live | 05:34 |
| 6 | together with adopted parents in Colorado; is that | 05:34 |
| 7 | correct? | 05:34 |
| 8 | MS. HEPBURN:  Misstates -- | 05:34 |
| 9 | THE WITNESS:  That's correct. | 05:34 |
| 10 | MS. HEPBURN:  Misstates testimony. | 05:34 |
| 11 | Objection. | 05:34 |
| 12 | BY MR. BALOGH: | 05:34 |
| 13 | Q.  Is that correct, Mr. Laws? | 05:34 |
| 14 | A.  Yes. | 05:34 |
| 15 | Q.  And these three juveniles, can you tell me | 05:34 |
| 16 | their names? | 05:34 |
| 17 | A.  I cannot. | 05:34 |
| 18 | Q.  These three juveniles, can you tell me the | 05:34 |
| 19 | age ranges they are? | 05:34 |
| 20 | A.  Between -- if memory serves me right, | 05:34 |
| 21 | between eight and twelve at that time. | 05:34 |
| 22 | Q.  And when you say "at that time," is that | 05:34 |
| 23 | the time of the abuse or the time of your meeting? | 05:34 |
| 24 | A.  The time of my meeting. | 05:34 |
| 25 | Q.  So in September 2020, if I can track down | 05:34 |

Page 158

```
 1    the three juveniles that's between ages eight and        05:34
 2    twelve in this case, I might be able to narrow it        05:35
 3    down?  Is that your testimony?                           05:35
 4         A.   Possibly, yes.                                 05:35
 5         Q.   And do we know what they look like at all?     05:35
 6    Are they will blond, brunette, redhead?                  05:35
 7         A.   Blond.                                         05:35
 8         Q.   So these three --                              05:35
 9         A.   Well, let me rephrase that.  Blondish.         05:35
10         Q.   Blondish.  I think it's always blondish,       05:35
11    quite frankly.                                           05:35
12              But my joke notwithstanding, regarding         05:35
13    these three juveniles, this is the sole occasion you     05:35
14    believe you used scientific knowledge with respect       05:35
15    to forming your identification testimony; is that        05:35
16    correct?                                                 05:35
17         A.   Yes.                                           05:35
18         Q.   And with respect to the scientific            05:35
19    knowledge, what was the scientific knowledge you         05:35
20    applied to make the identification regarding the         05:35
21    three unnamed juveniles?                                 05:35
22         A.   I was comparing the shape of the nose, the     05:35
23    eyes, and the ears.                                      05:35
24         Q.   Okay.  And what makes that scientific          05:35
25    knowledge?  Did you rely on any journals or              05:35
```

Page 159

| | | |
|---|---|---|
| 1 | trainings with respect to that work you just | 05:35 |
| 2 | explained to us? | 05:35 |
| 3 | A.   No. | 05:36 |
| 4 | Q.   Okay.   What makes it scientific knowledge, | 05:36 |
| 5 | in your opinion? | 05:36 |
| 6 | A.   Well, I guess it would just be -- be | 05:36 |
| 7 | knowledge.   It wouldn't be scientific. | 05:36 |
| 8 | Q.   Did you apply -- and apart from that | 05:36 |
| 9 | example, regardless of the proper name, is there any | 05:36 |
| 10 | other example of scientific knowledge you brought to | 05:36 |
| 11 | bear with respect to your identification work in | 05:36 |
| 12 | this case, your plaintiff identification work? | 05:36 |
| 13 | A.   No. | 05:36 |
| 14 | Q.   Did you apply any technical knowledge to | 05:36 |
| 15 | identify plaintiffs as the persons who claim to be | 05:36 |
| 16 | depicted in Mr. Curtis's pornography collection? | 05:36 |
| 17 | A.   If "technical," you mean by comparing the | 05:36 |
| 18 | exemplar images I have to the child pornographic | 05:36 |
| 19 | images, then yes. | 05:36 |
| 20 | Q.   Okay.   What makes it technical knowledge? | 05:36 |
| 21 | What technique -- what techniques did you | 05:36 |
| 22 | specifically apply? | 05:36 |
| 23 | A.   Well, you have to -- you have to get | 05:36 |
| 24 | the -- you have to get the image.   And it has to be | 05:36 |
| 25 | at the right angle to be able to compare the | 05:36 |

Page 160

```
 1    exemplar with the child exploitation image.            05:36
 2            There was -- there was occasion on this        05:36
 3    case when I looked at -- when I looked at an image     05:37
 4    that I had of the exemplar, and one of the survivors   05:37
 5    in the image, it could have been them, but I wasn't    05:37
 6    willing to make that -- make that leap.  Unless        05:37
 7    it's -- unless it's a clear identification, then I'm   05:37
 8    not going to identify that person.                     05:37
 9        Q.    Is there anything else that you did on the   05:37
10    identification part of it that makes it technical      05:37
11    knowledge?                                             05:37
12        A.    No.                                          05:37
13        Q.    Okay.  Did you use any -- can you describe   05:37
14    any principles you applied to make identifications     05:37
15    in this case?                                          05:37
16        A.    Just, you know, a visual comparison          05:37
17    between the exemplar and the exploitation file.        05:37
18        Q.    Was there any other methodology              05:37
19    whatsoever?                                            05:37
20        A.    No.                                          05:37
21        Q.    Are there other cases you're familiar with   05:37
22    where people have done what you have done in this      05:37
23    case to identify the victim of a child pornography     05:37
24    crime?                                                 05:38
25        A.    I'm sure -- I'm sure there is, but I don't   05:38
```

Page 161

```
 1    know a specific case to mention.                    05:38
 2         Q.    Have you ever seen -- have you ever seen a    05:38
 3    case?                                                05:38
 4         A.    Yes.                                       05:38
 5         Q.    And where did you see this case?           05:38
 6         A.    When I was working here in Fairfax.        05:38
 7         Q.    Can you describe the case to me in as much  05:38
 8    detail as possible?                                  05:38
 9         A.    Well, okay.  So this takes a bit of        05:38
10    explaining.  So one of -- okay.  One of the images   05:38
11    was taken inside a vehicle.  So not only did they    05:38
12    use the vehicle to find the victim, they also used   05:38
13    the exterior road signs, actually a -- what do you   05:38
14    call it? -- the tree line.  And then shape of the    05:38
15    nose and the ear to find the -- to find the          05:38
16    survivor.                                            05:38
17            And in addition, it might have been the       05:38
18    same -- I don't think it was the same case, but on a 05:39
19    different case, they actually used -- I don't know   05:39
20    what this part of the hand you call.                 05:39
21            MR. BALOGH:  Let the record reflect that      05:39
22    the witness is touching the outside of his palm.     05:39
23    The palm is in a flat -- the palm is facedown, the   05:39
24    hand is flat, and he's touching the part that goes   05:39
25    from down the pinky all the way to almost the wrist. 05:39
```

Page 162

```
 1          Q.    Is that an accurate depiction of what you      05:39

 2    are showing me, Mr. Laws?                                  05:39

 3          A.    That is accurate.                              05:39

 4          Q.    Okay.  Go ahead.                               05:39

 5          A.    So they had a -- they had a picture of the     05:39

 6    perpetrator's hand and they were able to enhance           05:39

 7    that and actually pull a print off the hand.  So           05:39

 8    when they got who they thought was the -- was the          05:39

 9    perpetrator, they were actually able to get a print        05:39

10    and then compare the two, and it was the same              05:39

11    person.                                                    05:39

12          Q.    Are you familiar with any case where the       05:39

13    expert testimony is based on someone saying "I met         05:39

14    the purported -- I met the purported survivor.  She        05:40

15    gave me a photograph of herself from the relevant          05:40

16    time frame.  I compared it to the images on the            05:40

17    hard drive, and she is, in fact, in my opinion, the        05:40

18    survivor"?  Are you familiar with any cases where          05:40

19    that expert testimony has been done?                       05:40

20          A.    No.                                            05:40

21          Q.    Are you familiar with any trainings or         05:40

22    scientific literature which addresses that kind of         05:40

23    process as a method of identification?                     05:40

24          A.    No.                                            05:40

25          Q.    Is there any -- what's the potential error     05:40
```

Page 163

1    rate with the work you've done on the question of                05:40

2    identification of plaintiffs?                                    05:40

3         A.    I have no idea.                                       05:40

4         Q.    Is there any peer-reviewed studies on the             05:40

5    subject matter area?                                             05:40

6         A.    No, not to my knowledge.                              05:40

7         Q.    Have you seen a publication at all on the             05:40

8    subject matter area?                                             05:40

9         A.    No.                                                   05:40

10        Q.    Do you know whether this has ever been                05:40

11   tested in any clinical setting?   This methodology               05:40

12   that you've described, has it ever been tested in                05:40

13   any clinical setting?                                            05:40

14        A.    I have no idea.                                       05:41

15        Q.    And you would agree that this methodology             05:41

16   has not reached general acceptance in the scientific             05:41

17   community as a mode of accurate identification of                05:41

18   child pornography of victims; is that right?                     05:41

19        A.    Well, I can't answer that either way, if             05:41

20   it was or was not.                                               05:41

21        Q.    You can't identify any scientific                     05:41

22   literature at all which even addresses this, much               05:41

23   less condones it; is that correct?                               05:41

24        A.    That's correct.                                       05:41

25        Q.    You say you met with the plaintiffs.  Do              05:41

```
 1   you remember that testimony, sir?                    05:41

 2        A.   Yes.                                        05:41

 3        Q.   Why did you meet with them as opposed to    05:41

 4   acquiring the photographs and alleged confirmation    05:41

 5   by email, for example, or Zoom?                       05:41

 6        A.   Because I wanted -- I wanted to meet them   05:41

 7   in person.  It's -- it's --                           05:41

 8        Q.   Why?                                        05:41

 9        A.   Why?  It's better to see someone            05:41

10   face-to-face than -- than over a Zoom.  Maybe         05:42

11   something is wrong with the camera.  Maybe it's out   05:42

12   of focus.  You know, there's a myriad of reasons why  05:42

13   you would rather meet someone in person than to do    05:42

14   it over Zoom or some other video form.                05:42

15        Q.   Can you give me all the examples you can    05:42

16   about the importance of meeting the plaintiffs        05:42

17   face-to-face to do your work in this matter?          05:42

18        A.   For me it's just -- it's just a personal    05:42

19   preference.  I would rather meet someone in person,   05:42

20   look them in the face.  They give me -- they give me  05:42

21   a -- their picture, and then I can look at the        05:42

22   picture and look at them.                             05:42

23        Q.   Is part of that analysis your need to       05:42

24   assess credibility of the subject as you were         05:42

25   trained to do as a federal agent?                     05:42
```

Page 165

```
1        A.   No, the credibility of the subject has        05:42
2   nothing to -- nothing to do with it.   I'm -- I'm        05:42
3   concerned about is this -- is the person that's         05:42
4   sitting in front of me or across from me the same       05:42
5   person as depicted in the image?   I mean it's --       05:42
6   it's -- it's easier to see the adult in a child than    05:43
7   a child in the adult.                                   05:43
8        Q.   So you said there's no credibility            05:43
9   assessment at all.   So as long as they say they're a   05:43
10  victim, you accept that without further -- without      05:43
11  further probing or assessment?   It doesn't matter to   05:43
12  you, they said the words, that's sufficient?   Is       05:43
13  that your testimony?                                    05:43
14       A.   If they say they're a victim, that doesn't    05:43
15  necessarily make them a victim.   They're not a         05:43
16  victim until I've seen their image, you know, them      05:43
17  being abused, a child pornographic image.               05:43
18       Q.   Okay.   Are there any other reasons why you   05:43
19  wanted to meet them as opposed to just have them        05:43
20  email you their ID and photographs and say "This is     05:43
21  me"?   Why not do it that way?                          05:43
22       A.   Primary reason, I don't want that evidence    05:43
23  in my email.   I don't want that personal               05:43
24  identification stuff, you know, their email or a        05:43
25  copy of their -- sorry, not their email, but a copy     05:44
```

Page 166

```
 1    of their passport or their driver's license or        05:44
 2    something like that.                                   05:44
 3              I want to see them.  I want to speak to       05:44
 4    them in person.  I want them to hand me the            05:44
 5    identification.                                        05:44
 6              I mean that just -- I guess that just goes    05:44
 7    back to my time as a special agent.  I would never     05:44
 8    want to interview somebody, no matter who it was,      05:44
 9    over the phone or via video.                           05:44
10        Q.   Why not?                                      05:44
11             Did you get that?  Why not?                    05:44
12        A.   No, I didn't hear that.                       05:44
13        Q.   I figured -- you were being quiet.  This      05:44
14    computer, obviously, needs some speaker assistance.    05:44
15             Why not?  What are the disadvantages or       05:44
16    lack of sufficiency of an email communication or       05:44
17    anything other than an in-person communication such    05:44
18    that you require the in-person communication?          05:44
19        A.   Well, anybody -- anybody could be             05:44
20    sending -- anybody could be sending an email, you      05:44
21    know.  So you don't know who is -- you don't know      05:44
22    who is on the other end.                               05:45
23             Just the same way as if you're talking to     05:45
24    somebody on the phone.  You know, you don't know who   05:45
25    that is.  They could say "I'm Kevin Laws," and send    05:45
```

Page 167

```
 1   you my ID, and it's not them.  So I want to sit        05:45
 2   across from them and see their ID no matter who it      05:45
 3   is.                                                     05:45
 4          You know, any time I was doing an               05:45
 5   interview, regardless of who it was, I always asked     05:45
 6   for identification.                                     05:45
 7       Q.   Is that part of your training too?            05:45
 8       A.   No.  That's just something that I did         05:45
 9   because it just makes sense.  If you're sitting         05:45
10   across from somebody and they say "I'm Kevin Laws,"     05:45
11   and you just take their word for it, that's -- in my    05:45
12   opinion, that's -- that's foolish.  You need to --      05:45
13   you need to verify who that person is that you're       05:45
14   talking to.                                             05:45
15       Q.   Give me one second.                           05:45
16          I'm going to send you an exhibit,               05:45
17   Mr. Laws.  I'm going to carbon copy our court           05:46
18   reporter and plaintiffs' counsel, Carol.  I'm just      05:46
19   going to hit you and John and -- excuse me, Deb, I      05:46
20   apologize.                                              05:46
21          MS. BIANCO:  That's okay.                       05:46
22          MR. BALOGH:  My brain is hurting.  I'm          05:46
23   sorry.                                                  05:46
24          I'm sending the witness Exhibit 48.  And,       05:46
25   Mr. Laws, wait for it, and when you get the exhibit,    05:46
```

Page 168

```
 1    let me know you have it, and we can continue on from      05:46
 2    there.                                                    05:46
 3            With the others, as I've done this                05:46
 4    morning, Ms. Tylor and Ms. Ortiz, I will -- even          05:46
 5    though I've sent it to you this way, I will make          05:46
 6    sure that all exhibits have been uploaded to the          05:46
 7    Veritext link at the conclusion of the day.  I won't      05:46
 8    repeat myself again on the subject.  You can rest         05:46
 9    assured, I'll do it, but at the end, feel free to         05:46
10    remind me, because I'm a lawyer.  But as long as          05:46
11    there's no math, I'm all right mostly.                    05:46
12        Q.   Let me know when you have it.                    05:47
13        A.   You must have my email wrong because I           05:47
14    still haven't gotten the original emails from this        05:47
15    morning.                                                  05:47
16        Q.   Okay.  Let's try it again.  So what's your       05:47
17    email?  I must have it wrong on here.  So give it to      05:47
18    me again.  K --                                           05:47
19        A.   K, N as in Nancy, S as in Sam, teaching --       05:47
20    so T-E-A-C-H-I-N-G -- @gmail.com.                         05:47
21        Q.   That's the way I have been sending it you.       05:47
22    KNSteaching.  Let's see if that works.                    05:47
23            It's so odd.  Because for some reason --          05:47
24    and you self-populate to that in my email stream.         05:47
25            THE REPORTER:  Did you email or Dropbox?          05:48
```

Page 169

```
 1              MR. BALOGH:  Email.                        05:48

 2              THE REPORTER:  I don't see that either.    05:48

 3              MR. BALOGH:  What's going on with my       05:48

 4     machine?  I show gone at 2:48 from my computer.  And 05:48

 5     we shall find out.                                  05:48

 6              MS. HEPBURN:  Is that Exhibit 48 you're    05:48

 7     referring to, Ethan?                                05:48

 8              MR. BALOGH:  Yes.                           05:48

 9              MS. BIANCO:  I have it, for what that's     05:49

10     worth.                                              05:49

11              MR. BALOGH:  My computer's working.  We're  05:49

12     just waiting on Kevin.  If not, I can -- I'll share  05:49

13     a screen.  How about that?                          05:49

14              THE WITNESS:  Nothing.                      05:49

15              MR. BALOGH:  That's fine.                   05:49

16              THE WITNESS:  And I know my email is        05:49

17     working because I have other emails that have come   05:49

18     in.                                                 05:49

19              MR. BALOGH:  Yeah, we have an issue         05:49

20     between my computer and your computer.  We'll        05:49

21     survive it.                                          05:49

22              I'm going to share screen now.              05:49

23              You have my screen, sir?                    05:49

24              THE VIDEOGRAPHER:  Counsel, we have your    05:49

25     entire screen.  You might want to expand the photo   05:49
```

Page 170

```
 1    so it takes up your entire browser.  Because we can      05:49
 2    see your entire --                                       05:49
 3              MR. BALOGH:  That's what I'm doing.             05:49
 4    Great.                                                   05:49
 5              THE VIDEOGRAPHER:  And then you might want      05:49
 6    to zoom in on the actual photo.                          05:49
 7              THE REPORTER:  For my record, can I ask         05:49
 8    what exhibit number this is?                             05:49
 9              MR. BALOGH:  48.                                05:49
10              THE REPORTER:  Thank you.                       05:49
11                        (Exhibit 48 was marked for           05:49
12                        identification and attached          05:49
13                        hereto.)                             05:49
14    BY MR. BALOGH:                                            05:50
15        Q.   Okay.  So this is -- let me see if I can        05:50
16    zoom in.  Do you see this photograph, sir?               05:50
17        A.   I do.                                            05:50
18        Q.   Can you tell me who that is?                     05:50
19        A.   No, not without looking on the back of it.     05:50
20        Q.   Okay.  How about this?                           05:50
21             That was the first page of the photograph.     05:50
22    Second page.  Can you tell me who this is?               05:50
23        A.   No, not without looking on the back of the     05:50
24    photo.                                                    05:50
25        Q.   Next page, we have six photographs.  Can       05:50
```

                                                    Page 171

1    you pick out Number 3?                              05:50

2         A.    I know there is Skylar in there.  I can't    05:50

3    put the names to the faces without the names on      05:50

4    there.                                               05:50

5         Q.    Okay.  So we don't know -- you can't       05:50

6    identify any of them by sight?  Your recollection    05:50

7    doesn't permit that kind of identification; is that  05:50

8    right?                                               05:50

9         A.    Well, I could -- I know the face.  I just  05:50

10   don't know the name.                                 05:50

11        Q.    Okay.  So we can't identify them; is that  05:50

12   correct?                                             05:50

13              MS. HEPBURN:  Objection.  Asked and        05:50

14   answered.  Argumentative.  And I'd object to the     05:50

15   incomplete nature of the exhibit, Counsel.           05:50

16   Obviously, you've redacted out a portion of the      05:50

17   information we provided.                             05:51

18              MR. BALOGH:  Right.  I've redacted out the 05:51

19   names so I could ask him if he could identify them.  05:51

20   It wouldn't be a very good exercise if I had the     05:51

21   names on there.                                      05:51

22              MS. HEPBURN:  I'll just object.           05:51

23   BY MR. BALOGH:                                       05:51

24        Q.    Who is Number 4?  Can you tell me?  Can    05:51

25   you identify Number 4 for me from the lineup?        05:51

```
 1        A.    By name, no, I can't.                      05:51
 2              MS. HEPBURN:  Just a moment.  Again, I      05:51
 3    cannot see the screen share.  So if you could        05:51
 4    identify for the record which page of Exhibit 48     05:51
 5    you're referring to, that would be helpful.          05:51
 6              MR. BALOGH:  I'm on the third page.         05:51
 7              MS. HEPBURN:  Okay.                         05:51
 8    BY MR. BALOGH:                                        05:51
 9        Q.    Can you identify any -- by name, any        05:51
10    person in any of the six photographs depicted here?  05:51
11        A.    No.                                         05:51
12        Q.    Can you tell me how many different          05:51
13    women -- sorry -- how many different girls are        05:51
14    depicted on this page?                                05:51
15        A.    Three.                                      05:51
16        Q.    Turn to page 4.  Can you tell me who this   05:51
17    is?                                                   05:51
18        A.    That's Lily.                                05:51
19        Q.    And page 5?                                 05:51
20        A.    No.                                         05:52
21        Q.    And page 5 is -- you see the guy -- Lily    05:52
22    is the one -- she's on a -- she's sideways, she's    05:52
23    wearing pearls, and there's a pink background.  Is   05:52
24    that correct?                                         05:52
25        A.    That's correct.                            05:52
```

Page 173

```
 1          MS. HEPBURN:  Wait a second.  I'm sorry.      05:52
 2   I don't have that photo.                              05:52
 3          MR. BALOGH:  Page [sic] 48, page 4.  It's      05:52
 4   right after the six pictures.  The next page.  He's   05:52
 5   identified her as Lily, the girl in the pearls.       05:52
 6       Q.   Is that correct, Mr. Laws?                   05:52
 7          MS. HEPBURN:  Misstates the testimony.         05:52
 8   BY MR. BALOGH:                                        05:52
 9       Q.   Is that correct, Mr. Laws?                   05:52
10       A.   Yes.                                         05:52
11       Q.   Okay.  Turning from the next page of the     05:52
12   document, there's a little girl next to someone       05:52
13   wearing a shirt with a dragon on it.  She's wearing   05:52
14   a multicolored necklace.  Do you know who she is?     05:52
15       A.   No.                                          05:52
16       Q.   And the last page on the exhibit, there's   05:52
17   a little girl in a blue shirt.  Can you tell who she  05:52
18   is?                                                   05:52
19       A.   No, not by name.                             05:52
20       Q.   Okay.                                        05:52
21          MR. BALOGH:  I'll stopping sharing the         05:52
22   screen to make Ms. Ortiz happy.                       05:52
23       Q.   One of the things I believe you said is     05:53
24   when you obtained these photographs, you had each of 05:53
25   them signed by the individual and the legal guardian 05:53
```

Page 174

| | | |
|---|---|---|
| 1 | and yourself with respect to the date and time; is | 05:53 |
| 2 | that right? | 05:53 |
| 3 | A.   Yes, or at least the date. | 05:53 |
| 4 | Q.   At least the date.  Sorry.  Thank you. | 05:53 |
| 5 | And do you -- do you have a reason why | 05:53 |
| 6 | these materials were not produced to us with your | 05:53 |
| 7 | expert disclosures, those photographs? | 05:53 |
| 8 | A.   No. | 05:53 |
| 9 | (Pages 176 through 222 are | 05:53 |
| 10 | confidential - attorneys' eyes only | 05:53 |
| 11 | and are bound separately.) | 05:53 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 175

```
 1    BY MR. BALOGH:                                      07:05

 2        Q.   Mr. Laws, this is a one-page sheet of     07:05

 3    notes.  Can you tell me what's reflected on here?  07:05

 4        A.   Yes.  The date, 7-14-2020.  It says it's a 07:05

 5    Curtis Evidence Review, San Francisco, and then it 07:05

 6    lists a number of media and when I started         07:05

 7    processing that into my forensic program.          07:05

 8        Q.   Can you run through the lines with us?    07:05

 9    Withdrawn.                                          07:06

10            So you started your day at 8:47; is that   07:06

11    correct?                                            07:06

12        A.   No, that's when I started processing this 07:06

13    specific piece of media.                            07:06

14        Q.   Okay.  What was the specific piece of     07:06

15    media at 8:47 a.m.?                                 07:06

16        A.   This is a SanDisk 2, a 16-gigabyte thumb  07:06

17    drive.                                              07:06

18        Q.   And by 9:10, you were done with that task; 07:06

19    is that right?                                      07:06

20        A.   Yes.                                       07:06

21        Q.   From 10:47 until 11:02, you were working  07:06

22    on the SanDisk 16 gigabyte; is that right?          07:06

23        A.   Yes.                                       07:06

24        Q.   What were you doing for the hour and a    07:06

25    half between the first processing job and the second 07:06
```

Page 223

| | | |
|---|---|---|
| 1 | job? | 07:06 |
| 2 | A.   Looking -- looking at the -- looking at -- | 07:06 |
| 3 | searching the media for pictures. | 07:06 |
| 4 | Q.   Okay.  And then you did your third | 07:06 |
| 5 | processing job of the Gigaware 16 gigabyte thumb | 07:06 |
| 6 | drive from 11:08 to 11:10; is that right? | 07:06 |
| 7 | A.   Yes. | 07:06 |
| 8 | Q.   And from 11:18 you began processing the | 07:06 |
| 9 | PNY Attach -- Attache 16 gigabyte thumb drive; is | 07:07 |
| 10 | that right? | 07:07 |
| 11 | A.   Yes. | 07:07 |
| 12 | Q.   You didn't list when you completed that | 07:07 |
| 13 | task; is that right? | 07:07 |
| 14 | A.   That's correct. | 07:07 |
| 15 | Q.   Why not? | 07:07 |
| 16 | A.   At that point I didn't see any need to put | 07:07 |
| 17 | a completion time. | 07:07 |
| 18 | Q.   Why did you have completion times for the | 07:07 |
| 19 | other tasks but not this one? | 07:07 |
| 20 | A.   Just for -- just for brevity of the notes. | 07:07 |
| 21 | Q.   So -- but you included a bunch of times | 07:07 |
| 22 | and it didn't increase adding a time, right? | 07:07 |
| 23 | A.   I don't know what you mean by that. | 07:07 |
| 24 | Q.   Well, the first entry you took care to -- | 07:07 |
| 25 | to identify the time you started and the time you | 07:07 |

Page 224

```
 1    stopped, right?                                     07:07
 2        A.   Yes.                                       07:07
 3        Q.   Why did you do that?                       07:07
 4        A.   Well, that's just the -- that's just the   07:07
 5    time that it finished processing, not the time that 07:07
 6    I finished looking at it.                           07:07
 7        Q.   Right.  But why did you -- why did you     07:07
 8    note the finished processing time?                  07:07
 9        A.   Just for -- actually honestly, just for    07:07
10    something to do.                                    07:07
11        Q.   Okay.  And so you -- these notes are --    07:07
12    when you did it for the second processing from 10:47 07:08
13    to 11:02, you did that for the same reason, just for 07:08
14    something to do?                                    07:08
15        A.   Yeah, because there's no relevance in when 07:08
16    it ended.                                           07:08
17        Q.   Okay.  And the third processing time,      07:08
18    11:08 to 11:10, you include those numbers even      07:08
19    though it doesn't make any difference to anything;  07:08
20    is that right?                                      07:08
21        A.   Yes.  Actually what I was doing was -- was 07:08
22    seeing how long it was taking to process each one.  07:08
23        Q.   And the third one we don't -- the fourth   07:08
24    one we don't know how long it took; is that right?  07:08
25        A.   Correct.                                   07:08
```

Page 225

```
 1        Q.   And then the fifth one was 11:33 to 11:36,      07:08
 2   correct?                                                  07:08
 3        A.   Correct.                                        07:08
 4        Q.   And the third one was 1335 to 1239 --           07:08
 5   12:35 to 12:39; is that right?                            07:08
 6        A.   Correct.                                        07:08
 7        Q.   And then 12:55 to some unknown time was         07:08
 8   the final one; is that correct?                           07:08
 9        A.   Yes.                                            07:08
10        Q.   And these notes don't reflect when you          07:08
11   left the office -- is that right? -- or when you          07:08
12   completed your task for the day?                          07:08
13        A.   That's correct.                                 07:09
14        Q.   And the next entry is July 15th, the very       07:09
15   next day; is that correct?                                07:09
16        A.   Yes.                                            07:09
17        Q.   First line reads "Reprocessing Transcend        07:09
18   16 gigabyte thumb drive with Lace Carver - crying         07:09
19   deleted."  Did I read that?                               07:09
20        A.   It's actually "carbon deleted."                 07:09
21        Q.   Okay.  And what does that mean?                 07:09
22        A.   That means looking for files that were          07:09
23   deleted.                                                  07:09
24        Q.   Okay.  And on the right-hand side of it,        07:09
25   it says "Completed," then followed by "Vicky, Pia,        07:09
```

Page 226

```
 1    Violet, Skylar, Jenny, Sally, Savannah, Jessica       07:09
 2    question mark, Sarah question mark, Sierra, Mya."      07:09
 3             Have I read that correctly?                   07:09
 4        A.   Yes.                                          07:09
 5        Q.   What does that entry mean?                    07:09
 6        A.   That's -- that's the -- the survivors that    07:09
 7    I'm looking for, the images.                           07:09
 8        Q.   Okay.  What does it mean by "completed"?      07:09
 9        A.   That means I found at least one image of      07:09
10    the list except for Jessica and Sarah.                07:09
11        Q.   Okay.  I note that you -- for the ones you    07:10
12    found, you don't include here any file names or       07:10
13    hashtag names or other indicia of what you located;   07:10
14    is that correct?                                      07:10
15        A.   Correct.                                      07:10
16        Q.   Okay.  Is there -- the last section's        07:10
17    notes in the middle here, I'm highlighting it.  It's  07:10
18    the portion immediately to the left of the completed  07:10
19    list.  There's lines that say "Skylar, Sierra."       07:10
20             I can't read it.  Can you read what I put     07:10
21    in blue and tell us what that means?                  07:10
22        A.   Can you take the highlighting off, please.   07:10
23        Q.   I can make it larger too for you.            07:10
24        A.   "Skylar, Sierra" -- I don't know what the    07:10
25    last part was -- and then just "Savannah, Mya."       07:10
```

                                                    Page  227

```
 1              I'm just -- I think what I was doing was       07:10

 2    just writing down the series when I found them.         07:10

 3         Q.    Okay.  And you weren't writing down what      07:10

 4    the file name or hash values were on which you were     07:11

 5    basing that testimony; is that right?                   07:11

 6         A.    Not on -- not on this document.               07:11

 7         Q.    Below it says "SanDisk Cruzer."  Do you       07:11

 8    see that?                                                07:11

 9         A.    Yes.                                          07:11

10         Q.    What does that mean in that context?         07:11

11         A.    That would be where I found -- likely        07:11

12    where I found Pia and Jan Socks.                        07:11

13         Q.    Okay.  And what's the last line right        07:11

14    there?                                                   07:11

15         A.    That I don't know.                           07:11

16         Q.    Okay.  I'm going to close Exhibit 27 and     07:11

17    move on to Exhibit 26.                                  07:11

18                      (Exhibit 26 was marked for            07:11

19                      identification and attached           07:11

20                      hereto.)                              07:11

21    BY MR. BALOGH:                                          07:11

22         Q.    Do you see Exhibit 26 before you, sir?       07:11

23         A.    Yes.                                          07:11

24         Q.    What is it?                                  07:11

25         A.    That's -- that's a document where I have     07:11
```

                                              Page 228

```
 1   identified a couple pictures.  And then specifically    07:11
 2   one of them is not child exploitation for Marineland    07:11
 3   Sarah.  And the one underneath that is for              07:11
 4   Marineland Sarah and I'm not sure of the                07:11
 5   identification.                                         07:12
 6        Q.   Okay.  And these notes are on a computer.     07:12
 7   Do you see that?                                        07:12
 8             Withdrawn.                                    07:12
 9             It appears that these notes were typed        07:12
10   into a computer and then printed; is that correct?      07:12
11        A.   That's correct.                               07:12
12        Q.   Were you typing notes at the time you were    07:12
13   in the interview room -- withdrawn.                     07:12
14             When you were at the Homeland Security's      07:12
15   Investigation office in San Francisco, were you         07:12
16   taking notes on your laptop in addition to your         07:12
17   Homeland Security notebook handwritten notes?           07:12
18        A.   Yes.                                          07:12
19        Q.   And did you take notes on your computer       07:12
20   for every image you found and verified in this case?    07:12
21        A.   Yes, verified.  And -- and the ones that      07:12
22   were not -- I could not verify as seen on the screen    07:12
23   here.                                                   07:12
24        Q.   And this -- this purports to be a two-page    07:12
25   document, do you see that?  Or it is a two-page         07:12
```

Page  229

| | | |
|---|---|---|
| 1 | document? | 07:12 |
| 2 | A.   Yes. | 07:13 |
| 3 | Q.   Okay.  And it's dated July 14th; is that | 07:13 |
| 4 | right? | 07:13 |
| 5 | A.   Correct. | 07:13 |
| 6 | Q.   And on page 1 it reflects -- when it says | 07:13 |
| 7 | "Jessica, not sure of identification" on page 1, do | 07:13 |
| 8 | you see that, sir? | 07:13 |
| 9 | A.   Yes. | 07:13 |
| 10 | Q.   Does that refer to the material that's | 07:13 |
| 11 | presented above that entry or the material that's | 07:13 |
| 12 | below that entry, or both? | 07:13 |
| 13 | A.   Below. | 07:13 |
| 14 | Q.   So the first section of this, I'm going to | 07:13 |
| 15 | highlight it for -- just highlight it for a second | 07:13 |
| 16 | on the screen.  Who does this relate to? | 07:13 |
| 17 | A.   Jenny. | 07:13 |
| 18 | Q.   And then this part -- I'm highlighting the | 07:13 |
| 19 | second part.  I'm going to take this off. | 07:13 |
| 20 | And then the red area until the next -- | 07:13 |
| 21 | and with the black below it is Jessica; is that | 07:13 |
| 22 | correct? | 07:13 |
| 23 | A.   That's correct. | 07:13 |
| 24 | Q.   And then there's Marineland Sarah and a | 07:13 |
| 25 | description below that that bleeds on to page 2, and | 07:13 |

Page 230

```
 1    that refers to Sarah; is that correct?              07:14

 2         A.   That's correct.                            07:14

 3         Q.   And there's another entry for Sarah which  07:14

 4    you determined is not exploitation -- child          07:14

 5    exploitation; is that correct?                       07:14

 6         A.   That's correct.                            07:14

 7         Q.   Can you read the entry of the picture into 07:14

 8    the record, please.                                  07:14

 9         A.    "Depicts a prepubescent girl between five 07:14

10    and nine yoa.  The girl is depicted from just below  07:14

11    her nose the just below her naval.  The girl's mouth 07:14

12    is open and there's a whitish substance coming from  07:14

13    her mouth onto her chin.  The same substance" --     07:14

14    excuse me -- "The same substance also appears on her 07:14

15    chest."                                              07:14

16         Q.   So this would be referred -- as opposed to 07:14

17    a sex -- a photo depicting sexually explicit         07:14

18    conduct, which is illegal, this conduct, it shows    07:14

19    implicit sexual conduct, and does not meet the       07:14

20    definition of child porn under Section 2256 of Title 07:14

21    18 of the United States Code; is that correct?       07:14

22         A.   No, it does not.                           07:15

23         Q.   What is incorrect about it?                07:15

24         A.   It does not show any child sexual          07:15

25    exploitation.                                        07:15
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | Q.   And just because the whitish substance | 07:15 |
| 2 | implicitly suggests cum, that's insufficient to | 07:15 |
| 3 | bring it to the definition of sexually explicit | 07:15 |
| 4 | conduct; is that true? | 07:15 |
| 5 | A.   There's -- there's nothing in that photo | 07:15 |
| 6 | that makes -- makes anyone looking at that photo | 07:15 |
| 7 | think that it would be ejaculate. | 07:15 |
| 8 | Q.   Okay.  And the next section is about Sarah | 07:15 |
| 9 | as well; is that correct? | 07:15 |
| 10 | A.   Correct. | 07:15 |
| 11 | Q.   It says "Hash needs to be verified, MD5," | 07:15 |
| 12 | and you have it; is that correct? | 07:15 |
| 13 | A.   Correct. | 07:15 |
| 14 | Q.   There's no further notes in this document | 07:15 |
| 15 | to reflect such verification; is that right? | 07:15 |
| 16 | A.   Such verification of what? | 07:15 |
| 17 | Q.   The hash needs to be verified. | 07:15 |
| 18 | A.   Right, because there's no way for me to | 07:15 |
| 19 | verify the hash while I'm sitting there doing the | 07:15 |
| 20 | exam. | 07:15 |
| 21 | Q.   Okay.  And this document, you never | 07:15 |
| 22 | followed up and completed this document to the | 07:15 |
| 23 | verification of that hash; is that right? | 07:16 |
| 24 | A.   That's correct.  There's no -- there's no | 07:16 |
| 25 | way for me to verify that hash value. | 07:16 |

Page 232

```
 1        Q.   Where did you get that hash value from?        07:16
 2        A.   As I testified earlier, there was a number     07:16
 3   of places I got my hash values.                          07:16
 4        Q.   Do you know where you got this one from?        07:16
 5        A.   No.                                             07:16
 6        Q.   We're going to Exhibit 25.  These are the      07:16
 7   third page of notes you provided.                         07:16
 8                     (Exhibit 25 was marked for              07:16
 9                      identification and attached            07:16
10                      hereto.)                               07:16
11   BY MR. BALOGH:                                            07:16
12        Q.   And this one's an -- this one is undated;       07:16
13   is that correct?                                          07:16
14        A.   That's correct.                                 07:16
15        Q.   And it appears to be similar to a prior        07:16
16   exhibit you gave us.  I'm going to show it to you.        07:16
17             Sorry.  Leave that up.                          07:16
18             This is the exhibit we looked at,               07:17
19   Exhibit 28.  I'll load them up for you, sir.              07:17
20             And this reflects -- oh, no, we haven't         07:17
21   looked at this yet.  Excuse me.                           07:17
22             No, that's not it either.                       07:17
23             That's fine.  And these are your notes          07:17
24   regarding Jenny it appears as well "Compared to pic       07:17
25   of Jenny."                                                07:17
```

Veritext Legal Solutions
866 299-5127

```
 1        A.   Yes.                                    07:17

 2        Q.   And then finally, just to be clear, that   07:17

 3   was Exhibit 25, which we received today and now    07:17

 4   marked for your review.                            07:17

 5   BY MR. BALOGH:                                     07:17

 6        Q.   26, we have not looked -- we've looked at  07:17

 7   this document in the beginning and just been over   07:17

 8   it, and it starts with Jenny and continues with --  07:17

 9   and addresses Sarah and Jessica.  Do you see that?  07:18

10        A.   Yes.                                    07:18

11        Q.   We then have the handwritten notes in    07:18

12   San Francisco that we reviewed first.  Do you      07:18

13   remember that?                                     07:18

14        A.   Yes.                                    07:18

15        Q.   Okay.  So we covered that document.      07:18

16             And then there's Exhibit 28, which we're  07:18

17   going to get to now.                               07:18

18                      (Exhibit 28 was marked for      07:18

19                       identification and attached    07:18

20                       hereto.)                       07:18

21   BY MR. BALOGH:                                     07:18

22        Q.   And this is a six-page document.  And it  07:18

23   reflects the work done on July 14th and 15th; is   07:18

24   that correct?                                      07:18

25        A.   Yes.                                    07:18
```

Page 234

```
 1        Q.   Okay.  And finally we have 29.          07:18
 2                      (Exhibit 29 was marked for     07:18
 3                      identification and attached     07:18
 4                      hereto.)                        07:18
 5   BY MR. BALOGH:                                      07:18
 6        Q.   And this is the last set of notes we     07:18
 7   received today.  It's a four-page document which has 07:18
 8   the similar format regarding your identification    07:18
 9   work on some undated occasion; is that correct?     07:18
10        A.   Correct.                                  07:18
11             MS. HEPBURN:  Object to the extent it     07:18
12   misstates the record.  You said several times       07:18
13   "received today."  I think we provided these to you 07:18
14   before today, Counsel, just to be --                07:19
15             MR. BALOGH:  I apologize.  I only got the 07:19
16   handwritten notes.  You're right.  I received these 07:19
17   on Saturday.                                        07:19
18             Thank you for that correction,            07:19
19   Ms. Hepburn.                                        07:19
20        Q.   So these notes were received for the first 07:19
21   time on Saturday.  The ones we've just shown you now 07:19
22   and the handwritten notes, this is the sum total of 07:19
23   all the notes you have from which you would          07:19
24   subsequently make the declarations you presented in 07:19
25   this case either as expert reports or in support of 07:19
```

Page 235

| | | |
|---|---|---|
| 1 | a motion for summary judgment; is that correct? | 07:19 |
| 2 | A.   Yes, these are all of my notes. | 07:19 |
| 3 | Q.   Okay.  And you provided these notes to | 07:19 |
| 4 | plaintiffs' counsel when? | 07:19 |
| 5 | A.   I have no idea. | 07:19 |
| 6 | Q.   Before they prepared the declaration for | 07:19 |
| 7 | you, I would assume; is that correct? | 07:19 |
| 8 | A.   I don't know if I did or -- I don't know | 07:19 |
| 9 | if I did or not.  I know I wrote -- I was writing | 07:19 |
| 10 | draft reports and sharing them back and forth.  I | 07:19 |
| 11 | don't know when I sent the actual notes. | 07:19 |
| 12 | MR. BALOGH:  Okay.  Let's see.  I have two | 07:19 |
| 13 | more exhibits to go through.  How about I go through | 07:20 |
| 14 | Exhibit 17 first and then I will take our final | 07:20 |
| 15 | break for the day and we'll cover the declaration | 07:20 |
| 16 | last. | 07:20 |
| 17 | Does that work for you, Carol? | 07:20 |
| 18 | MS. HEPBURN:  It does. | 07:20 |
| 19 | MR. BALOGH:  Thank you. | 07:20 |
| 20 | (Exhibit 17 was marked for | 07:20 |
| 21 | identification and attached | 07:20 |
| 22 | hereto.) | 07:20 |
| 23 | BY MR. BALOGH: | 07:20 |
| 24 | Q.   Mr. Laws, I'm showing you what's been | 07:20 |
| 25 | marked for identification as Exhibit 17.  Do you see | 07:20 |

Page 236

```
 1    it?                                                    07:20

 2         A.    I do.                                       07:20

 3         Q.    And actually I'm going to close this out    07:20

 4    and stop sharing for a second.  I want to ask some     07:20

 5    questions.                                             07:20

 6              So I believe it was your testimony that      07:20

 7    you went to San Francisco and you did the review and   07:20

 8    your notes contained the completion of that review;    07:20

 9    is that right?                                         07:20

10         A.    No.  My reports contained the completion    07:20

11    of the review.                                         07:20

12         Q.    Well, you didn't review the actual          07:20

13    pornography in any place other than San Francisco      07:20

14    under the aegis of Homeland Security; is that right?   07:20

15         A.    That's correct.                             07:20

16         Q.    And they wouldn't let you leave the         07:20

17    office -- even though you're former law enforcement,   07:20

18    they wouldn't let you possess because it's unlawful    07:21

19    contraband that may not be possessed by members of    07:21

20    the public; is that correct?                           07:21

21         A.    Well, it's not -- it can't be possessed by  07:21

22    anyone.                                                07:21

23         Q.    Well, it could be possessed by Homeland     07:21

24    Security in a safe locker so you could review it,      07:21

25    because that's what happened, right?                   07:21
```

Page 237

| | | |
|---|---|---|
| 1 | A.   Yes. | 07:21 |
| 2 | Q.   And it could be viewed in a court of law | 07:21 |
| 3 | by judges and juries when cases go to trial and the | 07:21 |
| 4 | evidence requires that the jury assess whether an | 07:21 |
| 5 | image constitutes child pornography; isn't that | 07:21 |
| 6 | true? | 07:21 |
| 7 | A.   Yes. | 07:21 |
| 8 | Q.   Okay.  But you could only do the review of | 07:21 |
| 9 | the child porn on that occasion; is that right? | 07:21 |
| 10 | A.   No, I could have went back if I -- if I | 07:21 |
| 11 | needed to. | 07:21 |
| 12 | Q.   Right.  But to do a review of the actual | 07:21 |
| 13 | pornography, you would have to be at the government | 07:21 |
| 14 | facility under the supervision in some way of the | 07:21 |
| 15 | agent who must maintain possession, custody and | 07:21 |
| 16 | control of the contraband.  So they put you in a | 07:21 |
| 17 | locked room, but they're there and you can't leave | 07:21 |
| 18 | with it; is that right? | 07:21 |
| 19 | A.   Well, under supervision, and not a locked | 07:22 |
| 20 | room. | 07:22 |
| 21 | Q.   In a room there where you can't leave with | 07:22 |
| 22 | the contraband or otherwise depart with it in any | 07:22 |
| 23 | way, right? | 07:22 |
| 24 | A.   Yes. | 07:22 |
| 25 | Q.   So when you left San Francisco, did you | 07:22 |

Page 238

| | | |
|---|---|---|
| 1 | consider your work for identification of contraband | 07:22 |
| 2 | images done? | 07:22 |
| 3 | A.   Yes. | 07:22 |
| 4 | Q.   What further work, if any, did you do | 07:22 |
| 5 | after leaving San Francisco to make assessments of | 07:22 |
| 6 | whether or not the materials in possession of | 07:22 |
| 7 | Homeland Security in fact represent pornographic | 07:22 |
| 8 | images of any plaintiff in this case? | 07:22 |
| 9 | A.   None. | 07:22 |
| 10 | Q.   None.  So when you left you were done? | 07:22 |
| 11 | You took your notes, you made your identification; | 07:22 |
| 12 | it was over?  Is that right? | 07:22 |
| 13 | A.   That's correct. | 07:22 |
| 14 | Q.   What you had to do is you had to write it | 07:22 |
| 15 | up, but you already had the source material that you | 07:22 |
| 16 | were going to get; is that correct? | 07:22 |
| 17 | A.   No, I didn't have any source material.  I | 07:22 |
| 18 | had my -- I had my notes. | 07:22 |
| 19 | Q.   Okay. | 07:22 |
| 20 | MR. BALOGH:  Why don't we take a break | 07:23 |
| 21 | now.  It's 4:22.  We can go 10 -- Ms. Tylor, of | 07:23 |
| 22 | course, has proven correct, I'm behind schedule. | 07:23 |
| 23 | This session took longer than I hoped for.  But all | 07:23 |
| 24 | we have left is, I think, the declaration. | 07:23 |
| 25 | So it's 4:22.  If Carol consents, we'll go | 07:23 |

Page 239

```
 1    off the record and come back at 10:32 and see if we        07:23
 2    can get through this.  Is that acceptable?                 07:23
 3              MS. HEPBURN:  Yes, it is.  Thank you.            07:23
 4              THE VIDEOGRAPHER:  This marks the end of         07:23
 5    Media Number 6.  The time is 7:23 p.m.  We are off         07:23
 6    the record.                                                07:23
 7              (Recess.)                                        07:23
 8              (Off record:  7:23 p.m.)                         07:23
 9              (On record:  7:48 p.m.)                          07:23
10              THE VIDEOGRAPHER:  This marks the                07:48
11    beginning of Media Number 7.  The time is 7:48 p.m.        07:48
12    We are on the record.                                      07:48
13    BY MR. BALOGH:                                             07:48
14       Q.   Hello, Mr. Laws.  During the break did you        07:48
15    have any conversation with any of plaintiffs'             07:48
16    counsel in this case?                                      07:49
17       A.   No.                                                07:49
18       Q.   Okay.  This, hopefully, is the last               07:49
19    tranche of my questions today, after which time I         07:49
20    will tender you as a witness.  So if plaintiffs'          07:49
21    counsel would like to question you, they may have         07:49
22    the opportunity.                                           07:49
23              MR. BALOGH:  Before we get there, what I        07:49
24    want to do is put on the record with Ms. Hepburn's        07:49
25    consent.                                                   07:49
```

                                                        Page 240

```
1              During the break we confirmed that -- hold        07:49
2     on one second.  We confirmed that Exhibits 49 and 50       07:49
3     and the discussion of them in the text should be           07:49
4     under seal, both the text and the exhibits.                07:49
5              We have further agreed that the exhibit           07:49
6     I'm going to start talking about now, Exhibit 45, is       07:49
7     subject to a pending motion to seal, and that should       07:49
8     also be a sealed document.                                 07:49
9              At this point we're not going to seal the         07:49
10    text with respect to Exhibit 45.  But during the           07:49
11    examination, to the extent we get into any graphic         07:49
12    details, if Ms. Hepburn believes that conversation        07:49
13    with a starting point, when we get to it, should be        07:50
14    sealed to an ending point, the defense will have an        07:50
15    objection, we'll make a clear record with the court        07:50
16    reporter to understand what should be sealed               07:50
17    confidential, and both parties have -- or all              07:50
18    parties have agreed that we shall be sensitive to          07:50
19    needlessly publicizing graphic details of childhood        07:50
20    sexual abuse.                                              07:50
21             Do you agree with my recitation,                  07:50
22    Ms. Hepburn?                                               07:50
23             MS. HEPBURN:  I do.  Thank you.                   07:50
24             MR. BALOGH:  You're very welcome.                 07:50
25        Q.   So back to you, Mr. Laws.  What I have in         07:50
```

Page 241

| | | |
|---|---|---|
| 1 | front of me -- in front of you on the screen is a | 07:50 |
| 2 | declaration you signed in this case.  Do you see it, | 07:50 |
| 3 | sir? | 07:50 |
| 4 | A.   I do.  Exhibit 45? | 07:50 |
| 5 | Q.   And I'm going to go to page 16.  I think | 07:50 |
| 6 | we've done this before. | 07:50 |
| 7 | Does that reflect your signature attesting | 07:50 |
| 8 | to the accuracy of this exhibit under penalty of | 07:50 |
| 9 | perjury? | 07:50 |
| 10 | A.   It does. | 07:50 |
| 11 | Q.   And before you signed this you read it | 07:50 |
| 12 | carefully to ensure its accuracy before you swore to | 07:50 |
| 13 | its accuracy; is that correct? | 07:51 |
| 14 | A.   Yes. | 07:51 |
| 15 | Q.   Okay.  I'm going to direct your attention | 07:51 |
| 16 | to paragraph 6.  I'll highlight it on the screen | 07:51 |
| 17 | momentarily. | 07:51 |
| 18 | Please read it -- read it -- read it out | 07:51 |
| 19 | loud into the record, please. | 07:51 |
| 20 | A.   "In 2019, I was retained by Marsh Law Firm | 07:51 |
| 21 | PLLC, Carol L. Hepburn, P.S., and Deborah A. Bianco, | 07:51 |
| 22 | P.S.," and in quotes "('Firms') to serve as a | 07:51 |
| 23 | representative for certain of the firms' clients | 07:51 |
| 24 | pursuant to 18 USC 3509(m)(3).  During the summer of | 07:51 |
| 25 | 2019 I met with each of the firms' clients who are | 07:51 |

Page 242

```
 1    plaintiffs in this matter.  Where those plaintiffs      07:51
 2    were minors, I met with them together with their        07:51
 3    parents.  In each of these settings, which were         07:51
 4    conducted separately, I obtained photos of the minor    07:51
 5    or adult individual which were taken during the time    07:51
 6    period of their sexual abuse.  I compared the photos    07:51
 7    with the individuals in front of me to confirm that     07:52
 8    they were of the same person.  These photos were        07:52
 9    then signed by me and the plaintiff or their parent     07:52
10    and returned by me in my files" -- excuse me -- "and    07:52
11    retained by me in my files.  I also reviewed the        07:52
12    government issued identification either of adult         07:52
13    plaintiffs or of their parent of minor plaintiffs."     07:52
14         Q.   The second sentence says you met with each    07:52
15    of the firms' plaintiffs in the summer of 2019; is      07:52
16    that right?                                             07:52
17         A.   Correct.                                      07:52
18         Q.   You testified today that you met several      07:52
19    of these women in December 2019 or January 2020,        07:52
20    correct?                                                07:52
21         A.   That's correct.                               07:52
22         Q.   So that is not the summer of 2019, right?     07:52
23         A.   That is correct.                              07:52
24         Q.   So that statement is false, correct?          07:52
25         A.   Correct.                                      07:52
```

Page  243

```
 1        Q.   The second-to-last sentence says "These        07:52

 2   photos were then signed by me and by the plaintiff       07:52

 3   or their parent and retained in my files."               07:53

 4        Do you see that?                                     07:53

 5        A.   Yes.                                            07:53

 6        Q.   And the prior sentence says "I compared        07:53

 7   the photos with the individuals in front of me to        07:53

 8   confirm that they were the same person."                 07:53

 9        Did I read that correctly?                           07:53

10        A.   Yes.                                            07:53

11        Q.   And so your testimony is by seeing the         07:53

12   childhood picture with the adult, you believe you        07:53

13   had the ability to confirm that they were the same       07:53

14   person.  Am I understanding that's your testimony?       07:53

15        A.   Yes.                                            07:53

16        Q.   Let's turn to the next page.                   07:53

17        Take away the highlight on paragraph 6.              07:53

18   I'm going to go to paragraph 9.  I'm going to            07:53

19   highlight the paragraph.  This is about the at           07:53

20   school series.  Do you see paragraph 9?                  07:53

21        A.   Yes.                                            07:53

22        Q.   And you're saying paragraph 9 reflects the     07:53

23   fact that during your work in San Diego, you found a     07:53

24   picture of Violet -- you found a picture that you        07:53

25   contend is a picture of Violet, a plaintiff in this      07:54
```

Page 244

```
 1   case; is that correct?                             07:54

 2            MS. HEPBURN:  Objection, Counsel.  It's    07:54

 3   not San Diego.  It's San Francisco.                07:54

 4            MR. BALOGH:  Thank you for the correction. 07:54

 5   Let me reframe that question.  It was terrible.    07:54

 6        Q.   What paragraph 9 says is during your      07:54

 7   review of evidence in San Francisco in July of 2020, 07:54

 8   you identified this particular photograph as being 07:54

 9   both child pornography and of Violet, the plaintiff 07:54

10   in this case; is that correct?                     07:54

11        A.   Yes.                                      07:54

12        Q.   And when you described the image, she is 07:54

13   fully clothed, right?  The image doesn't show her  07:54

14   naked in any way, shape or form, right?            07:54

15        A.   If I can have a moment to read the        07:54

16   description.                                        07:54

17        Q.   Take your time.                           07:54

18            (Pause while witness peruses document.)    07:54

19        A.   And can I have the question again, please? 07:55

20        Q.   The question is, she was fully clothed in 07:55

21   the photograph?                                    07:55

22        A.   Correct.                                  07:55

23        Q.   We know from your prior testimony today  07:55

24   that the whitish liquid -- whitish substance in and 07:55

25   of itself is insufficient to bring a photograph    07:55
```

Page 245

```
 1    within the definition of child pornography.  Did I       07:55
 2    understand that testimony correctly?                     07:55
 3         A.   Yes, for that specific photo, but not for      07:55
 4    this one.                                                07:55
 5         Q.   And this photo you claim is child              07:55
 6    pornography because there's an adult penis in the        07:55
 7    foreground not near the child; is that correct?          07:55
 8         A.   That's correct.                                07:55
 9         Q.   And so it's your opinion that the --           07:55
10         MS. HEPBURN:  Objection.  Misstates the             07:55
11    evidence -- misstates the testimony in the               07:55
12    declaration.                                             07:55
13    BY MR. BALOGH:                                           07:55
14         Q.   Was that correct, what I just said,            07:55
15    Mr. Laws?                                                07:55
16         A.   You're going to have to repeat it.  I'm        07:55
17    sorry.                                                   07:55
18         MR. BALOGH:  Can I get a readback of the            07:55
19    question and answer, please.                             07:55
20                   (The record was read by the               07:56
21                   court reporter, as requested.)            07:56
22    BY MR. BALOGH:                                           07:56
23         Q.   So is it your opinion that because there's     07:56
24    a penis in the photograph, that's what makes it          07:56
25    child pornography?                                       07:56
```

Page 246

```
 1        A.    Yes.                                          07:56

 2        Q.    Okay.  I notice in this paragraph, you        07:56

 3   don't set forth your bases for believing it's --         07:56

 4   withdrawn.                                               07:56

 5             The first image says "The image" --            07:56

 6   withdrawn.                                               07:56

 7             The first sentence of the second paragraph     07:56

 8   of 9(a) in this declaration says "The image depicts      07:56

 9   Violet as I recognized her from the photo given to       07:56

10   me by her mother and meeting in person."                 07:56

11             Do you see that?                                07:56

12        A.    Yes.                                          07:56

13        Q.    So does that mean that you remembered         07:56

14   her -- at that occasion you were able to recognize       07:57

15   her from the photo or from your memory?                  07:57

16        A.    Both.                                         07:57

17        Q.    So you could remember meeting Violet, what    07:57

18   she looked like at the time you were looking at the      07:57

19   image; is that right?                                    07:57

20        A.    Yes.                                          07:57

21        Q.    But today you were unable to give             07:57

22   descriptions of where you met her, what she looks        07:57

23   like, or anything of the sort; isn't that correct?       07:57

24        A.    That's correct.                               07:57

25        Q.    And then let's turn to -- withdrawn.          07:57
```

Page 247

| | | |
|---|---|---|
| 1 | Regarding your definition of whether the | 07:57 |
| 2 | picture meets the definition, would you agree that | 07:57 |
| 3 | reasonable minds can differ as to whether this | 07:57 |
| 4 | picture actually constitutes child pornography? | 07:57 |
| 5 | MS. HEPBURN:  Could you read that back, | 07:57 |
| 6 | please?  I didn't get it all. | 07:57 |
| 7 | (The record was read by the | 07:57 |
| 8 | court reporter, as requested.) | 07:57 |
| 9 | THE WITNESS:  No. | 07:57 |
| 10 | BY MR. BALOGH: | 07:57 |
| 11 | Q.   Let's turn to the next page.  At the | 07:58 |
| 12 | bottom of page 5, you begin description of the Jan | 07:58 |
| 13 | Socks series, which you then begin on the top of | 07:58 |
| 14 | page 6.  Do you see where I am on the document? | 07:58 |
| 15 | A.   I do. | 07:58 |
| 16 | Q.   I'm highlighting a section, the top | 07:58 |
| 17 | paragraph on page, where you're describing images | 07:58 |
| 18 | relating to Sierra.  Do you see that portion of the | 07:58 |
| 19 | declaration? | 07:58 |
| 20 | A.   I do, but half of the paragraph is covered | 07:58 |
| 21 | by the video screen. | 07:58 |
| 22 | Q.   Oh.  Your video screen? | 07:58 |
| 23 | A.   Yes. | 07:58 |
| 24 | Q.   Interesting.  I can see it here.  How can | 07:58 |
| 25 | we get it to you?  Do you want to open your own copy | 07:58 |

Page 248

| 1 | of Exhibit 45?  You don't have a copy of Exhibit 45. | 07:58 |
| 2 | How do I get -- | 07:58 |
| 3 | A.   If you just -- if you just grab the top of | 07:58 |
| 4 | the screen and drag it to your left. | 07:58 |
| 5 | Q.   Like that? | 07:58 |
| 6 | A.   Perfect. | 07:58 |
| 7 | Q.   Okay.  How's that? | 07:58 |
| 8 | A.   Even better.  Now I can see -- now I can | 07:59 |
| 9 | see both pages of the document. | 07:59 |
| 10 | Q.   Excellent.  And so looking at that | 07:59 |
| 11 | paragraph, you say you recognize Sierra from meeting | 07:59 |
| 12 | her and from the photo given to you by her parents. | 07:59 |
| 13 | Do you see that? | 07:59 |
| 14 | A.   Yes. | 07:59 |
| 15 | Q.   That paragraph is written by Carol Hepburn | 07:59 |
| 16 | and provided to you; is that correct? | 07:59 |
| 17 | A.   Yes. | 07:59 |
| 18 | Q.   Yet you couldn't remember what Sierra | 07:59 |
| 19 | looked like and describe meeting with her in any | 07:59 |
| 20 | way, shape or form; is that correct? | 07:59 |
| 21 | A.   Correct. | 07:59 |
| 22 | Q.   At the time, in January of 2020, you could | 07:59 |
| 23 | remember her back then; is that right? | 07:59 |
| 24 | A.   Correct. | 07:59 |
| 25 | Q.   Have you suffered any injuries over the | 07:59 |

Page 249

| | | |
|---|---|---|
| 1 | last year that would cause your memory to fail? | 07:59 |
| 2 | A.   No. | 07:59 |
| 3 | Q.   I'd ask you to turn to -- not asking you | 07:59 |
| 4 | to turn to -- that's hysterical.  I ask myself to | 07:59 |
| 5 | turn to page 10 of the exhibit.  I want to ask you | 07:59 |
| 6 | questions about Sally as highlighted here. | 07:59 |
| 7 | Do you see the highlighted section? | 07:59 |
| 8 | A.   I do. | 08:00 |
| 9 | Q.   You say that it's a picture of her | 08:00 |
| 10 | standing in a tub.  Do you see that part, second | 08:00 |
| 11 | sentence? | 08:00 |
| 12 | A.   Yes. | 08:00 |
| 13 | Q.   What makes the focal point of her photo | 08:00 |
| 14 | her pubic or vaginal area? | 08:00 |
| 15 | A.   Because that's where the focal point of | 08:00 |
| 16 | the picture was. | 08:00 |
| 17 | Q.   I thought it was a picture of her complete | 08:00 |
| 18 | body straight on from sideways that we had discussed | 08:00 |
| 19 | earlier.  Isn't that right? | 08:00 |
| 20 | A.   No. | 08:00 |
| 21 | Q.   Okay.  Let's -- you say it's Exhibit 5; is | 08:00 |
| 22 | that right? | 08:00 |
| 23 | A.   Yes. | 08:00 |
| 24 | Q.   Let's go to Exhibit 5. | 08:00 |
| 25 | Exhibit 5 is page -- it's on PDF -- it's | 08:00 |

Page 250

| | | |
|---|---|---|
| 1 | the 58th page of the PDF.  It the picture here on | 08:00 |
| 2 | the right of my screen.  Do you see the picture I'm | 08:00 |
| 3 | indicating that says "Declaration of Kevin Laws in | 08:00 |
| 4 | support of Plaintiffs, MSJ-58"? | 08:00 |
| 5 | A.   I do. | 08:00 |
| 6 | Q.   That's the picture you're referring to, | 08:01 |
| 7 | right? | 08:01 |
| 8 | A.   It is. | 08:01 |
| 9 | Q.   What about -- I know it's blacked out, but | 08:01 |
| 10 | it seems to be a portrait of a child in a bathtub | 08:01 |
| 11 | that shows the entire body as opposed to a focal -- | 08:01 |
| 12 | a focused display of her genitalia; isn't that | 08:01 |
| 13 | correct? | 08:01 |
| 14 | A.   It is a whole photo of her body, but in my | 08:01 |
| 15 | opinion, it is a lewd and lascivious display of the | 08:01 |
| 16 | genitals. | 08:01 |
| 17 | Q.   What makes the focal point of this as | 08:01 |
| 18 | opposed to her face, which we see clearly in the | 08:01 |
| 19 | picture as a normal person standing? | 08:01 |
| 20 | A.   Well, because when I look at the photo, | 08:01 |
| 21 | the first thing I'm not drawn to is her face. | 08:01 |
| 22 | Q.   Okay.  So your definition is because | 08:01 |
| 23 | you're drawn to her -- you're drawn to the genitalia | 08:01 |
| 24 | when viewing the photo, that makes the focal point | 08:01 |
| 25 | of the photo the genitalia. | 08:01 |

Page 251

```
 1              Am I understanding your testimony          08:01
 2    correctly?                                           08:01
 3         A.   That's -- yes.  That's why they call it a  08:01
 4    focal point.                                         08:01
 5         Q.   Would you agree the reason why it's --     08:01
 6    whether this picture reflects a sideways -- a        08:01
 7    sideways photograph of the entire -- the focal point 08:01
 8    being the entire child as opposed to the focal point 08:01
 9    being the genitalia?                                 08:02
10         A.   I wouldn't.                                08:02
11         Q.   And the focal point -- she's doing nothing 08:02
12    with her hands to point to or otherwise indicate     08:02
13    that you should look at -- she's not -- look at her  08:02
14    pubis.  She's not spreading her -- her pubis or      08:02
15    taking any action; she's just standing there.  Is    08:02
16    that correct?                                        08:02
17         A.   She is.  But if I remember correctly, her  08:02
18    legs are slightly spread.                            08:02
19         Q.   You didn't include that in your            08:02
20    description in any place in your notes or in this    08:02
21    declaration, did you?                                08:02
22         A.   Did not.                                   08:02
23         Q.   And -- withdrawn.                          08:02
24              I'm going to turn to page 13 of the        08:02
25    declaration.  I'll give you one second.  Give me a   08:02
```

Page 252

```
 1    moment, if I may.                                08:03
 2              MR. BALOGH:  Okay.  Why don't we do this,  08:04
 3    Counsel.  I think I'm done.  If you can give me a   08:04
 4    final 10-minute break to organize my notes and make  08:04
 5    sure I'm done, I'd appreciate that opportunity.      08:04
 6              MS. HEPBURN:  Sure.  Of course.            08:04
 7              MR. BALOGH:  It's 5:04.  Why don't we read  08:04
 8    us out -- are you going to ask questions, Carol, or  08:05
 9    are we going to adjourn?                             08:05
10              MS. HEPBURN:  I've only got a couple just  08:05
11    based on your last series of questions.             08:05
12              You were also -- you know, we gave you     08:05
13    those invoices several breaks ago that we had, and I  08:05
14    just wanted to remind you, if you were going to ask  08:05
15    questions about those additional invoices, which I   08:05
16    think were from the Sweet Sugar series, and I think  08:05
17    Maggie sent you some from their clients as well.     08:05
18              MR. BALOGH:  I'll take a look at them, and  08:05
19    if I'm interested in asking questions, I will.  I    08:05
20    appreciate that.                                     08:05
21              MS. HEPBURN:  Okay.                        08:05
22              MR. BALOGH:  Let's go off for 10.  Lead us  08:05
23    off when you get a chance, Ms. Ortiz.                08:05
24              THE VIDEOGRAPHER:  This marks the end of   08:05
25    Media Number 7.  The time is 8:05 p.m.  We are off   08:05
```

Page 253

```
 1   the record and we're done recording.              08:05

 2          (Recess.)                                   08:05

 3          (Off record:  8:05 p.m.)                    08:05

 4          (On record:  8:19 p.m.)                     08:05

 5          THE VIDEOGRAPHER:  This marks the           08:05

 6   beginning of Media Number 8.  The time is 8:19 p.m. 08:19

 7   We are on the record.                              08:19

 8          MR. BALOGH:  Thank you, kindly, Ms. Ortiz.  08:19

 9      Q.   Good to see you again, Mr. Law -- excuse   08:20

10   me, Mr. Laws.                                      08:20

11          I have on the screen, that you should be    08:20

12   able to see what's been marked as Exhibit 17.  Do  08:20

13   you see the document, sir?                         08:20

14      A.   I do.                                       08:20

15      Q.   And do you see your signature on page 2?   08:20

16      A.   Yes.                                        08:20

17      Q.   And I'll represent this is the -- we       08:20

18   reviewed all of your other reports that were       08:20

19   produced to us as part of the expert disclosures   08:20

20   except for this one.  And so because we omitted this 08:20

21   one, I'd like to review it with you if I may.  Is  08:20

22   that all right?                                     08:20

23      A.   Yes.                                        08:20

24      Q.   Is it fair to say that on page 1, which    08:20

25   I'm highlighting essentially the same carbon copy  08:20
```

Page 254

```
1    that you included in all the reports of your          08:20
2    forensic exam to give both your background,           08:20
3    experience, and then what you were tasked to do in    08:20
4    this case with respect to the forensic investigation  08:20
5    as well as what your -- your experience and training  08:20
6    that makes you an expert on the child pornography      08:21
7    analysis question.  Is that a fair statement?         08:21
8         A.   Partially, along with my -- along with my   08:21
9    resume.                                               08:21
10        Q.   But it's in every one of your documents.    08:21
11   You begin all of your declarations about your         08:21
12   forensic work with the same page 1 that explains the  08:21
13   history in the case and how we get to what's going    08:21
14   to follow; is that correct?                           08:21
15        A.   That -- that's correct.                     08:21
16        Q.   So let's then focus on page 2.              08:21
17             Page 2 recites that you received sanitized  08:21
18   images from Agent Barfuss in October 2020; is this    08:21
19   correct?                                              08:21
20        A.   Yes.                                        08:21
21        Q.   That's about three months after you did     08:21
22   your forensic exam on-site in San Francisco, you      08:21
23   obtained these materials on October 13th, correct?    08:21
24        A.   Correct.                                    08:21
25        Q.   And you could not, with respect to these    08:21
```

Page 255

| | | |
|---|---|---|
| 1 | images, make an assessment whether they constituted | 08:21 |
| 2 | pornography by viewing them because any of the parts | 08:21 |
| 3 | of it that the agent felt would constitute | 08:22 |
| 4 | pornography, those would be redacted out, correct? | 08:22 |
| 5 | A.   Well, actually, the majority of all the | 08:22 |
| 6 | pictures were redacted, regardless of sexual acts. | 08:22 |
| 7 | Q.   Okay.  So all the pictures were redacted. | 08:22 |
| 8 | And so by looking at the redacted picture, you don't | 08:22 |
| 9 | know whether the picture has sexual content or not | 08:22 |
| 10 | because the photographs were redacted by the agents; | 08:22 |
| 11 | is that fair to say? | 08:22 |
| 12 | A.   Yes.  I'd say if a layperson looked at the | 08:22 |
| 13 | image, they couldn't tell what it was. | 08:22 |
| 14 | Q.   But because all the pictures were | 08:22 |
| 15 | redacted, including ones without sexual conduct, but | 08:22 |
| 16 | based on the redactions, you wouldn't be able -- | 08:22 |
| 17 | even you couldn't differentiate between two redacted | 08:22 |
| 18 | photos without seeing what's behind the redactions; | 08:22 |
| 19 | is that a fair and accurate statement? | 08:22 |
| 20 | A.   Well, not necessarily.  If I recognize -- | 08:22 |
| 21 | if I recognize a specific picture from the | 08:22 |
| 22 | background and some other things, I can, if I'd seen | 08:22 |
| 23 | it before in my work and I knew it was a child | 08:23 |
| 24 | exploitation photo. | 08:23 |
| 25 | Q.   So if you could see one of these redacted | 08:23 |

Page 256

```
 1   photos but remember that you had previously seen it      08:23
 2   either months or years earlier in unredacted form,       08:23
 3   you could base an opinion on that; is that what          08:23
 4   you're testifying to?                                    08:23
 5        A.   Yes.  Would I base a professional opinion      08:23
 6   on it?  No.  But would I say I've seen the               08:23
 7   unredacted version of that, yes.                         08:23
 8        Q.   Okay.  So let's take that piece that you       08:23
 9   wouldn't base a professional opinion on it.  Did you     08:23
10   base any professional opinion in this case based on      08:23
11   your recollection of child pornography photos you        08:23
12   had previously seen or based on photographs that you     08:23
13   saw in San Diego -- in San Francisco in July 2020?       08:23
14             MS. HEPBURN:  Object to form.                  08:23
15             Go ahead and answer if you can.                08:23
16             THE WITNESS:  Did I make a determination       08:24
17   if any of the photos that I had seen in                  08:24
18   San Francisco were child pornography based on having     08:24
19   seen them before?                                        08:24
20   BY MR. BALOGH:                                           08:24
21        Q.   No.  After you left San Francisco, did you     08:24
22   subsequently use your memory to form opinions and        08:24
23   present opinions in this case based on memory, or        08:24
24   did you base your opinions based on your review in       08:24
25   San Francisco, the notes you took on the events --       08:24
```

Page 257

```
 1    of the activities you undertook in San Francisco?      08:24

 2         A.   Only -- only what I've seen and the notes    08:24

 3    that I made while in San Francisco.                    08:24

 4         Q.   Okay.  The last question I have for you      08:24

 5    is -- one of the photographs that Agent Barfuss gave   08:24

 6    you on this occasion was one photograph of Jessica.    08:24

 7    Do you remember that?                                  08:24

 8         A.   Yes.                                         08:24

 9         Q.   And I'm highlighting for you -- I can't      08:24

10    highlight it.  We haven't OCRed this document.         08:24

11              With respect to the one photograph of        08:24

12    Jessica, on this occasion, you provided an opinion     08:24

13    in this report that reads as follows:  "Note:  This    08:24

14    folder contained the same image discovered during my   08:25

15    forensic examination although the angle of the         08:25

16    picture was not sufficient for me to make a positive   08:25

17    identification."                                       08:25

18              Did I read that correctly?                   08:25

19         A.   Yes.                                         08:25

20         Q.   And does that mean that you were not sure    08:25

21    whether this was a picture of Jessica; is that fair    08:25

22    to say?                                                08:25

23         A.   That is fair.                                08:25

24         Q.   Okay.  And last -- withdrawn.                08:25

25              Are there any on page 2 besides that         08:25
```

Page 258

| | | |
|---|---|---|
| 1 | statement?  Did you disclose any opinions on this | 08:25 |
| 2 | page other than that one? | 08:25 |
| 3 | A.  No. | 08:25 |
| 4 | Q.  Finally, this page reflects that the | 08:25 |
| 5 | sanitized photos you received on this occasion, | 08:25 |
| 6 | you're basing your belief that they come from | 08:25 |
| 7 | Mr. How -- from Mr. Curtis's collection because of | 08:25 |
| 8 | what Agent Barfuss said to you, correct? | 08:25 |
| 9 | A.  Correct. | 08:25 |
| 10 | Q.  You didn't schedule a trip to go back to | 08:25 |
| 11 | San Francisco to compare these sanitized versions to | 08:26 |
| 12 | the hard drive versions by comparing hash values or | 08:26 |
| 13 | file names to confirm that those document materials | 08:26 |
| 14 | were found on the media seized from Mr. Curtis; is | 08:26 |
| 15 | that correct? | 08:26 |
| 16 | A.  Not entirely.  You -- you couldn't -- you | 08:26 |
| 17 | couldn't use a hash value on a redacted image. | 08:26 |
| 18 | Q.  Okay.  But you could -- | 08:26 |
| 19 | A.  Actually, sorry, let me rephrase that. | 08:26 |
| 20 | You could, but it would be a totally different hash | 08:26 |
| 21 | value. | 08:26 |
| 22 | Q.  But you could have gone back to San Diego | 08:26 |
| 23 | with -- | 08:26 |
| 24 | MS. HEPBURN:  San Francisco. | 08:26 |
| 25 | MR. BALOGH:  What was that? | 08:26 |

Page 259

```
 1              MS. HEPBURN:  San Francisco.              08:26
 2              MR. BALOGH:  Thank you.  What did I say?  08:26
 3    San Diego?                                         08:26
 4              MS. HEPBURN:  Yeah.                       08:26
 5              MR. BALOGH:  Once you get it wrong, it's  08:26
 6    just like it's an -- thanks, Carol.  I appreciate  08:26
 7    you cleaning up my record for me.  Thank you very  08:26
 8    much.                                              08:26
 9              MS. HEPBURN:  I couldn't help myself.     08:26
10              MR. BALOGH:  I know, and I appreciate it. 08:26
11    Even though you drive yourself crazy by helping me. 08:26
12    I appreciate it, Carol.                            08:26
13       Q.   My last question:  You could have gone     08:26
14    back to San Francisco with these sanitized pictures 08:26
15    in your possession and made direct comparisons to  08:26
16    the media in the federal government's possession to 08:27
17    check their work, so to speak; is that true?       08:27
18              MS. HEPBURN:  Objection.  Speculation.    08:27
19              MR. BALOGH:  You can answer.              08:27
20              THE WITNESS:  Could I?  Yes.              08:27
21    BY MR. BALOGH:                                     08:27
22       Q.   But you chose not to; you didn't believe   08:27
23    it was necessary in your professional opinion; is  08:27
24    that right?                                        08:27
25       A.   That's correct.                            08:27
```

Page 260

```
 1              MR. BALOGH:  Okay.  With that, I will        08:27
 2    thank you, Mr. Laws.  You have been a very gracious    08:27
 3    witness in accommodating my questions.  If            08:27
 4    Ms. Hepburn or you or your colleagues would like to    08:27
 5    ask questions of the witness, I believe it's your      08:27
 6    turn.                                                   08:27
 7              MS. HEPBURN:  Yes.  Just a small issue.       08:27
 8                        EXAMINATION                        08:27
 9    BY MS. HEPBURN:                                        08:27
10        Q.   Mr. Laws, if you would look at your           08:27
11    declaration, which for the record is                   08:27
12    Exhibit Number 45.  Look at the text of that as a      08:27
13    whole.                                                  08:27
14              Can you look at that and tell me if you      08:27
15    recognize in the substance of that declaration any     08:27
16    of your reports that you've previously provided in     08:27
17    this matter?                                            08:28
18        A.   Let me -- let me pull up Number 45.           08:28
19              Okay.  I do not have Exhibit 45.             08:28
20              MR. BALOGH:  Can you mail it to him,         08:28
21    Ms. Hepburn?                                            08:28
22              MS. HEPBURN:  I can try.                     08:28
23              MR. BALOGH:  I can put it on the screen if   08:28
24    you'd like.  Would you like me to do that,             08:28
25    Ms. Hepburn?                                            08:28
```

Page 261

```
 1              MS. HEPBURN:  Oh, that would be so nice      08:28
 2    because I'm not a cohost.                             08:28
 3              MR. BALOGH:  And you have been gracious as  08:28
 4    well, and I'm returning the favor as par for the     08:28
 5    course.                                              08:28
 6              You let me know, Mr. Laws.  I will keep up  08:28
 7    two pages at a time.  And when you'd like me to turn 08:28
 8    the page, you may direct me to do so by saying       08:28
 9    "please turn the page," and I will follow that       08:29
10    directive.                                           08:29
11              THE WITNESS:  Thank you.                    08:29
12              And I do see exhibit marked 45 on the      08:29
13    screen.                                              08:29
14              MR. BALOGH:  Okay.  So read page 1 to      08:29
15    yourself, and when you're ready for page 2, I'll     08:29
16    go -- I'll flip so you can review the entire         08:29
17    document before Ms. Hepburn poses questions to you.  08:29
18              Ms. Hepburn, by the way, you may direct me 08:29
19    too.  I'll play trial director like we were in      08:29
20    trial.  If you want to tell me to turn the page or   08:29
21    focus on something, I'll be the paralegal right now. 08:29
22    Whatever you say.  You're batter up.  I'm just       08:29
23    working for you.                                     08:29
24              MS. HEPBURN:  What an opportunity.          08:29
25              THE WITNESS:  Next page?  Next page?        08:29
```

Page 262

| | | |
|---|---|---|
| 1 | MR. BALOGH:  Hold on.  I'm turning on | 08:29 |
| 2 | lights in this room so I'm in the dark.  It's become | 08:29 |
| 3 | dark here. | 08:29 |
| 4 | Next page.  Here you go. | 08:29 |
| 5 | THE WITNESS:  Next page.  And next page. | 08:30 |
| 6 | And the next page.  And the next page.  Next.  Next. | 08:30 |
| 7 | And I'm good. | 08:30 |
| 8 | MR. BALOGH:  Got it. | 08:30 |
| 9 | BY MS. HEPBURN: | 08:30 |
| 10 | Q.    So, Mr. Laws, the question is, and after a | 08:30 |
| 11 | review again of your declaration, which is | 08:30 |
| 12 | Exhibit 45, at least through those pages up through | 08:30 |
| 13 | page 16, which are the text of the document, do you | 08:30 |
| 14 | recognize any portion of that as being your reports | 08:30 |
| 15 | that you've previously provided? | 08:30 |
| 16 | A.    Yes, those are -- those are portions of my | 08:30 |
| 17 | reports. | 08:30 |
| 18 | Q.    Okay.  And who drafted your reports? | 08:30 |
| 19 | A.    I did. | 08:30 |
| 20 | Q.    Okay.  And when you testified before that | 08:30 |
| 21 | I prepared this declaration, was there any part of | 08:30 |
| 22 | the substance regarding your reports that I drafted | 08:30 |
| 23 | for you? | 08:30 |
| 24 | A.    No. | 08:30 |
| 25 | MS. HEPBURN:  I have nothing further. | 08:31 |

Page 263

| | | |
|---|---|---|
| 1 | MR. BALOGH:  I think we can adjourn for | 08:31 |
| 2 | the day.  I have no further questions as well. | 08:31 |
| 3 | Again, I'll thank the witness for your | 08:31 |
| 4 | time.  We appreciate it very much.  And I think even | 08:31 |
| 5 | though we've spent the time, we still have more | 08:31 |
| 6 | left, but I'm sure everyone is happy to get on with | 08:31 |
| 7 | their evenings. | 08:31 |
| 8 | So why don't we go off the record and then | 08:31 |
| 9 | we can do whatever housekeeping is necessary.  I | 08:31 |
| 10 | think we've covered it all, but we'll close the | 08:31 |
| 11 | loops as counsel, but we don't need to be on the | 08:31 |
| 12 | record. | 08:31 |
| 13 | Ms. Hepburn, do you agree? | 08:31 |
| 14 | MS. HEPBURN:  I do. | 08:31 |
| 15 | MR. BALOGH:  Ms. Ortiz, would you read us | 08:31 |
| 16 | out, please. | 08:31 |
| 17 | THE VIDEOGRAPHER:  Thank you. | 08:31 |
| 18 | Before we go off the record, though, I | 08:31 |
| 19 | just want to confirm video orders. | 08:31 |
| 20 | Mr. Balogh, standard is fine for your | 08:31 |
| 21 | video? | 08:31 |
| 22 | MR. BALOGH:  Yes.  And, please, it's | 08:31 |
| 23 | Balogh, rhymes with shallow. | 08:31 |
| 24 | THE VIDEOGRAPHER:  Balogh, thank you. | 08:31 |
| 25 | Ms. Hepburn, no order for you or anybody | 08:31 |

Page 264

```
 1   else?                                          08:31

 2           MS. HEPBURN:  Not at this time.  Thank  08:31

 3   you.                                           08:31

 4           THE VIDEOGRAPHER:  Thank you.          08:31

 5           And, Ashala, did you want to -- thank you.  08:31

 6           And is everyone ready to conclude now?  08:32

 7           MR. BALOGH:  Yes.                      08:32

 8           THE VIDEOGRAPHER:  Thank you.          08:32

 9           We are off the record at 8:31 p.m., and  08:32

10   this concludes today's testimony given by Kevin J.  08:32

11   Laws.  The total number of media units used was  08:32

12   eight and will be retained by Veritext Legal  08:32

13   Solutions.                                     08:32

14           (At the time of 8:31 p.m. the deposition  08:32

15            was concluded.)                       08:32

16

17

18

19

20

21

22

23

24

25
```

Page 265

```
 1                      J U R A T

 2

 3         I hereby declare I am the deponent in the within

 4    matter; that I have read the foregoing transcript and

 5    know the contents thereof; and I declare that the same

 6    is true of my knowledge except as to the matters which

 7    are therein stated upon my information or belief, and

 8    as to those matters, I believe them to be true.

 9         I declare under the penalties of perjury

10    under the laws of the United States that the

11    foregoing is true and correct.

12

13         This declaration is executed this _____ day

14    of _____, 20___, at

15    _____, California.

16

17

18

19

20         _____

21                    KEVIN J. LAWS

22

23

24

25

                                           Page  266
```

```
 1              CERTIFICATE OF REPORTER

 2       I, ASHALA TYLOR, CSR No. 2436, in and for the State

 3   of California, do hereby certify:

 4       That the foregoing proceedings were taken before me

 5   at the time and place herein set forth; that any

 6   witnesses in the foregoing proceedings, prior to

 7   testifying, were placed under oath; that a verbatim

 8   record of the proceedings were made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further that the foregoing is an accurate

11   transcription thereof.

12       That before the completion of the deposition,

13   review of the transcript was not requested.

14       I further certify that I am neither financially

15   interested in this action nor a relative or employee of

16   any attorney or any of the parties hereto.

17       In compliance with Section 8016 of the Business and

18   Professions Code, I certify under penalty of perjury

19   that I am a Certified Shorthand Reporter with

20   California License No. 2436 in full force and effect.

21   WITNESS my hand this 27th day of January, 2021.

22

23

24

25       Ashala Tylor, CSR #2436, RPR, CRR, CLR
```

Page 267