# EXHIBIT G

# HY MALINEK, Psy.D., Inc.

CLINICAL AND FORENSIC PSYCHOLOGY

337 SOUTH BEVERLY DRIVE #208, BEVERLY HILLS, CA 90212

Tel: 310-551-1345, Fax: 310-388-1454, MALINEK@AOL.COM

11/25/2020

**DECLARATION OF DR. HY MALINEK**

1. I am a clinical and forensic psychologist with 35 years of clinical experience. I have been licensed in California since 1988, have been a member of the Los Angeles Superior Court and multiple other expert panels since 1994, and have conducted well over 5,000 evaluations in both civil and criminal contexts over the years. I am an expert in assessing mental states and emotional injuries, and in this context have evaluated hundreds of individuals in both state and federal courts.

2. I have been a member of multiple expert panels of psychologists and psychiatrists for well over 20 years. In the past I consulted with the State department of Mental Health and supervised and trained psychologists in diagnosis and risk assessment. Since 2010, I have also consulted with the Civil Commitment unit of the U.S. Attorney's Office and have been appointed by federal judges in the east coast in cases involving diagnosis and risk assessment.  I am a Qualified Medical Evaluator (QME) with the Industrial medical Council of California, where I have had considerable experience in assessing emotional injuries and psychiatric disability. I have been recognized as an expert in several states and have testified more than 350 times in both criminal and civil trials. My opinions have been adopted by many state, district, and appellate courts.

3. On 08/10/2020, I was appointed as an expert by the Law Office of Coleman and Balogh, who represent Mr. Curtis in the civil litigation. Mr. Balogh informed me that the plaintiffs allege that the are victims of childhood sexual abuse, and claim that their images have been disseminated on the internet, and further claim that some of those images were possessed by Mr. Curtis; those plaintiffs have filed a lawsuit against Mr. Curtis for his alleged possession of some of their images, which have not yet been identified in their lawsuit.  The Office of Mr. Balogh provided a copy of both the complaint and amended complaint in this case as well as defendant Curtis Notice of Motion to Dismiss the Complaint, the Plaintiff's response to that motion, and the court order denying the motion to dismiss. The Office of Mr. Balogh also provided copies of multiple documents pertaining to Mr. Curtis' prosecution by the United States.  These documents included a copy of the judgment in his criminal federal trial (Case Number CR-16-00510-001 SI) and a transcript of the hearing where he had pled guilty to both possession and transportation of child pornography on 07/13/2017. Finally, I received voluminous records of psychological evaluations and supporting materials pertaining to the assessments conducted by multiple psychologists in this matter, which include their opinions on the plaintiffs' mental states and the harm they have endured as a result of learning that their pornographic images have become available online.

4. The plaintiffs each received a notice from the United States Department of Justice advising that they were victims of his crimes, and have argued through their lawyers that Congress has recognized the harm resulting to children from those who **possess** their images, and has acknowledged that "victims suffer continuing and grievous harm as a result of knowing that a large, indeterminate number of individuals have viewed and will in the future view images of their childhood sexual abuse."

5. Specifically, the complaint in this case alleged that Amy and several other female plaintiffs (several of them minors) "have been and will continue to suffer personal injury by the distribution and possession of child pornography depicting her by persons including Mr. Curtis". It is further alleged that "the permanent harm that she has proximately suffered includes, but is not limited to, extreme and permanent emotional distress with physical manifestations, interference with her normal development and educational progress, lifelong loss of income earning capacity, loss of past and future wages, past and future expenses for medical and psychological treatment, loss of enjoyment of life, and other losses to be described and proven at trial in this matter. The victims in this case have argued that they are entitled to liquidated damages in the amount of $150,000 each, as well as the cost of the action, including reasonable attorney fees and other litigation costs reasonably incurred.

6. Mr. Balogh requested that I review the above documents as well as relevant literature and publications and opine on three issues: 1) Is there evidence that the harm that is experienced by victims of child pornography is uniform? In other words, do all victims of child pornography respond to the knowledge that their images are available online in the same fashion and manifest the same type and level of problems, deficits, and dysfunction in their lives? And 2) Can a victim of child pornography be harmed by an individual without knowing that this specific individual had viewed their images? And 3) Is there a need for an additional and individualized assessment to ascertain the specific and current evidence that any of the alleged victims had been in fact harmed by Mr. Curtis, as opposed to other persons or other events?

7. Review of research on reactions to trauma in general, and traumatic child sexual abuse in particular, suggests that there is no uniform reaction to experiences of trauma and certainly not to the experience of having been a victim of child sexual abuse. While it goes without saying that sexual trauma and being a victim of child pornography is a traumatic event, and that some of these experiences could have long-lasting effects, individuals respond to traumas of sexual exploitation in a variety of ways. Their reaction could vary as a function of the type of abuse, the duration of the abuse, their available supports, the extent to which they have disclosed and dealt with the trauma, their psychosocial backgrounds, and the availability of help. I opine that without examining the individual cases and looking at the victim's history both prior and subsequent to the trauma, and examining evidence of current functional problems, one cannot ascertain whether and how they have been harmed.

8. A victim of child pornography who does not know that her image or images have been viewed by a particular individual could not be harmed by him or her. I offer this opinion given that any harm and any trauma "passes" through either an experiential or cognitive "trajectory" whereby the individual either goes through a specific experience or becomes

    aware of a specific and personal event which involves him or her. Absent prior cognitive/perceptual or experiential "events" harm is unlikely to occur.

    In the following paragraphs I offer additional research supported information and details in support of the opinions offered above.

9. Victimization through child pornography could certainly trigger significant consequences. In many cases, images placed on the internet can never be fully erased or recovered and continue to be passed from person to person indefinitely. Many users of child pornography amass large collections and distribute and trade child pornography.

10. The impact on the victims could vary quite substantially. Many report feelings of shame, unworthiness, anger, and confusion. Some develop somatic and "bodily" problems like headaches and stomachaches. Some victims of child pornography become withdrawn and isolated. Others show symptoms of anxiety, depression, and post-traumatic stress disorder. Still others act out in a variety of ways (substance abuse, anger outbursts). Some victims suffer protracted post-traumatic stress disorder, as well as major depression. Others develop a distorted and unhealthy sexuality, and have difficulty establishing healthy relationships.

11. Still others get involved in risky behaviors including promiscuity, self-mutilation, and even suicidal ideation. Some individuals become ensnared in commercial sexual exploitation. Victims of child pornography can, in some other cases, experience ongoing humiliation and lack of privacy, mostly because they are unable to escape the reach of the images and constantly live with the knowledge that any person, they meet could have viewed the images.

12. Studies have shown that the manner in which children respond to stress and trauma vary as a function of their character, prior developmental experiences, child rearing practices, and both social and environmental factors. Responses to trauma could be suppressed or allowed. Some victims of trauma have available treatment and explore and work through their traumas much more quickly than others depending on their intellectual and emotional resources. Many do not show symptoms at all given their natural resilience and prior learning experiences.

13. Studies that have looked at the complex experience of child pornography survivors have confirmed the impression that reactions among survivors of child pornography vary a great deal. A study by Gewirtz-Meydan, Walsh, Wolak, and Finkelhor, titled "The Complex Experience of Child Pornography Survivors" looked at 133 child pornography victims, used an online survey which included a series of open-ended questions, and queried them about their reactions and experiences. Nearly half of the respondents reported that they felt that the production of sexual images caused specific problems that were different from the problems caused by other aspects of the abuse. Nearly half of the sample worried at the time that people would think that they were willing participants or that people would recognize them. One-third refused to talk about the images, and 22% denied that there were images. The authors offered that the qualitative analysis identified three different distinct themes which emerged from the survivor's perspective as adults.

14. Research has shown that stress and trauma is complex and multivariate. Responses to stress vary with levels of intensity and duration of stressful experiences, and therefore, have shown different effects on the body, the brain, and the individuals. This is especially

important during crucial stages in the development of children and could vary depending on the individual's age at the time of the trauma. The Center on the Developing Child, at Harvard University, has categorized responses to stress from positive and tolerable to toxic, mild, or temporary stress. Researchers differentiate between various levels of stress and have reported that stress related responses have varied as a function of the duration of the stressful event and the availability of protective relationships.

15. It is important to note that children are forced to face things every day that are hard to imagine. Research of Adverse Childhood Experiences (ACE's) has brought into the forefront not only concepts of trauma, but also concepts of resilience and post traumatic growth. Studies have shown that protective factors mitigate lifelong negative impact of traumatic exposure, and that resiliency is the reason that some people bounce back from trauma easily and "beat the odds" and others do not. There are variables that promote the likelihood of a better recovery from traumatic exposure, including the caregiver's healthy psychological functioning, emotional and physical availability, and sensitivity to a child's emotional needs as well as other factors.

16. The concept of resilience has received wide research attention, certainly as it relates to one's ability to preserve balance in times of hardship and adversity, and particularly as it relates to victimology. Multiple studies have shown that individuals, including children, vary in their capacity for resilience. Some may have a specific frame of mind (mind-set) that incorporates a set of principles or attitudes about themselves which further exert a significant impact on their actions and the skills they develop. Their reactions and personal skills have an impact on their mindset, which altogether generates a continuous interactive and dynamic process between the two. Many authors now believe that everyone has the capacity for resilience and in order to develop it one must experience some hardship. In fact, in some academic circles, there is an opinion that resiliency is a distinctive feature of only those individuals who have already experienced some distress and overcome some hardships.

17. An important researcher of resilience has been Amy Werner, who conducted a 30-year study on the residents of a Hawaiian island, which grew up in an environment full of fear, domestic abuse, and alcoholism. Starting from the theoretical concept of a victim as the basis for forecasting the future lives of these children, Warner noted that one might arrive at the simple conclusion that their future lives would be clearly determined by their living circumstances at the time that they reached the age of 20, which primarily implied that they were most likely to carry on living the life of crime, alcoholism, unemployment, and desperation. However, the research has demonstrated that one-third of these children did not fall into such a predicament. In fact, being very good pupils, they embarked on successful careers and described themselves as "competent adults".

18. There are multiple similar examples in the research (and books) of John DeFrain. He and his associates examined a group of 40 adults who were abused in childhood to determine whether the adults had any psychological scars stemming from their childhood which was confirmed by every single respondent. The results showed that 11% of the respondents perceived themselves as people who were barely surviving, while 83% of the respondents asserted that they had overcome the harsh childhood experiences and managed to make a better life for themselves.

19. While being a victim of a child pornography crime could certainly have long-lasting negative effects, there are also studies which have shown that many victims have

demonstrated signs of post-traumatic growth. The concept of post-traumatic growth, like that of resilience, has been extensively researched and refers to the idea that suffering distress and experiences of abuse can, in some cases, yields positive change, again depending on a variety of factors. The term was originally coined by psychologists at the University of North Carolina (Haas, 2015). Variants of the idea have been evident in the groundbreaking research on Positive Psychology by Seligman (1998), as well as Park (2010), which have looked at elements of resilience, psychological health, and positive thinking, and at their impact on how one processes and deals with trauma.

20. Joseph N. Linley, proposed the adversarial growth model, which linked growth with psychological well-being and argued that an individual who is experiencing a traumatic situation can either integrate the traumatic experience into their current belief system, or modify their beliefs based on their current experiences. This model suggests that if the individual positively accommodates the trauma related information and assimilates prior beliefs, psychological growth can take place following adversity. Post-traumatic growth often occurs when individuals adapt to negative sets of circumstances that could engender high levels of psychological distress such as major life crises. Growth does not occur as a direct result of trauma. Rather, it is the individual struggle with the new reality in the aftermath of the trauma that is crucial in determining the extent to which post-traumatic growth can occur.

21. Studies have looked at a variety of predictors of post-traumatic growth and personality and positive change and have shown that some individuals who have been exposed to traumatic experiences have shown greater optimism and satisfaction in their lives. Of course, experiencing traumatic a life event, and certainly the experience of sexual abuse per se, do not automatically lead to post-traumatic growth. Not everyone who experiences a traumatic event will directly develop post-traumatic growth. Rather, an individual's emotional response to the traumatic event, and multiple other factors, will determine whether and how they will cope with the trauma and what the potential consequences or harm would be. Multiple personality factors have been studied including openness, optimism, extroversion/introversion, and many more.

22. The bottom line is that trauma, by definition, while offsetting the individual balance and potentially scarring, does not necessarily have the same impact on everyone, and does not always lead to long-term harm. **It is not the intention of this writer to suggest that victims of child pornography offenses do not experience trauma**. Rather, multiple studies have shown that there is no uniform harm or pattern of reactions, and that the consequences of child sexual abuse and of having pornographic pictures of the individual disseminated on the internet would vary and could take a variety of forms.

23. Given that this is the case, it is certainly crucial that the harm claimed by the victims in this case be examined on a case by case basis. Only by delving into their histories, both prior and subsequent to the trauma could one reliably assess the harm they have suffered as a result of the fact that their images were disseminated through the internet, parcel it out and separate it from the harm they have suffered as a result of the abuse itself (a completely different issue), and consequently assess their need for compensation. Crucial to this assessment would, in my opinion, be a review of the plaintiffs' current life situation, their living situation, their day to day functional ability, their treatment and rehabilitation participation, and their motivation for change. All of these would bear quite substantially on the harm that they have experienced, if any, as well as

the harm that they are likely to experience as a result of having been victims of child pornography.

24. Turning to the second psychological-legal issue, that is, whether individuals who have been victims of child pornography offenses could be harmed by a particular individual without knowing that their images have actually been viewed by him or her, I believe that the actual research that shows that this is the case is scant at best. Indeed, victims of child pornography offenses often express a sense of anxiety about the prospect that someone would recognize them and concomitant feelings of vulnerability, shame, and guilt. At the same time, it is important to note that traumatic experiences and any "harm" does not exist in a vacuum and is mediated by specific individualized events, be it ones that the individuals has directly experienced, or others that they have been exposed to or became aware of.

25. Theoretical conceptualizations of pathological anxiety and theories of emotional processing have supported this notion. Studies have varied in their discussion of the mechanism of emotional processing, however, with some offering that fear and anxiety reactions are activated through associative networks that include information about the feared stimulus or event, escape or avoidance responses and the meaning of the fear (e.g. threat or danger). Others emphasize the "fight or flight" cycle that is often activated when the individual faces a stressful event. Regardless of the mechanism involved, all theories assume that these processes occur when a psychological mechanism is activated, be it cognitively, emotionally, or by some combination of the two. A victim of a child pornography offense cannot be harmed by a specific individual when he does not know him (or her), has never met him, and does not know whether that individual has actually viewed his images online.

26. I conducted a preliminary review of the psychological reports and information for six of the plaintiffs. These included Amy, Jessica, Jenny, Sarah, Maureen, and Mya, and noticed that although they had all claim to have been been victims of sexual molestation, and although they have all been informed that their pornographic images have become available online, substantial individual differences exist between them, and in multiple respects. I note, for example, the rather wide variability in their age at the time of the molestation. Thus, for example, Amy was molested when she was approximately 10 years old, Jenny between the ages of 7 and 9, Maureen between the ages of 2 or 3 and 8, and Mya when she was 8 years old. Certainly, the victims' ages of the victimization (and what the images consequently depict) matters a great deal when one assesses the impact of its ramifications on their long-term functioning and the harm they have suffered.

27. I also note the wide age range of the plaintiffs at the time that they were evaluated. Thus, Mya was 15, Maureen 20, Jenny 22, Jessica 23, Sarah 26, and Amy 31. Perhaps more importantly, substantial differences exist between the plaintiffs when one looks at the identity of the molester, that is, at who they were victimized by. Thus, Amy was victimized by her uncle, Jessica by her father and grandfather, Jenny by her mother's boyfriend, Sarah by her father and grandfather, Mya by her father, and Maureen by a man who had lived with her family at the time.

28. The identity of the molester plays a significant role in the impact of the molestation on individual's well-being and adjustment. Multiple studies in victimology that have looked at the relationship between the criminal and his victim and the sociology of crimes have looked at the criminal-victim dyad, and have emphasized the importance of considering

them together and looking at various victim characteristics that may have played a role in their victimization. Most noteworthy in this regard are studies by Hans Von Hentig (1948), who was among the first researchers to have developed a specific and detailed categorization of victims. This researcher has, in fact, developed 13 different categories of victims based on their propensity for victimization (for example, young victims, old victims, immigrant victims, mentally defective victims, etc.).

29. Studies by Benjamin Mendelsohn (1977) and Stephen Schafer (1968) have further explored the relationship between victims and those who victimize them, classified victims based on their potential contribution to the crime, and have offered a typology of victims based on the dynamics of the victimization. Dr. Schafer offered seven categories of victims (including unrelated victims, biologically weak victims, minorities, depressed victims, etc.). The great variability in the identity of the molester and their relationship with the victims in this case is certainly expected to have differentially influenced their reaction not only to the molestation but also to their subsequent discovery that their images have become available online.

30. One notes that all of the victims in this matter have argued that at least part of the harm they have experienced is related to the fact that they could be publicly recognized because their pornographic images have become available online. Interestingly, social media searches have revealed that Amy, Jessica, Jenny, Sarah, Maureen, and Mya, have all established Facebook presence, where some share both pictures and life histories. Their decision to establish presence on Facebook can be viewed as inconsistent with their claims regarding fears and anxiety about being recognized. I note, for example, that plaintiff Sarah has Facebook, Instagram, and Twitter accounts, where she has posted videos of marijuana use and modeling photographs of herself. Perhaps even more interesting, her husband's Facebook account has a photograph of Sarah topless from behind.

31. Review of the histories and psychological reports prepared in connection with this litigation amplifies the importance of examining the impact of multiple, unrelated, but important life events, which quite possibly have differentially affected their adjustment and current functioning. I note, for example, that Amy has suffered a DUI in 2014, and that Amy sought protection for herself and her son, Joseph, from her former boyfriend, who was incarcerated at the time, by a restraining order between 2010 and 2013. It would certainly be important to examine the role that alcohol use or abuse have played in her life and its' impact on her emotional functioning. The same goes for the court's decision to approve a temporary restraining order in her case.

32. I also note that Jessica may have experienced similar difficulties and legal challenges give that at one point in 2015, her children were placed in foster care. These "stressors" are certainly important to explore as they are often associated with significant emotional concomitants which have no relationship to her current claim but still impact her emotional functioning. While some may be related to the plaintiff's earlier victimization and/or discovery that her pornographic images have become available online, that link is not "automatic" and requires further exploration and verification.

33. The unique impact and contribution of medical challenges some of the victims have reportedly experienced warrants further exploration and individual study. Thus, for example, Sarah has reportedly been diagnosed with fibromyalgia, a chronic pain disorder. Patients with fibromyalgia often suffer from significant pain and disability as well

as emotional problems. The contribution of this diagnosis to her mental state and current functioning, separate and apart from the harm she alleges to have suffered in connection with this case, is certainly important to examine and parcel out.

34. Examination of the specific complaints and symptoms the plaintiffs in this case have experienced as a result of finding out that their pornographic images have become available online have also revealed significant variability. Thus, for example, Jessica reported she has been diagnosed with a seizure disorder, Jenny described difficulties going to work, and Sarah complained of frequent numbness. Maureen, who reportedly underwent significant abuse between the ages of 2 and 8 had done well in school. According to Dr. Green's report ,"during her elementary school years, even with the sexual victimization and the general chaos at home, Maureen still had managed to do well in school and even viewed school as a haven in many respects." Dr Green noted that her performance on a national standardized test indicated that she had met standards in reading and writing and exceeded standards in math when compared to national norms.

35. In his 12/18/17 report, Dr. Green noted that Maureen "was cooperative, alert, spontaneous, and responsive to questions. She was able to be goal-directed, but also demonstrated cognitive flexibility in the manner in which she handled the flow of the evaluation". He noted that "she is very articulate, able to express herself well." While he noted changes in her facial expressions "at times when she was mildly lost in inner thoughts, sadness, fear, and anxiety" he" also acknowledged that her judgment is intact and that her thought processes are intact and unimpaired.

36. Perhaps more importantly, the same evaluator noted that a significant additional stressor in Maureen's case, and that is, that at the age of 13, Maureen was injured in a serious motor vehicle accident "which resulted in, among other injuries, those which required significant medical interventions, including surgeries, skin grafts, and extensive physical therapy." The evaluator noted further that "one of the residual effects was moderate to severe subjective pain for a number of years", and that "adding to the motor vehicle accident sequelae, the MVA was caused by one of her best girlfriends who has falsely claimed that Maureen had been the driver of the 4-wheeler that tipped over." The evaluator noted that "in the accusation and sides taken that followed, she (Maureen) became more of a pariah to the group of 'friends' who aligned with the teen driver of the vehicle."

37. A very different clinical picture has been presented by Mya, who was evaluated on 02/14/17 and 07/29/19, and whose original victimization by her father took place when she was 8. Contrary to what one would expect, Mya was, according to the report by Marsha Hedrick, Ph.D., "an excellent student". The evaluator noted her impression that "it seems evident that Mya has coped with the turmoil in the household by immersing herself in academic achievement and submerging feelings of depression and fear." Dr. Hedrick went on to suggest that "her motivation to achieve is a socially adaptive way of coping, but it allows her to avoid underlying emotional issues and is unlikely to be a successful way of managing in the long-term, though she described problems with sleep and migraines that are apt to be stress related, as well as repetitive thoughts and anxiety". Interestingly, Dr. Hedrick noted her impression that "these symptoms may not be specifically trauma related".

38. At the risk of sounding repetitive, I wish to emphasize that the purpose of the above paragraphs and the examples I have reviewed and commented on is not to dampen the

credibility of the symptoms alleged by the plaintiffs in this case, but rather to suggest that responses to trauma are not uniform but rather heterogeneous and multivariate. I opine that one must consider the impact of multiple variables while assessing the harm claimed by the victims in this case, and that even a preliminary review of the reports presented by psychologists who examined the victims strongly suggests that there is no way to assess the harm claimed by the victim without further individualized assessments, and that the clinical picture is not uniform and depends on multiple variables.

In summary, a preliminary review of the reports presented on six of the nine victims, and review of the literature on the impact of sexual trauma confirms the impression that even though the plaintiffs in this case had all undergone significant trauma, there exist multiple differences between them in numerous respects (historical, current age, age at the time of the abuse, age at the time they found out that the pictures had been available online, medical status, identity of the perpetrator, legal history, diagnosis, and reported symptoms) which clearly highlight the importance of additional and individualized inquiry.  While trauma

Respectfully Submitted,

HY MALINEK, Psy.D.
Licensed Psychologist
License# PSY 10667

**BIBLIOGRAPHY**

Gewirtz-Meydan, Walsh, Wolak, & Finkelhor (2018), "The Complex Experience of Child Pornography Survivors", Journal of Child Abuse and Neglect, 80, 238-248

Haas Michaela (2015), Bouncing Forward: Transforming Bad Breaks into Breakthrough, Atria/Enliven, ISBN 150111512X

Joseph S, PA (2005), 'Positive Adjustment to Threatening Events: An Organismic Valuing Theory of Growth Through Adversity". Review of General Psychology, 9(3), 262-280

Linely PA, Joseph S (2004)." Positive change following trauma and adversity; a review", Journal of Traumatic Stress, 17(1), 11-21

Mendelsohn, B. (1976), Victimology and Contemporary Society's Trends, Victimology, 1 (2)8-28

Park, CL (2010), "Making sense of the Meaning literature: an integrative review of meaning making and its effects on adjustment to stressful life events", Psychological Bulletin, 136 (2), 257-301

"Resilience: A Universal Capacity" http://wested.org/online_pubs/resliencey/resiliency.chap1.pdf

Seligman Martin E P (1998), Building Human Strength: Psychology's Forgotten Mission, APA Online, Vol 29, No 1

Schafer, S (1977), Victimology: The victim and his criminal, Reston Publishing Company

Von Hentig, H (1948), The criminal and his Victim: studies in the sociobiology of crime, New Haven, Yale University Press,

Werner, E and Smith R (2011) Journeys from Childhood to Midlife" Risk resilience and Recovery, NY, Cornell University Press